## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

DANIEL GUMNS, MICHAEL VIDEAU, TREVON WILEY, IAN CAZENAVE, REGINALD GEORGE, LIONEL TOLBERT, OTTO BARRERA, KENTRELL PARKER, MICHAEL ROBINSON, JULIUS ALLEN, ERNEST ROGERS, ALFOANSO GARNER, BRADLEY WINTERS, KENDRICK WILSON, and JAMES HUGHES, on behalf of themselves and all similarly situated individuals,

Plaintiffs,

v.

JOHN BEL EDWARDS, in his official capacity as Governor of the State of Louisiana; LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS; JAMES LEBLANC, in his official capacity as Secretary of the Department of Safety and Corrections; JOHN MORRISON, in his official capacity as Medical Director of the Department of Safety and Corrections; LOUISIANA DEPARTMENT OF HEALTH; and STEPHEN R. RUSSO, in his official capacity as Interim Secretary of the Louisiana Department of Health,

Defendants.

CIVIL ACTION NO.

CLASS ACTION

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................4

JURISDICTION AND VENUE ....................................................................................7

PARTIES ......................................................................................................................8

FACTUAL ALLEGATIONS ......................................................................................18

I.     COVID-19 Is a Serious and Deadly Global Pandemic That Threatens the Lives of Louisiana's Incarcerated Population...........................................................................18

     A.     COVID-19 Is Particularly Severe in Louisiana and Has Caused a Public Health Emergency.................................................................................................22

     B.     Incarcerated People are Especially Vulnerable to COVID-19 .....................23

     C.     DOC Is Ill-Prepared to Provide Adequate Treatment to Individuals with COVID-19, and LSP Especially So ..............................................................27

II.     The DOC's Insufficient Response to COVID-19 Places the Putative Class at a Substantial Risk of Serious Harm by Increasing the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment.......................................................................................31

     A.     Defendants Have Either Sought to Obscure Their Plans for COVID-19 from the Public, Their Patients, and Advocacy Groups—or There Is No Comprehensive Plan ...................................................................................31

     B.     The Skeletal Plans Provided by DOC, Including the Flu Regulation and Flu Coop Plans, Do Not Provide Appropriate Guidance to Louisiana Prisons...............33

     C.     As A Result of Improper Guidance and Oversight, People Are Receiving Compromised Care and Are Living in Dangerous Conditions .....................36

III.     The DOC's LSP Transfer Plan Places the Putative Class at a Substantial Risk of Serious Harm by Increasing the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment and by Unnecessarily Subjecting the Vulnerable LSP Population to an Increased Risk of Transmission ....................................................................................37

     A.     The DOC's LSP Transfer Plan Increases the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment ..............................................39

          i.     LSP's Remote Location Ensures that Patients Cannot Be Quickly Transported to Hospitals ...............................................................43

          ii.     LSP's Camp J Is Notoriously Unfit for Housing even Healthy Individuals ..49

B.    The DOC's LSP Transfer Plan Unnecessarily Subjects A Vulnerable Population to an Increased Risk of Transmission ..................................................................56

IV.    Defendants' Plans Place All Incarcerated Patients at Risk, Whether They Are Housed at DOC Facilities or Local Facilities and Whether They Are Pre-trial Detainees or Post-Trial Prisoners ..........................................................................................................60

A.    Defendants Have Obligations to People Incarcerated in Parish Prisons and Jails .....60

B.    Risk to People in Pre-Trial Detention ........................................................................62

CLASS ACTION ALLEGATIONS ........................................................................................63

V.    The Plaintiff Class and Subclasses ........................................................................................63

VI.    Rule 23(a) Factors ................................................................................................................64

C.    Numerosity — Fed. R. Civ. P. 23(a)(1) ....................................................................64

D.    Commonality — Fed. R. Civ. P. 23(a)(2) ..................................................................64

E.    Typicality — Fed. R. Civ. P. 23(a)(3) ......................................................................65

F.    Adequacy — Fed. R. Civ. P. 23(a)(4) ......................................................................66

G.    Rule 23(b)(2) ............................................................................................................66

H.    Rule 23(b)(1)(A) ......................................................................................................67

CLAIMS FOR RELIEF ..........................................................................................................68

I.    42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19 (Subclass I) (Eighth Amendment) (Defendants Edwards, DOC, LDH, LeBlanc, and Russo) ..................................................................................................................................68

II.    42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19 (Subclass II) (Fourteenth Amendment) (Defendants Edwards, LDH, and Russo) ...........69

III.    42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Created by The DOC's LSP Transfer Plan (Subclass II) (Fourteenth Amendment) (Defendants Edwards, DOC, LDH, LeBlanc and Russo) ..........................................................................................70

PRAYER FOR RELIEF ..........................................................................................................71

**CLASS ACTION COMPLAINT**

On information and belief,

**INTRODUCTION**

1.      COVID-19 is a deadly global pandemic caused by a novel coronavirus that has infected over 1.8 million people and killed over 117,500 worldwide in the four months between when it began to spread in Wuhan, China, and the date of this filing.[1] Louisiana is among the hardest hit states in the United States, with over 20,000 confirmed cases and nearly 1,000 deaths.

2.      Prisons and jails are congregate settings where COVID-19 can spread rapidly. Within the two weeks since the first positive COVID-19 case was identified in a Louisiana prison, 55 incarcerated individuals in six of the state's eight prisons and 45 staff working in seven of those eight prisons have tested positive for COVID-19, and one staff member has died. These numbers likely represent just the tip of the iceberg in terms of infections given the lack of available testing and the fact that many people are asymptomatic.

3.      The Centers for Disease Control ("CDC") issued an Interim Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities ("CDC Guidance").[2] The CDC Guidance provides, among other things, that correctional and detention facilities should coordinate closely with their local public health departments, facilitate social distancing wherever possible,  and restrict transfer to and from other facilities or jurisdictions unless necessary. Individuals with COVID-19 must be carefully monitored and transferred to the nearest hospital if they decompensate.

---

[1]    Coronavirus Resource Center, JOHNS HOPKINS UNIVERSITY, *available at* https://coronavirus.jhu.edu/map.html (last visited Apr. 13, 2020).
[2]    CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("CDC Guidance").

4.    The Louisiana Department of Public Safety and Corrections ("DOC") has adopted and is implementing a COVID-19 management plan that is inconsistent with the CDC Guidance and places the lives and health of incarcerated individuals at substantial risk of serious harm.

5.    The Louisiana Department of Health ("LDH") is responsible for the development and provision of health and medical services for the prevention of diseases, such as COVID-19, for the residents of Louisiana, including the standards of health and decency for all prisons and jails.

6.    Specifically, in the midst of this pandemic, the DOC is implementing a dangerous plan to transfer COVID-19 patients from prisons and jails in every part of the state and concentrate them at the remote and notoriously inhumane Camp J at the Louisiana State Penitentiary ("LSP").[3] By crowding large numbers of COVID-19 patients into a facility far removed from hospitals and adequate medical staff and where social distancing is impossible, the DOC is implementing a deadly course of action that controverts not only public health recommendations but also basic common sense. If the DOC is permitted to carry out this LSP transfer plan, it will likely result in the death of dozens—if not hundreds or thousands—of people.

7.    Perhaps even more disturbingly, the State of Louisiana through the LDH has set up the Medical Monitoring Station (MMS) with hundreds of beds ready and able to take non-acute COVID-19 patients. This facility has appropriate personal protective equipment, trained medical professionals of all qualifications, and appropriate quarantine facilities, yet the DOC has chosen not to move incarcerated patients there.

8.    Over the past several weeks, the United States has experienced the onslaught of an unprecedented viral pandemic that has brought "business as usual" to a complete halt—confining people to their homes, shuttering businesses, emptying the streets, curtailing social gatherings, and overwhelming hospital systems. Following guidance from the Centers for Disease Control and, in

many cases, orders from their state governments, many of the country's residents wait isolated in their homes, leaving only for essential purposes, desperately hoping to avoid contracting the disease. Those who are unable to avoid exposure face the firsthand reality of a highly contagious respiratory illness for which there is no cure. As of April 13, 2020, 560,891 people in the United States had tested positive for COVID-19, and 22,861 had died from the illness. Both the number of confirmed cases and the number of deaths continue to rise rapidly.[4]

9.      While the Louisiana government encourages people in most communities to promote and practice social isolation and heightened hygiene measures to protect themselves from the coronavirus and its potentially lethal symptoms, it affords its incarcerated communities no such option. Incarcerated individuals live in close and crowded quarters, have limited access to soap, are unable to augment the cleaning practices in their living environments of their own volition, and cannot make their own medical decisions. They are, in every sense, at the mercy of the State.

10.     The DOC has over 31,600 within its immediate custody, and another 15,000 people are detained pretrial in Louisiana. All are at risk of being transferred to LSP under the DOC's plan.[5] This population is especially vulnerable to outbreaks and disproportionately likely to suffer severe cases of COVID-19 if infected. These risks are compounded by inadequacies in the DOC's medical system overall and at LSP in particular. Nevertheless, the DOC has conceived and is implementing a plan to concentrate pre-trial and post-conviction COVID-19 patients from every part of the state at LSP, creating a substantial risk of serious harm both for the COVID-19 patients who are transferred and for the people already incarcerated at LSP. The DOC's LSP transfer plan will place COVID-19 patients at a remote facility that is over an hour away from the nearest hospital capable of treating

---

[3] In addition to the Camp J location, Patients are also set to be moved to Allen Correctional, and women who test positive are being moved to Elayn Hunt Correctional Facility.
[4] Coronavirus Resource Center, *supra* n.1.
[5] DOC Briefing Book at 18 (Dec. 31, 2019), *available at* https://doc.louisiana.gov/about-the-dpsc/annual-statistics/.

patients who need medical intervention of any kind, and LSP itself is indisputably incapable of providing such treatment. Moreover, a federal judge recently indicated that the medical care system at LSP is constitutionally deficient in at least some respects, and no injunctive remedies to alleviate its deficiencies in medical care, even without regard to a global pandemic, have yet been ordered. Under the circumstances, COVID-19 patients who develop life-threatening symptoms at LSP therefore face an unnecessarily increased risk of death.

11.     Equally troubling, LSP has disproportionately high numbers of elderly people and people with chronic pre-existing conditions that make them especially at risk of developing serious COVID-19 symptoms and death. Thus, the LSP transfer plan needlessly exposes an extremely vulnerable population of people to a high risk of viral outbreak in a carceral setting where social distancing is impossible. In addition to exposing these vulnerable people to COVID-19, the addition of dozens and likely hundreds of COVID-19 patients will also strain LSP's already broken medical system, and therefore impede the delivery of crucially needed health services to patients who are elderly and/or require treatment for chronic medical conditions that are unrelated to COVID-19. There is simply no way that LSP can adequately provide care to its current population while also dealing with an added concentration of COVID-19 patients from other facilities.

12.     Defendants' COVID-19 response constitutes deliberate indifference to the substantial risk of serious harm threatening Plaintiffs and similarly situated people. Plaintiffs, on behalf of themselves and the putative class they seek to represent, seek declaratory and injunctive relief against all Defendants to prevent the continued violation of their constitutional rights.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

15.     Plaintiff Kendrick Wilson is a pretrial individual who was previously being held in isolation at East Baton Rouge Prison's Unit 2. Mr. Wilson was tested for COVID-19 at approximately two o'clock in the morning on April 9. Before being tested, Mr. Wilson had a fever of 102.5 degrees. He has been suffering from body pains, a cough, and congestion. He was told he had tested positive on April 10 or April 11. He did not want to be transferred to Camp J at LSP because of the conditions and lack of access to medical treatment. Mr. Wilson was transferred against his will to Camp J on April 11 at approximately 5:00 p.m. in the evening. At Camp J he is being housed in an open dorm with approximately 39 other people. There is no physical isolation from the other patients. A lot of people are coughing and there are some patients hooked up to IVs or oxygen masks. There are two nurses who check on him once or twice a day. He was given Tylenol and sinus medication for his body pains and other symptoms.

16.     Plaintiff Julius Allen is a pre-trial individual being held in isolation at East Baton Rouge Parish Prison's Unit 2. Mr. Allen was tested for COVID-19 at approximately two o'clock in the morning on April 9 and is awaiting his results. Prison officials have informed him that he will not be told his test results but that he will be transferred to LSP if his test result is positive. He is suffering from fever, severe body aches, difficulty breathing, weakness, disorientation, and diarrhea. Mr. Allen also suffers from several pre-existing medical conditions, including diabetes, hypertension, bronchitis, and high cholesterol, and is therefore at a high risk of developing severe symptoms if he is in fact infected with the coronavirus, as noted by the CDC.[6] Mr. Allen is concerned about his ability to access medical treatment if he is transferred to Camp J at LSP. Mr. Allen is only permitted

to use the phone during limited periods of the day to update his wife and daughters on his medical condition. Mr. Allen is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

17.     Plaintiff Alfoanso Garner is a federal inmate being held at East Baton Rouge Parish Prison. He was tested for COVID-19 the morning of April 5, and his test came back positive on April 8. He was told that he was going to be transferred, although he was not told where. The other inmates he was being held with in medical isolation have been transferred to another facility but he does not know where. Mr. Garner is suffering from body aches, cold sweat, and a fever. He is concerned about his ability to access medical treatment if he is transferred to Camp J at LSP. Mr. Garner is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

18.     Plaintiff Ernest Rogers is a pre-trial individual being held in isolation at East Baton Rouge Parish Prison's Unit 2. Mr. Rogers was tested for COVID-19 at approximately two o'clock in the morning on April 9 and is awaiting his results. He is 65 years old and has hepatitis C, liver disease, and high blood pressure, and is therefore at a high risk of developing severe symptoms if he is in fact infected with the coronavirus, as noted by the CDC.[7] Mr. Rogers has been suffering from a cough, a sore throat, and a fever. He has previously been incarcerated at LSP and was housed at Camp J. He is desperate not to return there because of the terrible conditions and the lack of access to medical treatment. Mr. Rogers is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

19.     Plaintiff Bradley Winters is a pre-trial individual being held in isolation at East Baton Rouge Parish Prison's Unit 2. Mr. Winters was tested for COVID-19 on the afternoon of April 9

---

[6] People Who Are at Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 13, 2020).
[7] *Id.*

and is awaiting his results. He was housed in a cell with people who had tested positive for COVID-19 while he was waiting for his test results. He has had increasingly bad headaches and suffers from anemia and ADHD. He has not been told if he will be transferred to Camp J if his test results are positive, but he is concerned about being transported away from medical treatment that he may need.  Mr. Winters is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

20.    Plaintiff James Hughes is a pre-trial individual being held in quarantine at East Baton Rouge Parish Prison. He had not yet been tested for COVID-19 as of April 9, 2020, but he has been suffering from a cough, and he has chronic obstructive pulmonary disease ("COPD"), an inflammatory lung disease that causes obstructed airflow from the lungs. Mr. Hughes has been in contact with three or four people who have since tested positive, including Mr. Shawn Freeman, who slept across from him and who was transferred to Camp J after testing positive and was soon thereafter taken back to Our Lady of the Lake Hospital in Baton Rouge to be put on a ventilator. Mr. Hughes does not know if Mr. Freeman is still at the hospital or if he has died. Mr. Hughes is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

21.    Plaintiff Daniel Gumns is an individual in DOC custody housed at LSP's Camp D in the Building 1 dormitory where he lives in close quarters with approximately 80 other people and cannot practice social distancing, as recommended by the CDC and other public health official authorities.[8] Mr. Gumns is an epileptic and suffers from grand mal seizures. He also suffers from asthma,[9] which is triggered when he has seizures and sometimes leaves him unable to breathe

---

[8] Coronavirus Disease 2019 (COVID-19): How to Protect Yourself and Others, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Apr. 13, 2020).
[9] People Who Are at Higher Risk for Severe Illness, CDC, *supra* n.6 (listing "People with Asthma" among those at higher risk).

without medical support. He has had three seizures since being transferred to LSP on February 21, 2020. Mr. Gumns' most recent seizure occurred in or around April 2, 2020. Mr. Gumns is concerned that bringing COVID-19 patients to Camp J increases the risk that he will be infected. Because of COVID-19's effects on the lungs, Mr. Gumns fears that if he is infected, he will die or suffer from serious medical complications. He does not believe that Camp J will be prepared to meet his medical needs if he is taken there and does not think he will be taken to a hospital in time to receive treatment. Mr. Gumms has 18-20 months left in his sentence and could be eligible for probation within the next year. Mr. Gumns is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

22.     Plaintiff Michael Videau is an individual in DOC custody housed at LSP's Main Prison in the Spruce 4 dormitory in close quarters with approximately 80 other people and cannot practice social distancing. He has not been given soap or bleach and is unable to practice the hygiene and disinfectant measures recommended by the CDC. Mr. Videau is 63 years old and is therefore at a high risk of developing severe symptoms if he is infected with the coronavirus, as noted by the CDC and medical experts.[10] He also suffers from a multitude of pre-existing conditions that put him at high risk if he contracts the virus, including leukemia, high blood pressure, diabetes, arthritis, and acute pneumonia.[11] Mr. Videau takes at least eight different medications per day. He has had to be hospitalized approximately five times in the past nine years and required oxygen on at least one of those occasions. He is concerned that bringing people from across the state to Camp J increases the risk that he will be exposed to the coronavirus and potentially suffer severe complications or death if

---

[10] How to Protect Yourself and Others, CDC, *supra* n.8 (noting that older adults are at higher risk for severe illness).

[11] Groups at Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (noting that "people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19").

he catches the virus. Mr. Videau is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

23.    Plaintiff Lionel Tolbert is an individual in DOC custody housed at LSP's Ash 3 dormitory in close quarters with approximately 80 other people and cannot practice social distancing. He has not been given soap or bleach and is unable to practice the hygiene and disinfectant measures recommended by the CDC.[12] Mr. Tolbert is 64 years old and is therefore at a high risk of developing severe symptoms if he is infected with the coronavirus, as noted by the CDC and medical experts.[13] Mr. Tolbert is very concerned that by transferring COVID-19 patients into Camp J, the DOC is putting him at risk, given his underlying health conditions of coronary artery disease and heart and vascular disease. He has a history of cardiovascular disease and saw a cardiologist most recently in late 2019. He expects that he will not be able to be transported for his regular medical check-ups to manage his multiple chronic medical conditions until the risk of COVID-19 subsides. Mr. Tolbert is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

24.    Plaintiff Ian Cazenave is an individual in DOC custody housed at LSP's Ash 2 dormitory, which is a medical dormitory partially reserved for persons with acute medical needs. Mr. Cazenave lives in close quarters with approximately 80 other people and cannot practice social distancing. Mr. Cazenave suffers from advanced sickle cell disease and has suffered from leg ulcers and other common complications related to sick cell disease, which may include heart disease, lung disease, retinal disease, and other illnesses. Mr. Cazenave is at higher risk for severe illness if he contracts COVID-19 as respiratory viruses are known to cause severe complications—including higher rates of hospitalization, acute chest syndrome, and need for mechanical ventilation— for people with sickle cell disease. Mr. Cazenave needs his dressings changed at least every other day.

---

[12] *Id.*

He ordinarily goes to the Acute Treatment Unit for this, but because of the pandemic, nurses have been coming to his dormitory amidst the lockdown from the hospital to change his dressings. Mr. Cazenave is worried about COVID-19 patients being housed at Camp J in part because any medical or custodial staff going back and forth between Camp J, or having any contact with the staff at Camp J, and then coming into dormitories exposes the population to the virus. Mr. Cazenave expects that he will not be able to be transported for his regular appointments to the wound clinic and hematology clinic, which are already overdue, until the risk of COVID-19 subsides. Mr. Cazenave has difficulties communicating the status of his healthcare needs with family members, his daughter in particular, during this time. Mr. Cazenave is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

25.    Plaintiff Otto Barrera is an individual in DOC custody housed at LSP's Ash 2 dormitory, which is a medical dormitory partially reserved for persons with acute medical needs. Mr. Barrera lives in close quarters with approximately 80 other people and cannot practice social distancing. He has a prescription for a mechanical soft diet and is worried about his ability to receive this diet until the risk of COVID-19 subsides. Mr. Barrera is worried about COVID-19 patients being housed at Camp J because of the high risk that he will become infected if someone in Ash 2 contracts the virus. Last year, there was an outbreak of a rash that may have been scabies in Ash 2 and a large percentage of people were infected. Mr. Barrera knows that once something contagious gets into the dorms, it is impossible to stop it from spreading widely. Mr. Barrera is eligible for release within the next year; his release date is in February 2021, with a work release date in August 2020. Mr. Barrera is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

---

[13] People Who Are at Higher Risk for Severe Illness, CDC, *supra* n.6.

26.    Plaintiff Michael Robinson is an individual housed at LSP's Ash 2 dormitory, which is a medical dormitory partially reserved for persons with acute medical needs. Mr. Robinson lives in close quarters with approximately 80 other people and cannot practice social distancing. He has had liver disease and hepatitis C for the past twenty years. Mr. Robinson was picked up on a parole violation in Morehouse Parish and put in jail there, where he then broke his hip and required medical treatment. He was taken to Glenwood Regional Medical Center for surgery and then transported to LSP upon release from the hospital, despite the fact that he has not yet been to court or been sentenced for his parole violation. When he was first brought to LSP, Mr. Robinson was quarantined on the hospital ward for approximately 14 days, where he could have exposed the other ward patients—many of whom are at-risk if they contract coronaviruses because they are elderly or acute care patients—to the coronavirus if he picked it up before his arrival at LSP. Mr. Robinson is worried about COVID-19 patients being housed at Camp J because of the high risk that he will become infected if someone in Ash 2 contracts the virus. Mr. Robinson is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

27.    Plaintiff Kentrell Parker is an individual in DOC custody housed on LSP's Nursing Unit 2, an infirmary for patients requiring long-term nursing care and hospice patients. Mr. Parker is a quadriplegic and has a catheter that requires regular care. Mr. Parker takes blood pressure medication and until recently used a tracheostomy tube to help with breathing. Mr. Parker requires assistance in every single activity of daily living, including but not limited to bathing, eating, taking medication, and being turned several times a day. Mr. Parker has a history of decubitus ulcers and is currently developing an ulcer and is need of medical attention. He is concerned that transferring COVID-19 patients to Camp J will prevent LSP from being able to meet his daily needs and need for medical treatment. Mr. Parker is also worried about COVID-19 patients being housed at Camp J in part because any medical or custodial staff going back and forth between Camp J, or having any

14

contact with the staff at Camp J, and then coming onto the infirmary, exposes that vulnerable population to the virus. It is Mr. Parker's understanding that the nurse practitioner who typically provides his medical care and the medical care for others at the infirmary is working at Camp J now. Mr. Parker is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

28.     Plaintiff Reginald George is an individual in DOC custody housed in the cell blocks at LSP's Transition Unit, which serves as a transitional housing area for individuals with severe mental illness or developmental disabilities, including patients like Mr. George who are in wheelchairs. Mr. George suffers from multiple chronic medical conditions, including hypertension, prostate cancer, hepatitis C, and HIV, and is therefore at a high risk of developing severe symptoms if he is infected with the coronavirus, as noted by the CDC and medical experts.[14] Mr. George has had low CD4 counts in the past and is concerned that his counts are currently low and he will not be able to see a doctor until the risk of COVID-19 subsides. Mr. George has on occasion been housed at Camp J for disciplinary reasons and is concerned that he would have to return there if he tested positive for COVID-19. Mr. George is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

29.     Plaintiff Trevon Wiley is an individual in DOC custody housed at LSP's Cypress 3 dormitory. Mr. Wiley lives in close quarters with approximately 86 other people and cannot practice social distancing. Between January and February, Mr. Wiley was sick twice and received inadequate medical treatment. He had a high fever and other symptoms and was provided with treatment only after his family called LSP, and then he was only provided with Tylenol and Ibuprofen. He was finally provided with antibiotics and a steroid shot but remains congested. Mr. Wiley is concerned

---

[14] People Who Are at Higher Risk for Severe Illness, CDC, *supra* n.6 (noting that "people of any age who have a serious underlying medical condition might be at higher risk for severe illness, including people who are immunocompromised.").

about his ability to timely obtain adequate treatment if he develops COVID-19 symptoms and/or tests positive for the virus. He is concerned that the transfer of COVID-19 patients to Camp J increases the risk of transmission because security staff is still coming and going between his dorm and other places at LSP, potentially including Camp J or places where the Camp J staff have also been. Mr. Wiley is subject to Defendants' medical care policies and practices, including the DOC's COVID-19 policies and practices.

30.     Defendant Governor of Louisiana John Bel Edwards ("Governor Edwards") has the responsibility to "support the constitution and laws of the state and of the United States and shall see that the laws are faithfully executed," pursuant to the Louisiana Constitution, Article IV, § 5. Further, he is entrusted with the authority to act in times of emergency, pursuant to Louisiana R.S. § 29.724(D)(1), and has the ultimate authority for ensuring that all executive agencies, including the DOC and the DOH, function in compliance with state and federal laws. The Governor has personally been involved in the decision making regarding COVID-19 and the DOC, including discussions about the appropriateness of the transfer plan and ways to mitigate COVID-19 within facilities. Additionally, the Governor has failed to fulfill his duty to oversee the Secretary of Health and ensure that LDH is providing sufficient guidance to the DOC. The Governor has directed his staff to work with the DOC to come up with its responses to the pandemic. The Governor has the power to ensure that the DOC and the DOH implement adequate policies and procedures to protect Plaintiffs and the putative class from the harms of COVID-19. He can be served at 900 N. 3rd Street #4, Baton Rouge, LA 70802.

31.     The DOC oversees the custody and care of adults in prison and includes adults under probation and parole supervision, pursuant to La. R.S. § 36:4. The domicile of the DOC and its divisions is the parish of East Baton Rouge, city of Baton Rouge, Louisiana, pursuant to R.S.

15:821.1. Policies promulgated in response to the pandemic have been promulgated under the auspices of the DOC. The DOC can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

32.     Defendant Secretary James M. LeBlanc is responsible for the functioning and control of all programs within the DOC. He is appointed by the Louisiana Governor and is the chief executive officer for the DOC. He formulates rules and regulations and determines policy regarding management, personnel, and total operations. He leads and supports central office and field unit staff, which are charged with carrying out the work of the agency and protecting the constitutional rights of all persons held in DOC custody. At all relevant times, Secretary LeBlanc has acted under color of law and as the agent and official representative of the DOC. Secretary LeBlanc has personally been involved in the development of the COVID-19 planning and has approved all policies related to the DOC's COVID-19 response. He can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

33.     Dr. John E. Morrison is the Medical Director for DOC. He was hired to oversee the operation of the DOC's healthcare system. It is Dr. Morrison's responsibility to provide medical support for the system's COVID-19 response in conjunction the Louisiana Department of Health. Dr. Morrison has been involved in the DOC's COVID-19 response at every stage and signed off on the transfer plan as medical authority. He can be served at 504 Mayflower Street, Baton Rouge, LA 70802. Plaintiffs have heard, but have been unable to confirm, that Dr. Morrison resigned last week. If this is true, Plaintiffs would seek to substitute whoever has taken his place as Medical Director.

34.     The Louisiana Department of Health (LDH), through its Office of Public Health, has exclusive jurisdiction, control, and authority under R.S. § 40:5 to enact provisions regulating the standards of health and decency and building regulations of all prisons, jails, lock-ups, and camps where prisoners are detained or confined; to isolate or quarantine for the care and control of communicable disease with the state; to take such action as is necessary to accomplish the

subsidence and suppression of diseases of all kinds in order to prevent their spread; over the regulation of the carriage and transportation of people as they may affect public health; and additional powers detailed therein. The LDH is responsible for the development and providing of health and medical services for the prevention of disease for the citizens of Louisiana.[15] The domicile of the LDH and its divisions is the parish of East Baton Rouge, city of Baton Rouge, Louisiana, pursuant to R.S. § 36:251. The LDH can be served at 628 N. 4th Street, Baton Rouge, LA 70802.

35.     Stephen R. Russo is the interim Secretary of the LDH, the state's largest agency with a budget of $14 billion. As interim Secretary, he is responsible for the "administration, control, and operation of the functions, programs, and affairs" of the LDH.[16] He also has power to effectuate the LDH's oversight over health regulations affecting prisons, jails, and camps. His oversight responsibilities include, but are not limited to, public health and emergency preparedness. He can be served at 628 N. 4th Street, Baton Rouge, LA 70802.

## FACTUAL ALLEGATIONS

### I.    COVID-19 Is a Serious and Deadly Global Pandemic That Threatens the Lives of Louisiana's Incarcerated Population

36.     The coronavirus (COVID-19) is a viral pandemic. It is a novel virus for which there is no established curative medical treatment and no vaccine.[17]

37.     COVID-19 is an acute respiratory syndrome that can cause pneumonia, acute respiratory distress syndrome, respiratory failure, heart failure, sepsis, and other potentially fatal

---

[15] R.S. § 36:251.
[16] R.S. § 36:253; R.S. § 36:254.
[17] Ex. 1, Puisis Decl. at ¶ 2.

conditions.[18] Lab testing and imaging is required to appropriately evaluate and provide treatment to

patients with COVID-19. One-fifth of all confirmed cases cause serious illness, including respiratory

damage that requires hospitalization and mechanical ventilation, and can permanently harm those

who survive.[19]

38.    Treatment for severe cases of COVID-19 includes respiratory isolation, oxygen, and

mechanical ventilation.[20] Symptoms can range from fever, cough, chest pain, and headache to loss of

smell, abdominal pain, rash, diarrhea, aches, and vomiting.[21] Screening for cough or fever is not

sufficient to exclude the possibility of infection from COVID-19.[22] Even testing is not entirely

reliable; fifteen percent of patients who are tested for COVID-19 have a false negative, meaning

they do indeed have COVID-19 but the test is negative.[23]  Symptoms can rapidly worsen, with

people who appear to have mild cases quickly developing severe symptoms that require medical

intervention and life-saving measures immediately upon arrival to the hospital.[24]

39.    There are no lab tests that predict the course of a COVID-19 patient's illness.[25]

Some patients have adequate oxygen saturation for days and then deteriorate.[26] There are no signs or

symptoms that can be used to predict clinical deterioration.[27] Given the lack of tell-tale signs or a

---

[18] Fei Zhou et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: A Retrospective Cohort Study*, 395 LANCET 1054 (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

[19] "While about 80% of cases manifest as a mild illness (i.e. non-pneumonia or mild pneumonia), approximately 20% progress to a more severe illness, with 6% requiring specialist medical care, including mechanical ventilation." World Health Organization, *Preparedness, Prevention And Control Of COVID-19 In Prisons And Other Places Of Detention: Interim Guidance*, 10 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.

[20] Ex. 1, Puisis Decl. at ¶ 13.

[21] Ex. 2, Vassallo Decl. at ¶ 7.

[22] *Id.* at ¶ 8.

[23] *Id.* at ¶ 7.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

timeline for subsequent deterioration, it is critical that patients who test positive or likely positive (known as persons under investigation) for COVID-19 or have been exposed and show symptoms, be within easy transportable distance of hospitals in the event that more critical care is necessary.[28] Uniquely, COVID-19 Patients are not always aware of the lack of oxygen in their bodies and can be on the edge of death without gasping for breath or feeling the need for oxygen.[29]

40.    Severe COVID-19 patients can suffer acute respiratory distress syndrome ("ARDS"). The lungs fill with fluid, and the patient becomes extremely difficult to oxygenate. The only way to manage ARDS is to put the patient on a ventilator. The mortality rate for ARDS is 40%. COVID-19 patients can develop ARDS very quickly, and the severity and sensation of ARDS for COVID-19 patients is similar to drowning.[30]

41.    COVID-19 is highly transmissible. Recent estimates by the CDC suggest that, on average in community settings, each infected person transmits the virus to an additional 5.7 additional people.[31] If that figure is correct, only the influenza pandemic of 1918 is known to have higher infectivity.[32] COVID-19 is transmitted by droplets of infected aerosol when people with the infection cough, which can survive in the air for up to three hours—and on surfaces such as plastic and stainless steel for up to 2-3 days.[33] The virus can also be transmitted *inter alia* through saliva, fecal matter, or discharge from the nose.[34] The intubation period is believed to be 2-14 days, which

---

[28] *Id.*

[29] *Id.*

[30] Lizzie Presser, A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients, PROPUBLICA (Mar. 21, 2020, 5 AM), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[31] Ex. 2, Vassallo Decl. at ¶ 3.

[32] *Id.*

[33] Ex. 1, Puisis Decl. at ¶ 6, Ex. 2, Vassallo Decl. at ¶ 10.

[34] Ex. 2, Vassallo Decl. at ¶ 18.

is particularly concerning for transmission rates given that so many people are asymptomatic and infectious.[35]

42.    The rapid spread of COVID-19 has created an unprecedented health emergency in every part of the world. The World Health Organization ("WHO") declared COVID-19 a worldwide pandemic on March 11, 2020.[36] Governor John Bel Edwards declared "a statewide public health emergency" in Louisiana that same day.[37] On March 13, 2020, President Trump declared a national emergency.[38]

43.    The number of confirmed cases of COVID-19 in the United States is rising rapidly. As of April 13, 2020, WHO was reporting 524,514 confirmed cases in the United States with 20,444 deaths. Both the number of confirmed cases and the number of deaths continue to rise rapidly.[39] In fact, the United States has the highest number of reported cases of any country in the world. The Centers for Disease Control and Prevention ("CDC") projects that without swift and effective public health interventions, over 200 million people in the U.S. could be infected with COVID-19 over the course of the epidemic, with as many as 1.7 million deaths.[40]

---

[35] *Id.* at ¶ 3.
[36] WHO Director-General's opening remarks at the media briefing on COVID-19, WORLD HEALTH ORGANIZATION (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[37] Proclamation No. 25 JBE 2020 (Mar. 11, 2020), *available at* https://gov.louisiana.gov/assets/Proclamations/2020/modified/25-JBE-2020-Public-Health-Emergency-COVID-19.pdf.
[38] Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[39] Coronavirus disease (COVID-19) Situation Dashboard, WORLD HEALTH ORGANIZATION, https://who.sprinklr.com/region/amro/country/us (last visited Apr. 13, 2020).
[40] Sheri Fink, *Worst-Case Estimates for U.S. Coronavirus Deaths*, N.Y. TIMES, (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html.

44.     Many studies have shown the increased risk for serious complications in patients infected with COVID-19 that also suffer from comorbidities, including common health problems that afflict Plaintiffs like hypertension, diabetes, COPD, and cancer.[41]

45.     Although advanced age and underlying illnesses or chronic medical conditions increase the risk of serious effects of COVID-19, younger patients ages 20-54 years old can also have serious complications, including hospital admission, admission to an intensive care unit, invasive ventilation, or death.[42] Screening by age and prior medical history alone is not sufficient to determine who may develop serious complications and need medical intervention.

46.     COVID-19 can result in serious medical complications leading to death and it is imperative that those patients have access to palliative care to ensure they do not suffer needlessly.[43] The provision of morphine or other end-of-life drugs is crucial to manage pain and symptoms and allow for a humane death.[44] The pandemic has resulted in widespread shortages of the pharmaceuticals needed to treat COVID-19 patients.[45]

47.     Compared with past outbreaks of communicable diseases, the COVID-19 pandemic is of nearly unprecedented magnitude,[46] and reliance on pre-existing influenza or infectious disease protocols simply is insufficient to respond to this novel and deadly disease.

### A.    COVID-19 Is Particularly Severe in Louisiana and Has Caused a Public Health Emergency

48.     Louisiana is experiencing one of the worst COVID-19 outbreaks in the world. As of April 13, 2020, Louisiana had 21,016 confirmed cases of COVID-19, with at least 884 deaths.[47]

---

[41] Ex. 2, Vassallo Decl. at ¶ 19.

[42] *Id.* at ¶ 9.

[43] *Id.* at ¶ 20.

[44] *Id.*

[45] Vanessa Taylor, *Doctors ask state prisons to donate lethal injection drugs to help treat coronavirus*, MIC, (Apr. 10, 2020), https://www.mic.com/p/doctors-ask-state-prisons-to-donate-lethal-injection-drugs-to-help-treat-coronavirus-22804253.

[46] *United States v. Martin*, No. 19-cv-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020).

49.    A study from the University of Louisiana at Lafayette reported that confirmed COVID-19 cases grew by 67.8% in the two weeks after the first diagnosis on March 9, 2020, the highest rate in the United States.[48]

50.    UpToDate[49] reports an overall case mortality rate from the disease of 2.3%. Louisiana has 884 deaths for 21,016 confirmed cases; 4.2% of persons diagnosed with the infection in Louisiana die.[50]

51.    Black people constitute approximately 32% of Louisiana's population but 67.8% of the state's prison population[51] and over 70% of the deaths from COVID-19.[52]

52.    New Orleans "is quickly becoming a coronavirus epicenter in the U.S.,"[53] while "an equally alarming outbreak" is occurring in Shreveport.[54]

### B.    Incarcerated People are Especially Vulnerable to COVID-19

53.    People in carceral settings are among the most vulnerable populations for COVID-19 infection, as they have shown high rates of coinfection with hepatitis C, HIV, and tuberculosis

---

[47] Coronavirus Updates in Louisiana, WDSU NEWS, https://www.wdsu.com/article/coronavirus-updates-in-louisiana-3540-covid-19-cases-in-state-151-deaths-reported/31969586# (last visited Apr. 13, 2020).

[48] Adam Daigle, *Coronavirus Cases Grew Faster in Louisiana Than Anywhere Else in the World: UL Study*, THE ACADIANA ADVOCATE (Mar. 24, 2020), https://www.theadvocate.com/acadiana/news/coronavirus/article_94494420-6d4b-11ea-ac42-ff7dd722c084.html.

[49] UpToDate is an online medical reference widely used in hospitals, health organizations, and private physicians.

[50] Ex. 1, Puisis Decl. at ¶ 5.

[51] Ashley Neils, *The Color of Justice: Racial and Ethnic Disparity in State Prisons*, THE SENTENCING PROJECT (June 14, 2016) https://www.sentencingproject.org/publications/color-of-justice-racial-and-ethnic-disparity-in-state-prisons/.

[52] Sam Karlin, *John Bel Edwards: An Emotional Thought on Easter, a Call for Coronavirus Disparity Task Force*, THE ADVOCATE (Apr. 10, 2020), https://www.theadvocate.com/baton_rouge/news/coronavirus/article_ec7691d8-7b5c-11ea-becd-132e7ab42c80.html.

[53] Erika Edwards, *Why New Orleans Is Quickly Becoming a Coronavirus Epicenter in the U.S.*, NBC NEWS (Mar. 26, 2020), https://www.nbcnews.com/health/health-news/why-new-orleans-quickly-becoming-coronavirus-epicenter-u-s-n1169376.

(TB).[55] They are at a significantly higher risk of spreading infectious diseases. For example, the World Health Organization has identified the level of TB in prisons to be 100 times higher than that of the general population, in part due to the hazardous combination of overcrowding and poor ventilation.[56] It is typically not possible to isolate incarcerated people from the outside world (including from staff and vendors who may have been exposed to COVID-19), nor is it possible to isolate them from one another. The transmission of COVID-19 in prisons can be likened to the transmission of TB, where social distancing practices are impossible with inmates living in close quarters and lack of available means to ensure preventative hygiene practices.[57] As a result, jails and prisons are known to be a breeding ground for infectious respiratory illness.[58] The most vivid example is the Cook County Jail, which currently has the highest outbreak numbers in the country.[59]

54.     Prisons are not closed environments. Staff enter and leave the prisons on a daily basis, and there is little ability to ensure that individual staff members are not carrying the virus in or out; a significant percentage of carriers are asymptomatic, or are presenting with less-known symptoms, and will not be caught by a screening for temperatures or coughs.[60] When the COVID-19 virus is introduced to a prison, all persons, staff and incarcerated people alike, are at heightened risk of contracting the virus and, in turn, spreading the virus to others with whom they live or come into contact in their own homes and neighborhoods.[61]

---

[54] Kent Sepkowitz, *The Alarming Message of Louisiana's Sharp Rise in Covid-19 Cases*, CNN (Mar. 29, 2020)        (https://www.cnn.com/2020/03/29/opinions/shreveport-louisiana-new-orleans-coronavirus-kent-sepkowitz-opinion/index.html).

[55] Ex. 2, Vassallo Decl. at ¶ 10.

[56] *Id.*

[57] *Id.*

[58] Ex. 1, Puisis Decl. at ¶ 8.

[59] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars*, NEW YORK TIMES (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[60] Ex. 2, Vassallo Decl. at ¶ 8.

[61] *Id.* at ¶ 11.

55.    People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships and nursing homes.

56.    Similarly, jails and prisons promote the spread of respiratory illnesses because of their crowded congregate housing arrangements.[62] Social distancing practices are impossible with inmates living in close quarters, and there is also a lack of available measures to ensure proper handwashing, hygiene, and sanitation.[63]

57.    The risk of contracting an infectious disease is higher in correctional facilities in part because the facilities are not sanitary environments. People share toilets, sinks, and showers and often have limited access to soap, hand sanitizer, hot water, and other necessary hygiene items. Repeated sanitation of horizontal and touch surfaces in living units and throughout LSP, as recommended by the CDC, is not typically done.[64]

58.    People who have been exposed to COVID-19 and are then screened for cough and/or fever could still by infected.[65] Many patients are asymptomatic and infectious to others.[66] The CDC advises people to "[r]emember that some people without symptoms may be able to spread virus," that "[k]eeping distance from others is especially important for people who are at higher risk of getting very sick," and that "[y]ou could spread COVID-19 to others even if you do not feel sick."[67] The Director of the CDC has warned that as many as 25% of individuals infected with COVID-19 may be symptom-free.[68] With limited testing performed on asymptomatic patients, you

---

[62] Ex. 1, Puisis Decl. at ¶ 10.
[63] Ex. 2, Vassallo Decl. at ¶ 10.
[64] Ex. 1, Puisis Decl. at ¶ 7.
[65] Ex. 2, Vassallo Decl. at ¶ 8.
[66] *Id.*
[67] How to Protect Yourself and Others, CDC, *supra* n.8.
[68] Ex. 2, Vassallo Decl. at ¶ 15.

cannot confirm or negate the presence of COVID-19 in an individual.[69] People who are incarcerated and prison and jail staff can be infected with the virus and unknowingly spread it through the already crowded prison.[70] Screening for symptoms—such as fever checks—will not flag asymptomatic carriers.

59.     To reduce the risk of contracting COVID-19, the CDC advises all people—and particularly those at higher risk of severe illness—to "[w]ash your hands often with soap and water," "[i]f soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol," "[a]void close contact with people who are sick," "[p]ut distance between yourself and other people," and to "[c]over your mouth and nose with a cloth face cover when around others."[71] None of these recommended preventive measures is available to people who are incarcerated.[72]

60.     People who are incarcerated cannot always wash their hands often with soap and water because they have limited access to soap and often no access to hand sanitizer. Plaintiff Lionel Tolbert is given soap once a week in the Ash 3 dormitory at LSP. Plaintiff Trevon Wiley has no access to hand sanitizer in the Cypress 3 dormitory at LSP. Plaintiff Ian Cazenave only has access to the communal soap that they make at the prison. Plaintiff Daniel Gumns has to pay $15-20 to buy soap from commissary.

61.     People who are incarcerated cannot always avoid contact with people who are sick, and they certainly cannot put distance between themselves and others. Plaintiffs Daniel Gumns, Michael Videau, Lionel Tolbert, Ian Cazenave, Otto Barrera, Michael Robinson, and Trevon Wiley are all housed in dormitories of 75-86 people, where it is impossible to practice social distancing. Plaintiff Kentrell Parker is housed on Nursing Unit 2 with between 20-24 other vulnerable patients

---

[69] *Id.*
[70] *Id.*
[71] How to Protect Yourself and Others, CDC, *supra* n.8.
[72] Ex. 2, Vassallo Decl. at ¶ 10.

who are elderly or require long-term nursing care. No effort has been made to create physical barriers between the extremely vulnerable patients housed on the Nursing Units.

62.    Health profiles of incarcerated people show that they are significantly sicker and more vulnerable to COVID-19 than the population at larger.[73] Many have multiple comorbidities and are at a higher risk of complications, including ARDS.[74]

| Health condition | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

**C.    DOC Is Ill-Prepared to Provide Adequate Treatment to Individuals with COVID-19, and LSP Especially So**

63.    The DOC operates eight adult correctional facilities throughout the State of Louisiana. It has 31,600 people within its custody and control.[75] Some of these people are housed in one of more than 100 local parish jails and prisons across 62 parishes, instead of at one of the state facilities, and the sheriffs are reimbursed by a per diem from the State. The DOC maintains control and ultimate constitutional responsibility for the care for all of these individuals, regardless of where they are housed.

---

[73] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform,* Prison Policy initiative (Mar. 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic/.

[74] Ex. 2, Vassallo Decl. at ¶ 19.

[75] DOC Briefing Book, *supra* n.5, at 18.

64.    On December 31, 2019, DOC had capacity to house 15,410 people in its eight state prisons[76] and it held 15,042 people.[77] Therefore, right before the COVID-19 crisis, the DOC's prisons were at 97% of 2019 operating capacity.

65.    The DOC employs approximately 4,788 staff members, with around 3,883 of these people working inside of its eight correctional facilities.[78] DOC's facilities are undeniably understaffed; despite operating at 97% operational capacity, in February 2020, the agency had more than 400 vacant positions (7% vacancy).[79]

66.    COVID-19 will severely exacerbate these pre-existing shortages of crucial staff, especially medical staff. When staff become infected, they will not be able to come to work, leaving essential positions open.[80] On April 3, 2020, 282 staff stayed home due to COVID-19. Approximately 140 of these staff members were security employees and 22 were medical employees.

67.    As of April 4, 2020, based on the self-reporting data from DOC. the percentage of the DOC employees with COVID-19 was roughly twice as high as the rate of COVID-19 in the general Louisiana population.[81]

68.    LSP has a particularly vulnerable population, with over 50% of people over 50 years of age, many of whom have high-risk medical conditions.[82] The many patients with ongoing medical needs at LSP are already experiencing the decrease in available medical care. For instance, Plaintiff

---

[76] *Id.* at 120.

[77] *Id.* at 18.

[78] *Id.* at 102.

[79] Melinda Deslatte, *Another $34M Sought to Fill Gaps in Louisiana Prisons Budget*, THE ADVOCATE (Feb. 21, 2020, 6:22 PM), https://www.theadvocate.com/baton_rouge/news/politics/legislature/article_6421eebe-5509-11ea-883c-9f44d94bfcfe.html.

[80] Ex. 2, Vassallo Decl. at ¶ 11.

[81] According to the DOC, on April 4, 2020, it had 20 people working in facilities with COVID-19, showing a virus rate of 0.5 percent of its prison staff. On that same date, Louisiana had a rate COVID-19 rate pf 0.21 percent.

[82] Ex. 2, Vassallo Decl. at ¶ 11.

Kentrell Parker has developed a bed sore and is finding it difficult to get medical treatment because the nurse practitioner who usually oversees the infirmary is overseeing Camp J.

69.     In addition to staffing concerns, even under normal conditions, the DOC's medical system spends very little on patient care compared to other states and therefore has a very limited infrastructure with which to provide medical services. The most recent report from Pew Charitable Trusts on state by state medical spending shows the DOC's health care spending per incarcerated person was only $2,173, compared to $19,786 in California's correctional system.[83] In fact, the DOC's health care spending is the lowest correctional medical spending in the country.[84]

70.     Considering the low spending on medical care for people incarcerated in Louisiana, it is unsurprising that Louisiana prisons have the highest mortality rate in the country.[85] According to a Bureau of Justice Statistics report released in February 2020, Louisiana's mortality rate per 100,000 prisoners is 817.[86] The next highest mortality rate in the country—Alabama—is 497.[87]

71.     Louisiana's prison deaths are primarily related to medical conditions, rather than accidents, homicides or suicide.[88] While Louisiana has the highest prison mortality rates for cancer, heart disease, and AIDS, it has relatively low rates of homicide, accident and suicide.[89] Louisiana has the third highest prison mortality rate for people dying from respiratory illnesses.[90]

72.     An example of how low medical spending and staffing deficiencies impact care can be seen at LSP, the state's largest prison and the largest maximum security prison in the country. As

---

[83] Prison Health Care Costs and Quality: How and why states strive for high performing systems, PEW CHARITABLE TRUSTS (Oct. 18, 2017), https://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality.
[84] Id.
[85] U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Mortality in State and Federal Prisons, 2001-2016 (Feb. 2020), available at https://www.bjs.gov/content/pub/pdf/msfp0116st.pdf.
[86] Id. at 12.
[87] Id.
[88] Id. at 15-16.
[89] Id.

described above, LSP has a particularly vulnerable population.[91] Despite this particularly high-risk population, LSP is understaffed on an average day without the added medical pressures of a pandemic.[92] Additional systemic deficiencies show in the medical care at LSP:

- Physicians are not credentialed appropriately and did not provide medical care in line with national standards;[93]
- Patients at LSP lack appropriate access to hospital care;[94]
- Physicians and other staff frequently fail to recognize indications for hospitalization, including many cases of failure to recognize typical signs of respiratory decompensation which is critical for COVID-19 patients;[95]
- Physicians, nurses, and EMTs fail to recognize "red flag" signs resulting in adverse events;[96]
- Laboratory services are only available on weekdays and blood gas assessments are not available at all.[97]

73.    On February 21, 2020, the United States District Court for the Middle District of Louisiana issued an order indicating that the Court had found "that the medical care at Angola State Penitentiary is unconstitutional in some respects" and was preparing "to Order injunctive relief addressing conditions which the Court finds unconstitutional."[98] This Order was issued after a three-week trial held before the Court in October 2018 on behalf of a certified class of all individuals incarcerated at LSP.

74.    While the ruling and injunctive order are still pending, the Court's February 21 Order plainly indicates a finding that the DOC has acted with deliberate indifference to the medical needs of the individuals detained at LSP and that all such individuals are incarcerated under conditions

---

[90] *Id.*
[91] *See* Ex. 2, Vassallo Decl. at ¶ 11.
[92] *Id.*
[93] *Id.* at ¶ 13.
[94] *Id.*
[95] *Id.*
[96] *Id.;* Ex. 1, Puisis Decl. at ¶ 14.
[97] Ex. 1, Puisis Decl. at ¶ 14.

posing a substantial risk of serious harm. As yet, the Court has not ordered any remedy alleviating those unconstitutional conditions.

75.    The pandemic threatens to further aggravate this situation for both those with COVID-19 who receive treatment at LSP and for those who depend on DOC for other medical care.[99]

## II.    The DOC's Insufficient Response to COVID-19 Places the Putative Class at a Substantial Risk of Serious Harm by Increasing the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment

76.    As detailed below, Defendants failed to proactively plan for the prevention and management of COVID-19 in DOC facilities.

### A.    Defendants Have Either Sought to Obscure Their Plans for COVID-19 from the Public, Their Patients, and Advocacy Groups—or There Is No Comprehensive Plan

77.    On March 16, 2020, dozens of Louisiana-based organizations that advocate for the rights of individuals who are detained and imprisoned in Louisiana sent a letter requesting that Defendant Governor Edwards and Defendant DOC develop evidence-based and proactive plans for the prevention and management of COVID-19 in Louisiana's prisons. This letter was also sent to Defendant LeBlanc and Defendant Russo. The letter included 26 recommendations and numerous resources to help in the development of these plans.

78.    Defendants never responded. Instead, in response to a request by the plaintiffs in *Lewis v. Cain*, the DOC and the Governor's Office provided

- Department Regulation No. HCP 26, concerning influenza,
- Several continuing operation plans with skeletal guidance,
- An instructional video produced for patients, and
- A checklist for cleaning.

---

[98] *Lewis v. Cain*, No. 3:15-cv-00318-SDD-RLB (M.D. La., Feb. 21, 2020) (order directing parties to meet and confer).
[99] *Id.* at ¶ ¶ 12; 14.

79.     Similar letters and resources have been sent to Defendants from public health leaders, faith leaders, and organizations comprised of the formerly incarcerated.

80.     Information has been sought by families of the incarcerated about the plans to protect incarcerated people. As Louisiana has the highest incarceration rate in the country, the lack of leadership on this issue has made national news. Nothing has been provided in response to these requests.

81.     In short, it can be assumed that no comprehensive plan exists. The DOC has not even shared information about the number of COVID-19 tests it has administered.

82.     The certified class of plaintiffs in *Lewis v. Cain* sought both formal and informal discovery of documents related to LSP's COVID-19 response, and they were denied such information beyond the barebones documents listed above. In fact, on March 31, 2020, counsel for the DOC represented that "there are no imminent plans" to transfer individuals with COVID-19 to LSP.[100]

83.     On April 1, 2020, Defendant LeBlanc and two other DOC officials signed declarations swearing that no one had been transferred to Camp J and that there were no inmates housed at LSP who had COVID-19.[101]

84.     By April 2, 2020, however Camp J held at least one person from Iberville Parish and at least three other people from East Baton Rouge Parish, Union Parish, and Ouachita Parish—at least two of whom were serving sentences and in DOC custody.

85.     As of the morning of April 9, 2020, eight people detained at East Baton Rouge Parish Prison had tested positive for COVID-19, four had been taken to Our Lady of the Lake Hospital in Baton Rouge, and 29 were awaiting test results. At least four people who tested positive for COVID-19 had been transferred from East Baton Rouge Parish Prison to Camp J.

---

[100] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585-4.

86.     As of the evening of April 10, 2020, six people who were normally housed elsewhere at LSP were being housed at Camp J, presumably because they had tested positive for COVID-19. On April 11, 2020, at least four more people were transferred from East Baton Rouge Parish Prison, including Plaintiff Kendrick Wilson, who is a pre-trial individual and tried to refuse transport.

87.     By April 11, 2020, at least 40 people had been transferred to the remote Camp J. The DOC's transfer plan has expanded swiftly.

**B.      The Skeletal Plans Provided by DOC, Including the Flu Regulation and Flu Coop Plans, Do Not Provide Appropriate Guidance to Louisiana Prisons**

88.     The primary written plan in operation by the DOC for Louisiana's eight prisons is Department Regulation No. HCP 26 (the "Flu Regulation").

89.     The Flu Regulation is 10 pages long, with one page of definitions. Only a few of the words in the definition section of the regulation appear anywhere else in the regulation. The remaining nine pages of the regulation are skeletal in nature, and reflective of the efficacy of the efforts in the prisons to protect the lives of incarcerated Louisianans.

90.     The Flu Regulation requires that plans be made across the corrections system to address a pandemic, and details the subject matter of these plans, but provides almost no guidance as to the content of the plans, imposing virtually no standards in line with public health practices.

91.     The eight state prison facilities have continuing operation plans ("Flu Coop Plans") for the flu pandemic, and these are the only plans at these facilities for addressing COVID-19.

92.     The Flu Regulation does not properly involve the LDH's Office of Public Health or recommend appropriate levels of consultation with the LDH's Office of Public Health, despite the fact that the LDH is the only entity that is statutorily tasked with pandemics, quarantine, and medical isolation in Louisiana.

---

[101] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585-1 to 585-3.

93. Instead, the Flu Regulation only requires that each prison establish a point of contact with the LDH. Some, if not all, Flu Coop Plans have no further coordination with the LDH than designating a person to be available if there is ever an order to contact the LDH.

94. During the course of the pandemic, the DOC's Medical Director—who had no public health background—resigned, leaving the fate of a particularly at-risk population even more in peril.

95. Because the DOC's guidance has been so skeletal, and because the LDH has been largely absent from pandemic oversight in Louisiana's prisons, the individual wardens' Flu Coop Plans lack the requisite focus on the medical and public health aspects of pandemic response.

96. For instances, LSP's plan has the medical director coordinating with Homeland Security instead of the LDH, despite the LDH being the entity statutorily responsible for quarantine and medical isolation practices during a pandemic.

97. The Dixon Correctional Institute's Flu Coop Plan does no more than set a contact point for the LDH's Office of Public Health. Its focus is primarily on correctional staffing rather than medical response.

98. Belatedly, on April 8, 2020—more than 11 days after the first positive COVID-19 cases began spreading through the incarcerated population in Louisiana prisons— the LDH's Office of Public Health issued guidance to be followed inside of prisons and jails in Louisiana. It included a number of recommendations that are not being followed or required of prisons by the DOC.

99. By a second memorandum dated April 8, 2020, the LDH rescinded its guidance and has not appeared to take any additional steps to provide oversite for quarantine, medical isolation, transportation, and hygiene practices in the state and local correctional systems.

100. In the few instances where the Flu Regulation does provide examples to guide the prisons, the guidance is cursory. For instance, the Flu Regulation requires wardens to "Develop a

34

written plan identifying areas of quarantine and isolation for the offender population (dorm and cell blocks.) The unit shall consider ways to prevent cross contamination of staff and offenders assigned to work in affected areas, for example, employees/offenders assigned to work in isolation or quarantine areas should not be allowed to work in other areas. Offenders assigned to work in these areas should not be allowed to return to the general population."

101.    The Flu Regulation does not describe the CDC recommendations for how to create these spaces, physical preferences for these spaces (solid doors and access to isolated bathrooms), and the other specifics of medical isolation.[102]

102.    The DOC policies lack any discussion of efforts to ensure that incarcerated people will be able to maintain six-foot distances from each other and lack a clear description of the special levels of quarantine and medical isolation recommended for COVID-19. There is further a lack of any description of how medical monitoring would be carried out or when patients should be sent to a hospital. There is no discussion of what is appropriate medical care, particularly for isolated and quarantined populations.[103]

103.    These plans fail to delineate appropriate training of staff for the health and safety of patients and staff.

104.    The plans fail to provide guidance about necessary personal protective equipment ("PPE") requirements, the amount needed by facilities, and any other details necessary to provide either the facility or the staff a sense of how much is needed and how to prioritize its distribution.

105.    Defendants' COVID-19 response is knowingly and uselessly skeletal. As a result, the prisons are failing to accomplish appropriate social distancing, hygiene practices, return-to-work policies for the sick, quarantines, medical isolation, personal protective equipment practices, transfers to medical facilities, transportation, medical staffing ratios, training, and protection for

---

[102] CDC Guidance, *supra* n.2.

medically vulnerable populations. Defendants are therefore failing to abate the risk caused by COVID-19 and, in many circumstances, increasing that risk.

C.    **As A Result of Improper Guidance and Oversight, People Are Receiving Compromised Care and Are Living in Dangerous Conditions**

106.    Defendant Governor Edwards has failed to assert his authority over the Secretaries of the DOC or the LDH to protect Louisiana's incarcerated population's access to appropriate precautions to stop the spread of COVID-19, assure appropriate quarantine practices, and assure appropriate medical isolation practices. The lack of appropriate oversight, policies, and practices by Defendants has resulted in people with confirmed COVID-19 cases not getting the care recommended by the CDC.

107.    For instance, the CDC recommends that medical isolation should end when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials, according to the CDC. Named Plaintiff Kendrick Wilson is confirmed to be COVID-19 positive and has been told he will be moved from medical isolation in 10 days, regardless of his medical symptoms.

108.    Because there are no recommendations of the staffing and medical infrastructure for those in medical isolation, there is a shortage of qualified health professionals observing medical isolation. The ratio of nurses to patients at medical isolation facilities outside of Louisiana's correctional system is 1:6, while at LSP's Camp J medical isolation the ratio is 1:20.

109.    The conditions for those in quarantine are equally concerning. There are reports in DOC facilities of quarantine being broken, no social distancing options in quarantine, and no masks for people in quarantine. The conditions for those not in quarantine similarly show very limited efforts to make accommodations to allow for social distancing. Numerous locations report a lack of soap, and/or insufficient soap, and a lack of hygienic practices to keep people safe.

---

[103] Ex. 1, Puisis Decl. at ¶¶ 16–20.

110.    "We are packed in like sardines," Fate Winslow told a reporter from The Appeal about his living conditions in LSP. "Today all the guards showed up to work with masks on to protect themselves from us, when it is us that needs protection from them."[104]

111.    While not included within its health care regulation, the DOC has announced a plan to set medical isolation at LSP's Camp J for people being held pre-trial, people in DOC custody at state-run facilities, and people in DOC custody being held in parish jails and prisons. This plan, described further below, is contrary to the recommendations of the CDC, and contrary to the LDH guidelines issued and rescinded on April 8, 2020. It is the direct result of the failure of Defendants to appropriately respond to this crisis and indicative of the lack of medical and public health considerations being made in the very clearly "correctional" response to a pandemic. It is putting all people in jails and prisons in Louisiana at risk.

III.    **The DOC's LSP Transfer Plan Places the Putative Class at a Substantial Risk of Serious Harm by Increasing the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment and by Unnecessarily Subjecting the Vulnerable LSP Population to an Increased Risk of Transmission**

112.    According to the DOC, patients housed in DOC facilities or local parish prisons and jails who test positive for COVID-19 will likely be transported to LSP's Camp J for medical isolation unless they are so ill that they need to go directly to the hospital. This will include pre-trial and post-trial patients.

113.    Defendants are treating the COVID-19 pandemic as if it were a hurricane—a crisis with which Defendants have far more experience. When a facility is impacted by a hurricane, it is important to find space where impacted people can be relocated. But COVID-19 is a global pandemic and a worldwide public health emergency, not a hurricane.

---

[104] Tana Ganeva, *Report from Inside Angola Prison Paints A Troubling Picture As Coronavirus Grips Louisiana*, THE APPEAL (Apr. 10, 2020), https://theappeal.org/report-from-inside-angola-prison-paints-a-troubling-picture-as-coronavirus-grips-

114.    In fact, the DOC's LSP transfer plan contravenes the recommendations of the LDH's Office of Public Health issued on April 8, which included a recommendation that "correctional and detention centers should . . . [h]ave a trained Emergency Medical Service/Emergency Medical Technician (EMS/EMT) assess and transport anyone you think might have COVID-19 to a healthcare facility."[105] Camp J is not a healthcare facility and the DOC plan goes against this guidance.[106]

115.    The CDC explicitly recommends halting transfers that are not made on the basis of medical needs.[107] The LDH guidance, although immediately rescinded,[108] similarly states transfer should be for medical treatment only. The movement of people across the state for medical isolation is a policy built for the wrong disaster and lacks the appropriate understanding of the public health crisis Louisiana's prisons and jails are in today.

116.    There is no evidence that the LDH was involved in making the decision to use Camp J as a quarantine facility. The COVID-19 pandemic is a public health emergency, not a custody or other non-medical emergency, but custody officials, rather than health officials, have been directing decisions around transfers between facilities.[109]

---

louisiana/?fbclid=IwAR0lFKJHVLHzP1N7E18zC1KL-g1-i-
AeKTo7BzYtICOYYzETPno33otWyig.

[105] Ex. 3, Memorandum from the LDH to the Department of Public Safety and Corrections and Office of Juvenile Justice (Apr. 8, 2020) (rescinded via Memorandum from the Louisiana Department of Health Office of Public Health to the Department of Public Safety and Corrections and Office of Juvenile Justice (Apr. 8, 2020) (on file with Plaintiffs' counsel). The LDH rescinded its recommendation memorandum for reasons unrelated to the efficacy of the medical recommendations therein.

[106] Ex. 2, Vassallo Decl. at ¶ 11.

[107] CDC Guidance, *supra* n.2.

[108] *See* Nicholas Chrastil, *The Louisiana Department of Health issued recommendations on how to stop the spread of coronavirus in prisons – then rescinded them*, THE LENS (Apr. 13, 2020), https://thelensnola.org/2020/04/13/the-louisiana-department-of-health-issued-recommendations-on-how-to-stop-the-spread-of-coronavirus-in-prisons-then-rescinded-them/.

[109] Ex. 1, Puisis Decl. at ¶ 16.

117.    The DOC's plan places the putative class at a risk of substantial risk of serious harm by increasing the likelihood that COVID-19 patients will not receive proper treatment and unnecessarily subjecting a vulnerable population to an increased risk of transmission. Transferring detainees who test positive for COVID-19 from facilities around the state to Camp J is against the initial guidance of the LDH, against the guidance of the CDC, puts at risk people who are incarcerated who have chronic medical conditions requiring treatment and/or medication, distances COVID-19 patients from hospitals with adequate services, and subjects patients to the medical care system at LSP that has already been found unconstitutional at least in part by a federal court.

A.    **The DOC's LSP Transfer Plan Increases the Likelihood that COVID-19 Patients Will Not Receive Proper Treatment**

118.    The DOC's LSP transfer plan ensures that COVID-19 patients will not receive proper treatment. While DOC stated that it does not intend to transport patients who test positive but are in need of immediate medical attention, there is no provision to ensure that patients' cases are reviewed by a doctor prior to this determination. There are no clinical criteria regarding age or co-morbidities to determine who is appropriate for transfer.

119.    Further, patients' medical care needs will not be fully known at the moment of a positive COVID-19 test; COVID-19 patients can rapidly devolve into medical crisis. In at least one study, half of patients admitted to the intensive care unit for COVID-19 died on the first day.[110] There are no tell-tall signs or a timeline for clinical deterioration, and is it crucial that patients who test positive or likely positive for COVID-19 be within easy transportable distance of hospitals in the event that more critical care is necessary.[111] Age alone is not an adequate screening device—38%

---

[110] Ex. 2, Vasall Decl. at ¶ 7.
[111] *Id.*

of individuals hospitalized in the United States in late March 2020 were between 20 and 54 years old.[112]

120.     Named Plaintiff Kendrick Wilson to his knowledge was not medically evaluated before he was transferred to Camp J, and he was in fact experiencing symptoms.

121.     As of April 12, 2020, Mr. Wilson and approximately 39 other people who had tested positive for COVID-19 were being housed on an open dorm at Camp J, without any isolation from one another. Many people have coughs or other symptoms, and some require IV machines or oxygen masks. There are only two nurses per shift to care for the COVID-19 patients. Mr. Wilson has been told he will be transferred two more times in the next 10 days. To his knowledge, he did not undergo any medical assessment regarding his fitness to be transferred, and his transfer to LSP's Camp J was not done to meet any individualized need for specialized medical treatment that could not be obtained at the facility where he was held before LSP's Camp J.

122.     LSP is not equipped to treat COVID-19 symptoms, especially if the symptoms become severe. The care required to appropriately evaluate and provide treatment to patients with COVID-19 includes lab testing, imaging, and treatment individualized to the presentation of the patient.[113] Treatment may require oxygen therapy by nasal cannula, high flow oxygen masks, and intubation and ventilator assistance.[114] Some patients develop blood clots on the lungs and require anticoagulation.[115] Some patients require intravenous fluid therapy.[116] Some patients require vasopressor treatment for low blood pressure, support for kidney failure, and/or early antibiotics.[117] Treatment requires staff that have experience using this equipment and accurately assessing what is

---

[112] *Id.* at ¶ 9.
[113] *Id.* at ¶ 7.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] *Id.* at ¶ 16.

needed.[118] The intensity of care and protracted length of care for COVID-19 cannot be provided at LSP or any of the hospitals within an hour of LSP.[119]

123.    Upon its representations, the DOC does not plan to attempt to treat severe symptoms at LSP. However, there is no way to define or predict who will develop severe symptoms in the course of the illness and require treatment and hospitalization.[120] Nor is there any representation that Camp J has staffing and equipment to monitor the COVID-19 positive patients for clinical deterioration, including signs of hypoxia.[121] It is critical that patients be within easy transportable distance of hospitals that can provide the adequate level of care.[122]

124.    The DOC is not testing people for the virus unless they show symptoms.[123] Therefore, all the COVID-19 patients being transferred to Camp J are at least symptomatic, not healthy or even seemingly healthy.

125.    The likelihood of Plaintiff Julius Allen's symptoms continuing to be severe and ultimately requiring hospitalization is high; Mr. Allen's pre-existing medical conditions, including diabetes, hypertension, and high cholesterol, make him especially vulnerable to COVID-19 complications.[124]

126.    The likelihood of Plaintiff Ernest Rogers' symptoms continuing to be severe and ultimately requiring hospitalization is high; Mr. Rogers is 65 years old and has a pre-existing medical condition, which makes him especially vulnerable to COVID-19 complications.[125]

---

[118] *Id.*
[119] *Id.*
[120] *Id.* at ¶ 12.
[121] *Id.*
[122] *Id.*
[123] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585-1 at ¶ 20.
[124] Ex. 2, Vassallo Decl. at ¶19.
[125] *Id.*

127.    The likelihood of Plaintiff James Hughes developing severe symptoms is high; Mr. Hughes' pre-existing medical condition, chronic obstructive pulmonary disease, make him especially vulnerable to COVID-19 complications.[126]

128.    The likelihood of Plaintiff Daniel Gumns developing severe symptoms is high; Mr. Gumns' pre-existing medical conditions, epilepsy and asthma, make him especially vulnerable to COVID-19 complications. [127]

129.    The likelihood of Plaintiff Michael Videau developing severe symptoms is high; Mr. Videau is 63 years old, and his age plus his pre-existing medical conditions, including leukemia, high blood pressure, diabetes, and acute pneumonia, make him especially vulnerable to COVID-19 complications.[128]

130.    The likelihood of Plaintiff Lionel Tolbert developing severe symptoms is high; Mr. Tolbert is 65 years old, and his age plus his pre-existing medical conditions, including coronary artery disease and heart and vascular disease, make him especially vulnerable to COVID-19 complications. [129]

131.    The likelihood of Plaintiff Ian Cazenave developing severe symptoms is high; Mr. Cazenave's pre-existing medical conditions, including sickle cell and related heart complications, make him especially vulnerable to COVID-19 complications. [130]

132.    The likelihood of Plaintiff Ian Michael Robinson developing severe symptoms is high; Mr. Robinson's age and pre-existing medical conditions, including liver disease and hepatitis C, make him especially vulnerable to COVID-19 complications. [131]

---

[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.*
[130] *Id.*
[131] *Id.*

133.    The likelihood of Plaintiff Kentrell Parker developing severe symptoms is high; Mr. Parker's pre-existing medical conditions, including paralysis and hypertension, make him especially vulnerable to COVID-19 complications. [132]

134.    The likelihood of Plaintiff Reginald George developing severe symptoms is high; Mr. George's pre-existing medical conditions, including hypertension, prostate cancer, hepatitis C, and HIV, make him especially vulnerable to COVID-19 complications. [133]

135.    People who are transferred to Camp J may also have difficulties or delays in getting their regularly prescribed medications, which could exacerbate their complications from COVID-19.[134]

136.    Additionally, medical staff worldwide have been acutely impacted by COVID-19, and new protocols previously not used have been implemented to protect medical staff. There is no requirement in the DOC's plan that the medical staff at LSP receive any training in appropriate safety precautions for themselves or their patients.

137.    COVID-19 is a new virus, and new information is becoming available daily for health care workers to better understand the disease. There is no requirement in the DOC's plan that nursing staff receive any training about COVID-19 and the signs and symptoms associated with the virus.

138.    No doctors are staffed to the facility in order to make determinations of when a patient might become acute or if a patient is ready to end isolation.

      i.      **LSP's Remote Location Ensures that Patients Cannot Be Quickly Transported to Hospitals**

---

[132] *Id.*
[133] *Id.*
[134] Ex. 2, Vassallo Decl. at ¶ 19.

139.    If Plaintiffs' COVID-19 cases become severe, they will require hospitalization; LSP does not have the medical equipment or personnel necessary to treat severe COVID-19 symptoms.[135]

140.    DOC has stated that if Plaintiffs' COVID-19 cases become severe, they will be transported to a hospital. The DOC has said that they will not treat the Plaintiffs in the ATU or the treatment center at LSP.[136]

141.    But symptoms can rapidly worsen, with people who appear to have mild cases quickly developing severe symptoms that require medical intervention and life-saving measures immediately upon arrival to the hospital.[137] There are no lab tests that predict the course of a COVID-19 patient's illness.[138] Some patients have adequate oxygen saturation for days and then deteriorate.[139] There are no signs or symptoms that can be used to predict clinical deterioration.[140] Given the lack of tell-tale signs or a timeline for subsequent deterioration, it is critical that patients who test positive or likely positive (known as persons under investigation) for COVID-19 or have been exposed and show symptoms, be within easy transportable distance of hospitals in the event that more critical care is necessary.[141] Uniquely, COVID-19 Patients are not always aware of the lack of oxygen in their bodies and can be on the edge of death without gasping for breath or feeling the need for oxygen.[142]

---

[135] Ex. 1, Puisis Decl. at ¶ 14.
[136] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585 at 7 ("If an offender housed at Camp J begins to exhibit severe symptoms, he will be transport [sic] to an outside hospital. **Offenders transferred to Camp J will not be sent to the ATU or the treatment center at LSP.**")
[137] Ex. 2, Vassallo Decl. at ¶ 7.
[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*

142.    LSP is approximately 150 miles from University Medical Center in New Orleans, 60 miles from Our Lady of the Lake Hospital in Baton Rouge, 50 miles from Lane Regional Medical Center in Zachary, and 25 miles from West Feliciana Parish Hospital in St. Francisville.

143.    To illustrate one of the problems with the DOC's plan to transfer COVID-19 patients to Camp J: Under the DOC's plan, people incarcerated in the East Baton Rouge Parish Prison who test positive are being transported more than an hour away to Camp J, and then transported back to Baton Rouge or New Orleans when they require hospitalization.[143] People incarcerated in the Orleans Justice Center in New Orleans could be transported more than three hours away to Camp J, and then transported to Baton Rouge or back to New Orleans when they require hospitalization.[144] Furthermore, the MMS at the New Orleans Convention Center, for example, is ready and available to take the incarcerated population and is a much better-equipped and medically appropriate place to take symptomatic COVID-19 patients.

144.    Any time a COVID-19 patient is transported, it puts the staff conducting the transport at unnecessary risk.[145] In the close-quarters setting of a vehicle, even one infected person could easily spread the virus to everyone else in the vehicle.[146] Additionally, reduced airflow in a transport vehicle could result in higher concentrations of contaminated droplets remaining in the air and on surfaces.[147] Transport should be avoided unless necessary for hospitalization, and only having to travel a short distance to the hospital is the safest option.[148] The DOC is therefore engaging in elective transfers that are discouraged by all public health guidance.

145.    The nearest hospital to LSP, West Feliciana Parish Hospital, is not a reference hospital, meaning it is not equipped to accept patients who require a higher level of care, and is not

---

[143] *Id.* at ¶ 12.
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.*

suitable for a patient requiring intubation.[149] There are no ventilators at West Feliciana Hospital.[150] A patient requiring intubation would need to be sent to Baton Rouge or New Orleans, a one-hour hour or three-hour drive from LSP, respectively.[151]

146.    West Feliciana Parish has approximately two ambulances.[152] Even without the transfer of COVID-19 positive people to LSP, West Feliciana would be strained for resources like ambulances and ambulance personnel.[153] Ambulance personnel are being infected daily and they transmit the infection widely.[154] Transporting many COVID-19 positive people to the parish will further strain what is already a strained system, at increased risk to both those patients and the surrounding community.[155]

147.    If a patient is admitted to West Feliciana Parish Hospital or another rural hospital without ventilator access, there is no guarantee that the hospital will be able to transfer the patient to a hospital with ventilators. Hospitals are not necessarily required to accept transfers of patients with suspected or confirmed COVID-19 from small or rural hospitals that lack sufficient isolation facilities or equipment to meet the current state or local CDC recommendations.[156] While hospitals with capacity and the specialized capabilities needed for stabilizing treatment are required to accept

---

[148] *Id.*

[149] Ex. 1, Puisis Decl. at ¶ 14.

[150] *Id.* at ¶ 18.

[151] *Id.* at ¶¶ 14, 18.

[152] Ex. 2, Vassallo Decl. at ¶ 17.

[153] *Id.*

[154] *Id.*

[155] *Id.*

[156] Louisiana Department of Health, Emergency Medical Treatment and Labor Act (EMTALA) Requirements and Implications Related to Coronavirus Disease 2019 (COVID-19) (Revised) (Apr. 1, 2020) *available at* http://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/MEMO_HOSPITAL_CAH_EMTALA_04012020.pdf.

appropriate transfers from hospitals without the necessary capabilities, the receiving hospital may refuse the transfer if it does not have the capacity to provide the necessary care and services.[157]

148.    This could potentially further disadvantage a patient held at Camp J when a medical emergency necessitates immediate hospitalization and that patient is taken to a closer—yet ill-equipped—hospital, but the patient's COVID-19 progression later necessitates a transfer to a different hospital for ventilator access. In certain cases, the original jail or prison would have been in a better proximity to a hospital with ventilator access, and original admission at that hospital would have assured a better position to access a ventilator. The Camp J transfer plan inherently ignores the individual medical needs of COVID-19 patients and the proximity of equipped medical facilities to the correctional facilities in which patients are originally held.

149.    LSP has demonstrated a tendency to delay in transferring patients to a hospital.[158] Medical staff at LSP frequently fail to recognize indications for hospitalization, including many cases of failure to recognize typical signs of respiratory decompensation, which is critical for COVID-19 patients.[159]

150.    Even if DOC intends to provide limited medical care, rather than just isolation at Camp J—or changes its plan and provides more robust care—the medical care at LSP has long been deficient.[160] Plaintiffs will not receive the medical attention needed to appropriately monitor their COVID-19 there, and there are no plans for the DOC to staff Camp J with sufficient medical staff in order to monitor all patients for signs of clinical deterioration.[161] Named Plaintiff Kendrick Wilson observed two nurses per shift caring for him and approximately 39 other COVID-19 positive patients in an open dorm.

---

[157] *Id.*
[158] Ex. 1, Puisis Decl. at ¶ 14.
[159] Ex. 2, Vassallo Decl. at ¶ 13.
[160] Ex. 1, Puisis Decl. at ¶ 14.
[161] *Id.*

151.    Generally, LSP is not set up to manage acutely ill patients, and people incarcerated at LSP lack access to hospital care across the board. The pandemic will only make it worse.[162] LSP lacks the necessary equipment and personnel to provide hospital-level care, for example, for patients in need of invasive mechanical ventilation or support for kidney failure.[163] The facility is not set up to manage hospital-level care, including ventilation, and the LSP staff cannot manage hospital-level patients.[164]

152.    While LSP uses its Acute Treatment Unit to provide emergency care, it lacks several diagnostic and treatment capabilities necessary in an emergency room, and often lacks qualified operators for some of the capabilities it does have. Emergency medical technicians, rather than physicians or nurses, are the principal medical providers in the Acute Treatment Unit outside of business hours.

153.    Laboratory services are only available weekdays during working-day-hours and typically not available on weekends. Blood gas assessments, critical for managing acute respiratory distress, are not available at LSP.[165] There are no ventilators at LSP.

154.    The DOC's LSP transfer plan exposes a relatively remote area to an outbreak. Most of LSP's staff members do not live at LSP and must return to their home communities daily. This movement exposes LSP's surrounding communities—where there is no hospital capable of treating severe symptoms—to the virus.[166] As of April 13, 2020, 45 DOC staff members had tested positive for COVID-19. Additionally, the high concentration of infected persons at LSP would increase the

---

[162] *Id.* at ¶ 14; Ex. 2, Vassallo Decl. at ¶ 11.
[163] Ex. 2, Vassallo Decl. at ¶ 16.
[164] Ex. 1, Puisis Decl. at ¶ 13.
[165] *Id.* at ¶ 14.
[166] Ex. 1, Puisis Decl. at ¶¶ 18, 20; Ex. 2, Vassallo Decl. at ¶ 18.

likelihood of the virus spreading to West Feliciana community members via infected LSP medical and custodial staff who are exposed to those viral loads and further strain local resources.[167]

> ii. **LSP's Camp J Is Notoriously Unfit for Housing even Healthy Individuals**

155.    LSP's Camp J is notoriously unfit for housing even healthy individuals, let alone those suffering from COVID-19 symptoms. Completed in 1976, Camp J has four buildings, all connected through open-air walkways. One of the buildings is a dormitory-style housing facility, and the other three are closed-cell blocks. Defendant LeBlanc said of Camp J in 2018, "It's just not a good place to be."[168]



*Figure 1Floor Plan for One of Closed-Cell Block Buildings at Camp J.*

156.    Camp J was constructed and designed to be a "punishment camp." DOC used Camp J to discipline incarcerated people following alleged infractions of prison rules or for behavioral issues,[169] and Camp J's infrastructure and inherit conditions are particularly suited to those functions.

---

[167] Ex. 2, Vassallo Decl. at ¶ 18.
[168] Grace Toohey, *Angola Closes Its Notorious Camp J, "a Microcosm of a lot of Things that Are Wrong,"* THE ADVOCATE, (May 13, 2018, 8:01 PM), https://www.theadvocate.com/baton_rouge/news/crime_police/article_b39f1e82-4d84-11e8-bbc2-1ff70a3227e7.html.
[169] *Id.*

157.    The building is notorious for its lack of ventilation, heating, and cooling. People incarcerated in Camp J were forced out of necessity to "strip naked and lie on the cement floors to keep cool during the long, humid summer days; in the winter, the cells can be frigid."[170]  In 2000, death row inmate Abdullah Hakim El-Mumit sued the prison to be returned from Camp J to death row, saying conditions in the punishment camp were worse than in the death house and thereby unconstitutional.[171]

158.    After more than 40 years as one of the most restrictive housing units within Louisiana's prison system, DOC closed Camp J in May 2018.[172] At Camp J's peak, it confined more than 400 individuals being disciplined in solitary cells for more than 23 hours a day.[173]

159.    At the time of the closure, prison officials cited the deterioration of the decades-old facility as the basis for the closure.[174] Additionally, significant mold and flooding issue issues plagued the building.

---

[170] Brooke Shelby Biggs, *Camp J, Red Hats and the Hole: Inside Angola's three circles of solitary-confinement hell,* MOTHER JONES, (Mar. 5, 2009), https://www.motherjones.com/politics/2009/03/camp-j-red-hats-and-hole.
[171] *Id.*
[172] Grace Toohey, *supra* n.168.
[173] *Id.*
[174] *Id.*



*Figure 2: Photo of Mold in Camp J Shortly After Camp Closure.*



*Figure 3 Row Of Cells With Flooding Shortly After Camp J's Closure.*

160.     The locks for the cells in Camp J malfunctioned, sometimes opening on their own.[175]

A complicated procedure for locking the doors was required to prevent the doors from opening on

their own and, even if the procedure was followed, there was no guarantee the doors would stay

locked, leading to incredibly dangerous confinement conditions.



*Figure 4* Instructions posted in Camp J in 2018 near time of closure.

161.    According to Defendants, COVID-19 patients will be under strict cell isolation, but that strict isolation may not be possible if the defects in the door mechanisms remain in place.

162.    Because Camp J's buildings do not have proper ventilation, those facilities are extremely inappropriate for housing patients with COVID-19, an illness that causes severe respiratory symptoms. There is no air conditioning at Camp J. There are ceiling fans to help circulate air, but large fans blowing air are likely to spread aerosolized agents around the facility, making it more likely that staff at Camp J will breathe in contagions.[176]

163.    Moreover, holding COVID-19 patients in a concentrated environment with no ability for individual patients to self-isolate, and with fans blowing contagions around the facility,

---

[175] *Id.*
[176] Ex. 1, Puisis Decl. at ¶ 10.

may expose patients to higher viral loads and make them more vulnerable to more serious symptoms.[177]

164.    The COVID-19 patients whom the DOC is transferring to Camp J are not asymptomatic; the DOC is not testing people in its custody for the virus unless they show symptoms.[178] The patients being held at or transferred to Camp J are suffering at the very least mild-to-moderate symptoms, which will only be exacerbated by an environment that was designed for maximum punishment, not medical isolation, and certainly not medical care or treatment. Neither the open bar cells nor the open dorm allows for complete medical isolation, as is recommended by the CDC.[179]

165.    Kendrick Wilson was forcibly transferred to Camp J on the evening of April 11, 2020, despite the fact that he was suffering from body aches, a cough, congestion, and had a fever of 102.5 degrees before he was tested. He is not aware of any medical screening that was done before he was transported. At Camp J, he is housed in an open dormitory with approximately 40 other people, many of whom are coughing, and some of whom are hooked up to IVs or using oxygen masks. There is no physical isolation or barrier between him and the other patients.

166.    Plaintiff Julius Allen has tested positive for COVID-19 and is facing transfer from medical isolation in Unit 2 at the East Baton Rouge Parish Prison to Camp J. He is at-risk for serious medical complications because of his diabetes and hypertension. He is already suffering from fever, severe body aches, difficulty breathing, weakness, disorientation, and diarrhea. These myriad

---

[177] James D. Walsh, *Is 'Viral Load' Why Some People Get a Mild Case of COVID-19?*, NY MAG (Mar. 27, 2020), https://nymag.com/intelligencer/2020/03/is-viral-load-key-to-understanding-coronaviruss-severity.html.

[178] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585-1 at ¶ 20.

[179] CDC Guidance, *supra* n.2 ("Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission;" "Facilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible.")

symptoms alone will require at least some medical attention, and Camp J is not remotely equipped to provide such attention.

167.    Camp J does not have its own medical unit and was designed to house people with disciplinary issues; it is entirely unfit to house those who are ill, suffering, and in need of medical monitoring and treatment because of the lack of ventilation, inadequate temperature control, mold, flooding issues, and faulty door locks.

168.    The DOC's plan for supplies at Camp J is also deficient. The DOC plans to provide the following medical supplies to Camp J:

        a.  $O_2$
        b.  $O_2$ Mask (15 at each site)
        c.  Suction machines and canisters (2 machines and 25 canisters)
        d.  Yanker suctions with tubing (25)
        e.  Thermometers and covers (3 at each area)
        f.  B/P monitors (2 at each area)
        g.  Stethoscopes (2)
        h.  IV fluids (10)
        i.  IV tubing (10)
        j.  IV start kits (10)
        k.  Tape (5 rolls)
        l.  Gauze (1 case at each site)
        m.  Wash basins (25)
        n.  Disposable wash cloths (1 case at each site)
        o.  Foley catheters (10)
        p.  IV catheters (5 of each size 20G, 22G, 18G, 24G)
        q.  Disposable gowns (1 case at each site)
        r.  N 95 masks (2 boxes at each site)
        s.  Bedpans (20 at each site)
        t.  Crash cart fully supplied (1 at each site)
        u.  Vacutainers (1 box at each site)
        v.  Blood tubes (1 package of each type at each site)
        w.  Butterfly needles (1 box at each site)
        x.  Gloves (case of each size)
        y.  Alcohol preps (5 boxes at each site)
        z.  Hand sanitizers (6 bottles at each site)
        aa.  Bleach with dispenser bottles (4 bottles at each site)
        bb.  Tissue (1 case)
        cc.  Diapers (1 case)
        dd.  Blue pads (1 case)
        ee.  Potty chairs (10)
        ff.  Red bags (1 case)

gg. Glucometer at each site
hh. Syringes with needles (1 case at each site)
ii.  Medicine cups (1 case at each site)
jj.  Ice bags (1 case at each site)
kk. IV poles (4 at each site)
ll.  Sharps containers (2 large at each site)

169.    Moreover, taking a space designed specifically for solitary, disciplinary confinement and repurposing it for medical isolation is inappropriate. Solitary Confinement is the practice of isolating incarcerated people from the rest of the prison population while simultaneously imposing punitive measures such as major restrictions on visitors, phone calls, recreation and outdoor time, and access to personal property.[180] Medical Isolation is the practice of isolating incarcerated people from the rest of the prison population when they show signs or test positive for COVID-19 in order to stem the risk of COVID-19 transmission throughout the prison.[181]

170.    "Placing people in solitary confinement (punitive isolation) will worsen the COVID-19 crisis. Many corrections officials lack guidance on how to humanely and effectively separate sick or contagious individuals from the general population. At times, the most feasible and only available housing units in jails and prisons for medical isolation or quarantine of sick patients are those used for punitive solitary confinement in 'normal' times (single cells, solid cell doors rather than barred, [housing areas] removed from the main center of the prison). Use of these units for medical purposes…can run the risk of corrections officials falling back on regular policies and procedures governing living conditions in these units that harm the health of those exposed."[182]

171.    Nationwide, there is significant concern that fear of being placed in solitary will deter people from reporting symptoms to correctional staff. "Experts and advocates are deeply concerned

---

[180] David Cloud, JD, MPH; Dallas Augustine, MA; Cyrus Ahalt, MPP; & Brie Williams, MD, MS, *The Ethical Use of Medical Isolation—Not Solitary Confinement—to Reduce COVID-19 Transmission in Correctional Settings*, AMEND (Apr. 9, 2020), https://amend.us/wp-content/uploads/2020/04/Medical-Isolation-vs-Solitary_Amend.pdf.
[181] *Id.*
[182] *Id.*

that incarcerated people, many of whom will go to great pains to avoid solitary confinement due to well-established mental and physical health harms associated with the experience, will not come forward when they have symptoms of COVID-19 because they do not want to be placed in such conditions. This avoidance of reporting symptoms or illness will not only accelerate the spread of infection within facilities but also increase the likelihood of prisoner deaths due to lack of treatment."[183] Some individuals in DOC and pre-trial custody are avoiding coronavirus testing because they fear that they will test positive and be transferred to Camp J.

> **B.    The DOC's LSP Transfer Plan Unnecessarily Subjects A Vulnerable Population to an Increased Risk of Transmission**

172.    The DOC's LSP transfer plan, which is reflective of its overall COVID-19 plan, unnecessarily subjects an extremely vulnerable population to an increased risk of transmission.

173.    LSP's provisions in its pandemic plan do not lay out adequate protocols for medical isolation of Camp J from the rest of LSP's population, the majority of whom are elderly or otherwise at high risk because of their medical conditions.[184]

174.    It will be very difficult, if not impossible, for the DOC to prevent the spread of COVID-19 at LSP.

175.    On April 1, 2020, DOC officials signed declarations that there would be no mingling between staff working at Camp J and LSP's sick and elderly population. But by April 3, 2020, at least one staff member who regularly comes into direct contact with the patients in LSP's hospice program and on the medical wards was going back and forth from Camp J.

176.    There is no way to access Camp J without entering through the main entrance at LSP and going through the facilities' centralized security checkpoint, which is used daily by staff using

---

[183] *Id.*
[184] Ex. 1, Puisis Decl. at ¶ 20.

other parts of the prison. While somewhat isolated on the LSP campus, Camp J is, and the DOC has always treated it as, a part of the prison.

177.    Defendants' plan for preventing staff from transmitting the virus is directly contrary to CDC guidelines. Defendants have directed employees found to have a fever to be sent home, and then return to work as soon as 24 hours after they are fever-free without the use of fever medication.[185] But the CDC recommends returning to work no less than *three* days after resolution of the fever—and at least *seven* days after symptoms first appeared (or after receiving multiple negative COVID-19 tests).[186]

178.    LSP poses a particularly high risk of transmission. The CDC recommendations described above are not possible in LSP.[187] The majority of the people incarcerated at LSP live in dormitories of up to 86 people, where social distancing is functionally impossible, as the distance between beds is approximately 3 feet.[188] Large fans blow air through the units which is likely to spread contagious agents embedded in aerosol like COVID-19.[189] As a result, LSP is an environment that could not be more contrary to current public health recommendations and the President's Task Force recommendations.[190] Indeed, LSP has worse living conditions and higher commingling of people than cruise ships and nursing homes, where COVID-19 is known to easily spread and cause significant death.[191]

179.    LSP houses thousands of people who are at high risk of suffering severe or even fatal effects if they contract COVID-19 due to the aging and elderly population, as well as the

---

[185] *Lewis v. Cain*, 15-cv-318, Rec. Doc. No. 580-4 at 31.
[186] Ex. 1, Puisis Decl. at ¶ 22 n.17; *see also* CDC, "What to Do If You Are Sick" (Mar. 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (under "How to discontinue home isolation"); CDC Guidance, *supra* n.2 (advising that symptomatic correctional staff should follow the guidance in "What to Do If You Are Sick").
[187] Ex. 1, Puisis Decl. at ¶ 7.
[188] *Id.* at ¶ 10.
[189] *Id.*
[190] *Id.*

extremely high numbers of people suffering from chronic diseases. Spread of the virus among these vulnerable populations would result in high rates of death.[192]

180.    By classification, LSP houses people who are elderly, have disabilities, are mentally ill or have severe chronic illness profiles in specific housing areas, making these populations extremely vulnerable to spread if the virus is introduced among them. Housing the elderly and medically vulnerable together in dormitories in this manner creates a nursing-home-like environment, an environment where COVID-19 is known to spread rapidly.[193]

181.    The most vulnerable among the LSP population are the patients at the infirmaries in the R.E. Barrow Treatment Center ("Treatment Center"). Most if not all of these patients have one or more conditions that put them at high risk. Their beds are in dormitory style settings and are close together.[194] The approximately 240 residents of the so-called "medical dormitories" are nearly as vulnerable: virtually all have risk factors for severe consequences from COVID-19, yet they live in dormitories that are incapable of allowing them to follow current CDC recommendations regarding prevention against COVID-19.[195] Plaintiff Michael Videau is elderly and suffers from a multitude of pre-existing conditions that put him at high risk of developing severe COVID-19 symptoms. Mr. Videau has leukemia, high blood pressure, diabetes, arthritis, and has suffered from pneumonia. Last year, he needed to be put on oxygen on one occasion.

182.    As discussed above, Defendants cannot constitutionally provide adequate medical care to COVID-19 patients at Camp J. If the DOC intends to provide treatment for even moderate cases of COVID-19, they will need to do so at the Treatment Center. In addition to housing the most vulnerable people at LSP in the infirmaries, the Treatment Center provides medical care to

---

[191] *Id.* at ¶¶ 7, 10.
[192] *Id.* at ¶ 12.
[193] *Id.* at ¶¶ 10, 12.
[194] *Id.* at ¶ 10.
[195] *Id.*

thousands of high-risk patients. Most if not all of these patients are at high risk of death or severe injury and suffering if COVID-19 spreads within the Treatment Center.

183.    The Flu Regulation and the LSP Flu Coop Plan that LSP uses as its COVID-19 plan are not consistent with COVID-19 recommendations because three distinct types of special housing are recommended for COVID-19: quarantine, isolation for people with known COVID-19, and isolation for persons under investigation ("PUI"). The PUI group are people who are symptomatic (fever, cough, shortness of breath, etc.) but have not yet been tested or have test results pending. These three groups should be housed separately. Neither the Flu Regulation plan nor the LSP Flu Coop Plan includes these three separate groups, suggesting further vulnerability at this location.[196]

184.    The LSP Flu Coop Plan does not address how the PUI group or the COVID-19-positive groups will be monitored or what arrangements would be made when patients need to be transferred to the hospital.[197]

185.    The LSP Flu Coop Plan does not address LSP's capacity to provide appropriate medical care, particularly while maintaining isolation and quarantine for COVID-19 patients from the rest of LSP.  The plan does not explain how the DOC will provide sufficient medical personnel at Camp J, who would have no contact with patients at the rest of LSP, without further diminishing the capacity of the already overtaxed LSP doctors and nurses.[198]

186.    Even if Defendants could find a way to provide all medical care for the COVID-19 transferees at Camp J, Plaintiffs have reported that medical personnel and other correctional staff regularly move between Camp J and the Treatment Center, creating a high likelihood of transmission from Camp J to the rest of the prison.

---

[196] *Id.* at ¶ 17.
[197] *Id.* at ¶ 18.
[198] *Id.* at ¶ 19.

187.    Plaintiff Daniel Gumns suffers from asthma, which puts him "at higher risk of getting very sick from COVID-19," as the disease could "affect [his] respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease."[199] Mr. Gumns also recently suffered a cardiac arrest while hospitalized for a seizure. Many COVID-19 patients suffer heart damage, and some even die from heart failure.[200]

188.    Plaintiff Michael Videau is elderly and suffers from a multitude of pre-existing conditions that put him at high risk of developing severe COVID-19 symptoms. Mr. Videau has leukemia, high blood pressure, diabetes, arthritis, and has suffered from pneumonia. Last year, he needed to be put on oxygen on one occasion.

189.    Plaintiff Lionel Tolbert is 65 years old and suffers from cardiovascular disease, which puts him at high risk of developing severe COVID-19 symptoms. He saw a cardiologist most recently in late 2019.

190.    Plaintiff Michael Robinson is elderly and suffers from liver disease and hepatitis C, which puts him at high risk of developing severe COVID-19 symptoms.

191.    Plaintiff Reginald George is handicapped and suffers from a multitude of pre-existing conditions that put him at high risk of developing severe COVID-19 symptoms. His chronic medical conditions include hypertension, prostate cancer, hepatitis C, and HIV.

## IV.    Defendants' Plans Place All Incarcerated Patients at Risk, Whether They Are Housed at DOC Facilities or Local Facilities and Whether They Are Pre-trial Detainees or Post-Trial Prisoners

### A.    Defendants Have Obligations to People Incarcerated in Parish Prisons and Jails

---

[199] People with Moderate to Severe Asthma, Coronavirus Disease 2019 (COVID-19), CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Apr. 13, 2020).

[200] Markian Hawryluk, *Heart Damage in COVID-19 Patients Puzzles Doctors*, SCIENTIFIC AMERICAN (Apr. 6, 2020), https://www.scientificamerican.com/article/heart-damage-in-covid-19-patients-puzzles-doctors/.

192.    Defendants' obligations do not end with the people in the DOC's eight facilities—all Defendants are also responsible for the care of the people being held in the parish prisons for compensation by the DOC. Presently, 52% of people in DOC custody are housed in local parish prisons and jails.[201] The DOC is ultimately responsible for the constitutionality of the conditions of the confinement of people it has transferred to local jails.

193.    The DOC has offered to hold at LSP's Camp J people who have tested positive for COVID-19 who are housed in local and state facilities, at the discretion of the facility where a person is being held. The DOC has offered no medical screening protocol to determine when someone at a local parish prison or jail should be sent to a hospital or medical facility and when that person should be sent to LSP's Camp J.

194.    The DOC has inspection and review authority of parish prisons and jails in Louisiana. As of December 2017, the DOC held people in well over 100 different parish prisons and jails and is believed to still house people in its control and custody within these facilities at similar rates.[202] It does not appear that the DOC has sought to assess the capabilities of these facilities for proper hygiene, social distancing, appropriate quarantining, and medical isolation.

195.    Because the LDH rescinded its guidance, no public health guidance has been issued to protect the people held in parish prisons and jails.

196.    The Governor's only activity has been to set a process for people within six months of their sentences, convicted of non-violent/non-sex crimes, over the age of 65, *and* with pre-existing conditions, the opportunity to be considered for early release. No one has been released from a parish jail, parish prison, or state facility as of the date of filing under this program.

---

[201] DOC Briefing Book, *supra* n.5, at 24.
[202] 2017 Status of State and Local Corrections Facilities and Program Report, Louisiana Commission on Law Enforcement and Administration of Criminal Justice, Apr. 1, 2018, http://lcle.la.gov/programs/uploads/2017_Status_of_State_and_Local_Corrections_Facilities_and_Program_Report.pdf.

197.    The inaction by Defendants requires court intervention on behalf of all Louisianans subject to unconstitutionally high risk during this pandemic.

**B.    Risk to People in Pre-Trial Detention**

198.    People detained while awaiting trial are also facing an unconstitutionally high risk of harm under Defendants' COVID-19 response efforts.

199.    The DOC is statutorily authorized to bring into its "temporary, constructive custody inmates evacuated" from a parish affected by an emergency or disaster declared under R.S. 29.721, even if "the inmates . . . are awaiting trial as a pretrial detainee."

200.    Governor Edwards declared an emergency under R.S. 29.721, and by implementing its Camp J transfer plan, the DOC is presumably taking into its constructive custody pretrial detainees and is therefore responsible for the care of those it transfers to state prisons.

201.    Presently, significant numbers of people in East Baton Rouge Parish Prison—where several Named Plaintiffs are or were held—and other parish prisons are testing COVID-19 positive. Without appropriate public health instruction, some of these jails have been unable to properly implement social distancing, hygiene practices, and PPE distribution. Others have been unable to set up the appropriate levels of quarantine and medical isolation in their jails.

202.    Both being held in such conditions and being transferred to LSP's Camp J independently constitute improper punishment.

203.    Notably, people who are detained pre-trial may have many avenues for release to medically isolate in their own homes or the homes of their families. Across the state, funds are being raised and motions are being submitted to raise and obtain bail for people who are at high risk for death if they contract COVID-19.

204.    For some people, their release opportunities may be impacted negatively by the DOC's transfer plan, and instead of being released from a jail in the parish where a person awaiting

trial resides, that person will find him or herself in another DOC facility where loved ones may struggle to find him or her.

## CLASS ACTION ALLEGATIONS

205.    Named Plaintiffs bring this action on behalf of themselves and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

206.    A class action is a superior means, and the only practicable means, by which named Plaintiffs and unknown Class Members can challenge Defendants' unconstitutional COVID-19 response.

207.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) or 23(b)(1)(A) of the Federal Rules of Civil Procedure.

### V.    The Plaintiff Class and Subclasses

208.    Plaintiffs propose a declaratory and injunctive class defined as: All prisoners and pre-trial detainees who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices (the "Plaintiff Class"). They seek declaratory and injunctive relief to terminate the ongoing course of conduct on the part of Defendants that is creating a substantial risk of serious harm and depriving the named Plaintiffs and the Plaintiff Class of their constitutional rights, and to enjoin the policies and practices adopted and implemented by Defendants that result in the deprivation of those rights.[203]

---

[203] Plaintiffs' proposed Class consists of people in pre-trial detention and also people who have been convicted of crimes. The Fourteenth Amendment's "substantive due process" protections apply to medical claims brought by individuals in pre-trial detention, whereas the Eighth Amendment applies to people in prison pursuant to convictions. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648-49 (5th Cir. 1996). However, the Fifth Circuit has held that the same subjective deliberate indifference standard applies to both and, therefore, the analysis *infra* proceeds pursuant to the Eighth Amendment's "deliberate indifference" analysis. *Id.* The pre-trial Plaintiffs note that the Fifth Circuit's decision in *Hare* is contrary to the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Following *Kingsley*, other circuits have held that a more protective "objective" deliberate indifference standard should apply to medical claims of individuals in pre-trial detention. *See, e.g., Gordon v. County of Orange,* 888 F.3d 1118, 1124-25 (9th Cir. 2018); *Darnell v. Pineiro,* 849 F.3d

209.    Subclass I: Plaintiffs propose a declaratory and injunctive subclass of all incarcerated individuals who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices.

210.    Subclass II: Plaintiffs propose a declaratory and injunctive subclass of all individuals being held in pre-trial detention who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices.

**VI.    Rule 23(a) Factors**

211.    The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

**C.    Numerosity — Fed. R. Civ. P. 23(a)(1)**

212.    The class is so numerous that joinder of all members is impracticable. The DOC has over 31,600 within its immediate custody, and another 15,000 people are detained pretrial in Louisiana. All are at risk of being transferred to LSP under the DOC's plan, and all are dependent on Defendants during the COVID-19 pandemic. Defendants' policies and practices put everyone in DOC's custody at risk of contracting and dying of COVID-19 and receiving inadequate health care while in custody.

213.    The Plaintiff Class members are identifiable using records maintained in the ordinary course of business by the DOC.

**D.    Commonality — Fed. R. Civ. P. 23(a)(2)**

214.    All members of the proposed Plaintiff Class are subject to the same systemic unconstitutional policies, practices, acts, and omissions on the part of Defendants described in this Complaint, and all are at risk of adverse impacts on their physical health resulting therefrom.

---

17, 33-36 (2d Cir. 2017). Nevertheless, this Court need not resolve that tension here, because the pre-trial Plaintiffs can easily show that Defendants' COVID-19 response constitutes subjective

215. There are questions of law and fact common to the members of the class.

216. Such common questions of law include, but are not limited to:

- Whether Plaintiffs, and the putative class they seek to represent, face a substantial risk of serious harm under the DOC's COVID-19 response plan;
- Whether Plaintiffs, and the putative class they seek to represent, face a substantial risk of serious harm due to the COVID-19 pandemic; and
- Whether the DOC's COVID-19 response plan amounts to deliberate indifference to Plaintiffs' right and the right of the putative class members they seek to represent to be free from cruel and unusual punishment.

217. Such common questions of fact include, but are not limited to:

- Whether Defendants are aware of the substantial risk of serious harm Plaintiffs face under the DOC's COVID-19 response plan;
- Whether Defendants have taken reasonable measures to abate the substantial risk of serious harm caused by the COVID-19 pandemic for the individuals who are within their custody;
- Whether Defendants have promulgated adequate policies to protect against the harms of COVID-19;
- Whether Defendants have ensured that prisons and jails have sufficient oversight, staffing, and resources to protect people from COVID-19;
- Whether COVID-19 patients housed at Camp J will have access to adequate medical care;
- Whether the DOC's plan to transfer COVID-19 patients to LSP's Camp J will further strain LSP's ability to provide medical care for its current population;
- Whether the DOC's plan to transfer COVID-19 patients to LSP's Camp J will increase the risk of COVID-19 transmission among the LSP population; and
- Whether the DOC's COVID-19 response plan is consistent with CDC guidelines.

218. Defendants are expected to raise common defenses to these claims, including denying that they are deliberately indifferent and denying that their actions violate the law.

**E.    Typicality — Fed. R. Civ. P. 23(a)(3)**

219. Plaintiffs' claims are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct, and their claims are based on the same theory of law as the class's claims. Named Plaintiffs are all subjected to the inadequate policies and practices of Defendants. Named Plaintiffs and the proposed class they seek to represent have suffered injuries or

deliberate indifference for the same reasons that the convicted Plaintiffs can show an Eighth

a have a substantial risk of serious harm and will continue to be in this position due to Defendants' unlawful and unconstitutional pattern and practice of transferring COVID-19 patients to LSP's Camp J.

### F.    Adequacy — Fed. R. Civ. P. 23(a)(4)

220.    Named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims. They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

221.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights by halting the DOC's LSP transfer plan.

222.    Plaintiffs are represented by attorneys from the Promise of Justice Initiative and the Southern Poverty Law Center, who have experience in litigating complex civil rights matters related to prisoners' rights in federal court and extensive knowledge of both the details of Louisiana's prison system and the relevant constitutional and statutory law.

223.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

### G.    Rule 23(b)(2)

224.    Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all putative Class Members by enforcing a plan in which any person in DOC custody who tests positive for COVID-19 will likely be transferred to LSP.

Amendment violation.

225.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from carrying out the LSP transfer plan. Because the putative Class challenges Defendants' transfer plan as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

226.    Injunctive relief compelling Defendants to respect Plaintiffs' constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful and dangerous plan. A declaration and injunction stating that Defendants cannot transfer COVID-19 patients to LSP would provide relief to every Class Member. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

### H.    Rule 23(b)(1)(A)

227.    Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all putative Class Members by enforcing a plan in which any person in DOC custody who tests positive for COVID-19 will likely be transferred to LSP but there is a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class

228.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from carrying out the LSP transfer plan. Because the putative Class challenges Defendants' transfer plan as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(1)(a) certification is appropriate and necessary.

229.    Injunctive relief compelling Defendants to respect Plaintiffs' constitutional rights will similarly impact all the parties. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

I.    **42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19 (Subclass I) (Eighth Amendment) (Defendants Edwards, DOC, LDH, LeBlanc, and Russo)**

230.    Plaintiffs repeat and re-allege the proceeding paragraphs as if fully set forth in this Count.

231.    Named Plaintiffs who are incarcerated post-conviction ("State Plaintiffs"), and the putative class they seek to represent ("Subclass I"), face a substantial risk of serious harm from the actions and inactions of Defendants in response the COVID-19 pandemic.

232.    The COVID-19 pandemic creates a substantial risk of serious harm for State Plaintiffs and Subclass I—a risk of which Defendants are well aware—and the Eighth Amendment requires that Defendants take reasonable measures to abate that risk for the individuals who are within the State's custody.

233.    Defendants have failed to take reasonable measures to abate that risk for people incarcerated in Louisiana.

234.    State Plaintiffs and Subclass I have been deprived and continue to be deprived by the Defendants of their rights under the Eighth Amendment to reasonably safe living conditions.

235.    Defendants are aware of the substantial risk of harm that COVID-19 poses to State Plaintiffs and Subclass I, and are further aware of the particular risks of severe illness and possible death that State Plaintiffs and Subclass I face as a result of the inherently congregate and unclean settings in incarceration. Despite this knowledge, Defendants have failed to take reasonable measures to mitigate these dangers.

236.    Defendant DOC's LSP transfer plan also creates a substantial risk of serious harm for State Plaintiffs and Subclass I. The transfer plan increases the substantial risk of serious harm created by the COVID-19 pandemic.

237.    Defendants are aware of the risks of transferring COVID-19 patients, of housing COVID-19 patients in concentrated environments in close contact with one another, of housing COVID-19 patients far from hospitals capable of treating life-threatening symptoms, and of increasing the exposure of the vulnerable LSP population to COVID-19.

238.    The Eighth Amendment requires that Defendants not impose this heightened, and serious risk, for individuals who are incarcerated created both by the risk of being transferred to Camp J and the risk of being held in a facility being used as a hub for COVID-19 patients.

239.    Defendants LDH and Russo are aware of the transfer plan and have not used their statutory authority to stop the transfer plan. To the extent Defendant Edwards denies participation in the transfer, Defendant Edwards is aware of the transfer plan and has not used the statutory authority and oversight to stop the transfer plan.

240.    The transfer plan constitutes deliberate indifference to State Plaintiffs' right and Subclass I's right to represent to be free from cruel and unusual punishment.

241.    State Plaintiffs, on their own behalf and on behalf of Subclass I, seek injunctive and declaratory relief against all Defendants to prevent the continued violation of their constitutional rights as detailed herein.

**II.    42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Posed by COVID-19 (Subclass II) (Fourteenth Amendment) (Defendants Edwards, LDH, and Russo)**

242.    Plaintiffs repeat and re-allege the proceeding paragraphs as if fully set forth in this Count.

243.    Kendrick Wilson, Julius Allen, Ernest Rogers, and Alfoanso Garner, ("Pre-Trial Plaintiffs") and the putative class they seek to represent (Subclass II), face a substantial risk of serious harm from the actions and inactions of Defendants Edwards, LDH, and Russo in response the COVID-19 pandemic.

244.     The COVID-19 pandemic creates a substantial risk of serious harm for Pre-Trial Plaintiffs and Subclass II—a risk of which Defendants are well aware—and the Fourteenth Amendment requires that Defendants take reasonable measures to abate that risk for Pre-Trial Plaintiffs and Subclass II.

245.     Defendants have failed to take reasonable measures to abate that risk.

246.     Pre-Trial Plaintiffs and Subclass II have been deprived and continue to be deprived by Defendants Edwards, LDH, and Russo of their rights under the Fourteenth Amendment to reasonably safe living conditions.

247.     Defendants Edwards, LDH, and Russo are aware of the substantial risk of harm that COVID-19 poses to all individuals, and are further aware of the particular risks of severe illness and possible death that these Plaintiffs face as a result of the inherently congregate and unclean settings in incarceration. Despite this knowledge, Defendants Edwards, LDH, and Russo have failed to take reasonable measures to mitigate these dangers.

### III.     42 U.S.C. § 1983 Deliberate Indifference to the Serious Risk of Harm Created by The DOC's LSP Transfer Plan (Subclass II) (Fourteenth Amendment) (Defendants Edwards, DOC, LDH, LeBlanc and Russo)

248.     Plaintiffs repeat and re-allege the proceeding paragraphs as if fully set forth in this Count.

249.     Defendant DOC's LSP transfer plan also creates a substantial risk of serious harm for Pre-Trial Plaintiffs and Subclass II. The transfer plan increases the substantial risk of serious harm created by the COVID-19 pandemic.

250.     Defendants are aware of the risks of transferring COVID-19 patients, of housing COVID-19 patients in concentrated environments in close contact with one another, and of housing COVID-19 patients far from hospitals capable of treating life-threatening symptoms.

251.    The 14th Amendment requires that Defendants not impose this heightened, and serious risk, for the individuals who are detained pre-trial created by the risk of being transferred to Camp J.

252.    Defendants LDH and Russo are aware of the transfer plan and have not used their statutory authority to stop the transfer plan. To the extent Defendant Edwards denies participation in the transfer, Defendant Edwards is aware of the transfer plan and has not used the statutory authority and oversight to stop the transfer plan.

253.    The transfer plan constitutes deliberate indifference to Pre-Trial Plaintiffs' right and Subclass II's right to represent to be free from punishment.

254.    Pre-Trial Plaintiffs, on their own behalf and on behalf of Subclass II, seek injunctive and declaratory relief against all Defendants to prevent the continued violation of their constitutional rights as detailed herein.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and the putative class they seek to represent, request that this Court enter judgment in their favor and against Defendants and order the following relief:

(a) An order and judgment declaring that Defendants' policies and practices concerning COVID-19, in their totality, violate the Eighth and Fourteenth Amendments to the United States Constitution;

(b) An order and judgment declaring that the conditions, acts, omissions, policies, and practices described above are in violation of the rights of Plaintiffs, and the rights of the Class and Subclasses they seek to represent, under the Eighth and Fourteenth Amendments to the United States Constitution;

(c) An order and judgment declaring that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) or 23(b)(1)(A), and appointing the undersigned as Class Counsel;

(d) An order and judgment preliminarily and permanently enjoining Defendants, their subordinates, agents, employees, representatives, contractors, and all others acting or purporting to act in concert with them or on their behalf from

subjecting Plaintiffs, and the Class and Subclasses Plaintiffs seek to represent, to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

(e) An order and judgment ordering Defendants to develop and implement, as soon as practicable, a plan to eliminate the substantial risk of serious harm that Plaintiffs, and all members of the Class and Subclasses Plaintiffs seek to represent, suffer due to the unlawful acts, omissions, conditions, and practices described in this Complaint. Defendants' plan shall include, at a minimum, taking all necessary steps to ensure the following during the COVID-19 pandemic:

- That Defendants promulgate and implement adequate policies and procedures related to COVID-19 that ensure adequate staffing; resources; quality assurance; surveillance; auditing; data tracking; coordination with local, state, and federal health officials; education; clinical guidance; and training;
- That each COVID-19 patient in DOC custody is evaluated by a medical professional and that transfers of such patients are initiated only at the recommendation of the evaluating medical professional;
- That each DOC facility's capacity to provide social distancing and the maximum number of inmates it can house safely under the CDC's social distancing guidelines is evaluated; and
- That Defendant Russo and Defendant LDH assess and make recommendations regarding conditions of confinement in all Louisiana jails and prisons consistent with the CDC's social distancing guidelines and that Defendants conform all policies and guidance in local parish prisons and parish jails that hold state prisoners to such recommendations.

(f) Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

(g) An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(h) Any other relief this Court deems proper.

Respectfully submitted this 14th day of April, 2020.

/s/ Mercedes Montagnes

Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
The Promise of Justice Initiative
1024 Elysian Fields Avenue

New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jared Davidson, La. Bar No. 37093
Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
Email: jared.davidson@splcenter.org

*Attorneys for Plaintiffs*