# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DANIEL GUMNS, MICHAEL VIDEAU, TREVON WILEY, IAN CAZENAVE, REGINALD GEORGE, LIONEL TOLBERT, OTTO BARRERA, KENTRELL PARKER, MICHAEL ROBINSON, JULIUS ALLEN, ERNEST ROGERS, ALFOANSO GARNER, BRADLEY WINTERS, KENDRICK WILSON, and JAMES HUGHES, on behalf of themselves and all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN BEL EDWARDS, in his official capacity as Governor of the State of Louisiana; LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS; JAMES LEBLANC, in his official capacity as Secretary of the Department of Safety and Corrections; JOHN MORRISON, in his official capacity as Medical Director of the Department of Safety and Corrections; LOUISIANA DEPARTMENT OF HEALTH; and STEPHEN R. RUSSO, in his official capacity as Interim Secretary of the Louisiana Department of Health,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER ENJOINING DEFENDANTS FROM TRANSFERRING COVID-19 CARRIERS TO LOUISIANA STATE PENITENTIARY**

The COVID-19 pandemic represents an unprecedented threat to the lives of Louisianans, particularly those in the State's poorly equipped prison system. At least 884 people have already perished in the State[1]—amongst the highest mortality rates in the world—and that number will grow

---

[1] Coronavirus, La. Dep't of Health, http://ldh.la.gov/Coronavirus/ (last visited Apr. 13, 2020).

exponentially larger with each passing day. There is no cure for this highly contagious and deadly virus. Instead, social distancing and ready access to adequate medical care are the only reliable methods of protection from the virus's lethal consequences. While the majority of Louisianans shelter in place and enjoy the benefit of self-determination over their medical care, people in the State's prisons remain sitting ducks in an increasingly perilous pond created by Defendants' dangerous COVID-19 response.

In direct contravention of public health recommendations and plain common sense, Defendants are implementing a dangerous plan to transfer COVID-19 patients from every part of the State to the remote and notoriously inhumane Camp J at the Louisiana State Penitentiary ("LSP"). By crowding large numbers of COVID-19 patients into a facility far removed from hospitals and constitutionally adequate medical care but yet in dangerously close proximity to LSP's medically vulnerable population, this deadly course of action promises to result in the preventable deaths of dozens—if not hundreds or thousands—of people, including Plaintiffs, putative class members, LSP staff, and people in the community. Further, the very act of transporting confirmed cases of COVID-19 throughout the state creates innumerable unnecessary opportunities for spread.

As set forth below, the evidence indisputably satisfies the four-factor test for a temporary restraining order (TRO) enjoining Defendants' "Camp J Plan." Defendants' deliberate decision to isolate COVID-19 patients far from crucially needed adequate medical care and in close proximity to medically vulnerable patients at LSP subjects Plaintiffs and the putative class to a substantial and unconstitutional risk of serious harm. That substantial risk is exponentially compounded by pre-existing unconstitutional defects in LSP's medical system as well as by serious and systemic deficiencies in Defendants' overall COVID-19 plan. As a result, there can be no serious dispute that Plaintiffs will suffer irreparable harm—and possibly preventable death—absent an immediate injunction. The public interest weighs heavily against a plan that would not only deprive COVID-19

patients with access to necessary medical care but also result in the spread of COVID-19 amongst LSP patients and staff as well as the community at large. And even assuming Defendants' suffered some *de minimis* harm from an injunction, such hypothetical harm pales in comparison to the risks to the health and safety of Plaintiffs. Accordingly, Plaintiffs respectfully request that the Court immediately restrain Defendants from transferring patients with COVID-19 to Camp J, and then issue a preliminary injunction enjoining the transfer plan once the parties have fully briefed the issue.

## FACTUAL BACKGROUND

### I. COVID-19 Is a Serious and Deadly Disease That Has Caused a Global Pandemic.

COVID-19 is a novel virus for which there is no established curative medical treatment and no vaccine.[2] It can cause pneumonia, acute respiratory distress syndrome, respiratory failure, heart failure, sepsis, and other potentially fatal conditions.[3] Lab testing and imaging is required to appropriately evaluate and provide treatment to patients. One-fifth of all cases cause serious illness, including respiratory damage that requires hospitalization and mechanical ventilation, and can permanently harm those who survive.[4] Treatment for severe cases of COVID-19 includes respiratory isolation, oxygen, and mechanical ventilation.[5] Symptoms can range from fever, cough, chest pain, and headache to loss of smell, abdominal pain, rash, diarrhea, aches, and vomiting.[6] Severe COVID-19 patients can suffer acute respiratory distress syndrome ("ARDS"), requiring

---

[2] Ex. 1, Puisis Decl. at ¶ 2.

[3] Fei Zhou et al., *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19 in Wuhan, China: A Retrospective Cohort Study*, 395 LANCET 1054 (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

[4] "While about 80% of cases manifest as a mild illness (i.e. non-pneumonia or mild pneumonia), approximately 20% progress to a more severe illness, with 6% requiring specialist medical care, including mechanical ventilation." World Health Organization, *Preparedness, Prevention And Control Of COVID-19 In Prisons And Other Places Of Detention: Interim Guidance*, 10 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.

[5] Ex. 1, Puisis Decl. at ¶ 13.

[6] Ex. 2, Vassallo Decl. at ¶ 7.

admission to an intensive care unit and invasive ventilation.[7] The mortality rate for ARDS is 40%.[8] The severity and sensation of ARDS for COVID-19 patients is similar to drowning.[9]

COVID-19 is highly transmissible. Recent estimates by the CDC suggest that, on average in community settings, each infected person transmits the virus to an additional 5.7 additional people.[10] Only the influenza pandemic of 1918 is known to have higher infectivity.[11] COVID-19 is transmitted by droplets of infected aerosol when people with the infection cough, which can survive in the air for up to three hours—and on surfaces such as plastic and stainless steel for up to 2-3 days.[12]  COVID-19 can also be transmitted into the air by aerosolized feces when a toilet is flushed.[13]

Many studies have shown the increased risk for serious complications in patients infected with COVID-19 who also suffer from comorbidities, including common health problems that afflict Plaintiffs like hypertension, diabetes, COPD, and cancer.[14] Although advanced age and underlying illnesses or chronic medical conditions increase the risk of serious effects of COVID, younger patients ages 20-54 years old can also have serious complications, including hospital admission, admission to an intensive care unit, invasive ventilation, or death.[15]

---

[7] *Id.* at ¶ 19.

[8] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19 — Even in His Young Patients*, PROPUBLICA, (Mar. 21, 2020, 5 AM), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[9] *Id.*; *see also* Ex. 2, Vassallo Decl. at ¶ 20.

[10] *Id.* at ¶ 3.

[11] *Id.*

[12] Ex. 1, Puisis Decl. at ¶ 6, Ex. 2, Vassallo Decl. at ¶ 10.

[13] Alexandra Sternlicht, *Why You Should Flush with the Lid Down: Experts Warn of Fecal-Oral Transmission of COVID-19*, FORBES, (Apr. 2, 4:59 PM), https://www.forbes.com/sites/alexandrasternlicht/2020/04/02/why-you-should-flush-with-the-lid-down-virologist-warns-of-fecal-oral-transmission-of-covid-19/

[14] Ex. 2, Vassallo Decl. at ¶ 19.

[15] *Id.* at ¶ 9.

4

People in carceral settings are among the most vulnerable populations for COVID-19 infection.[16] It is typically not possible to isolate incarcerated people from the outside world (including from staff and vendors who may have been exposed to COVID-19), nor is it possible to meaningfully isolate them from one another. The transmission of COVID-19 in prisons can be likened to the transmission of TB, where social distancing practices are impossible with incarcerated people living in close quarters and lack of available means to ensure preventative hygiene practices.[17] As a result, jails and prisons are known to be a breeding ground for infectious respiratory illness.[18] The most vivid current example is the Cook County Jail, which currently has the highest outbreak numbers in the country.[19]

To reduce the risk of contracting COVID-19, the CDC advises all people—and particularly those at higher risk of severe illness—to "[w]ash your hands often with soap and water," "[i]f soap and water are not readily available, use a hand sanitizer that contains at least 60% alcohol," "[a]void close contact with people who are sick," "[p]ut distance between yourself and other people," and to "[c]over your mouth and nose with a cloth face cover when around others." None of these recommended preventive measures is available to people who are incarcerated in Louisiana.[20]

Moreover, health profiles of incarcerated people show that they are significantly sicker and more vulnerable to COVID-19 than the population at large.[21] Many have multiple comorbidities and are at a higher risk of complications, including ARDS.[22] LSP has a particularly vulnerable population

---

[16] *Id.* at ¶ 10.
[17] *Id.*
[18] Ex. 1, Puisis Decl. at ¶ 8.
[19] Timothy Williams & Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars*, NY TIMES, (April 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html
[20] Ex. 2, Vassallo Decl. at ¶ 10.
[21] Peter Wagner & Emily Widra, *No need to wait for pandemics: The public health case for criminal justice reform,* PRISON POLICY INITIATIVE, (March 6, 2020), https://www.prisonpolicy.org/blog/2020/03/06/pandemic/
[22] Ex. 2, Vassallo Decl. at ¶ 19.

with over 50% of people over 50 years of age, many of whom have high risk medical conditions.[23] The number of positive COVID-19 cases throughout Louisiana is climbing rapidly and the death rate per capita is the third highest in the country.[24]

## II. The DOC Plans to Manage COVID-19 by Transferring Positive Cases to LSP's Camp J.

According to the DOC, patients housed in DOC facilities or local parish prisons and jails who test positive for COVID-19 may be transported to LSP's Camp J for medical isolation. As of April 11, 2020, at least 40 people had been transferred to Camp J.[25] The DOC's transfer plan has expanded swiftly and must be stopped before preventable harm—and even death—cannot be undone.

Kendrick Wilson is in pre-trial detention and was being held at East Baton Rouge Parish Prison ("EBRPP") until April 11, 2020, when the DOC transferred him to Camp J after he was told that he had tested positive for COVID-19.[26] The two guards who woke Mr. Wilson to be transported told him that he would be transferred one way or another, whether willingly or unwillingly.[27] He stated multiple times that he did not want to be taken to Camp J.[28] Mr. Wilson is currently being held at Camp J in an open dorm with approximately 39 other people, none of whom are isolated from one another.[29] Mr. Wilson would like to be near a hospital.[30]

Plaintiff Ernest Rogers is in pretrial detention and was being held at EBRPP.[31] He was tested for COVID-19 at around 2 a.m. on April 9 and is suffering from a cough, sore throat, a fever, and

---

[23] *Id.* at ¶ 11.
[24] *Id.* at ¶ 5.
[25] Ex. 3, Wilson Decl. at ¶ 11.
[26] *Id.* at ¶¶ 4, 7, 10.
[27] *Id.* at ¶ 8.
[28] *Id.*
[29] *Id.* at ¶ 11.
[30] *Id.* at ¶¶ 17, 18.
[31] Ex. 4, Rogers Decl. at ¶ 4.

shortness of breath.[32] Mr. Rogers is 65 years old and has hepatitis C, liver disease, and high blood pressure.[33] The guards have told Mr. Rogers that he will be transferred to Camp J—voluntarily or non-voluntarily—if his test results are positive.[34] Mr. Rogers was previously housed at Camp J while incarcerated at LSP in the 1980s, and he does not want to go back.[35] Mr. Rogers would like to be held somewhere near a hospital.[36]

Plaintiff Julius Allen is in pretrial detention and was held at EBRPP.[37] Like Mr. Rogers, he was tested for COVID-19 around 2 a.m. on April 9 and is suffering from a fever, severe body aches, difficulty breathing, weakness, disorientation, and diarrhea.[38] He has had these symptoms for at least 5-7 days.[39] Mr. Allen has several pre-existing medical conditions—diabetes, hypertension, high cholesterol, and a history of bronchitis[40]—some of which make him more vulnerable to severe symptoms of COVID-19.[41] On April 9, Mr. Allen was taken from EBRPP to Our Lady of the Lake hospital in Baton Rouge.[42] Medical staff at the hospital told Mr. Allen that there was a "10/10" chance that he was COVID-positive.[43] Mr. Allen was sharing a cell with Kendrick Wilson when the guards came to transport Mr. Wilson.[44] Mr. Allen watched the guards force Mr. Wilson out of the

---

[32] *Id.* at ¶¶ 5-6.

[33] *Id.* at ¶ 7.

[34] *Id.* at ¶ 10.

[35] *Id.*

[36] *Id.* at ¶¶ 11-13.

[37] Ex. 5, Allen Decl. at ¶ 4.

[38] *Id.* at ¶¶ 5-6.

[39] *Id.* at ¶ 6.

[40] *Id.* at ¶ 7.

[41] Ex. 2, Vassallo Decl. at ¶ 11 ("hypertension and diabetes [are] conditions that render patients vulnerable to severe COVID symptoms").

[42] Ex. 5, Allen Decl. at ¶ 8.

[43] *Id.*

[44] *Id.* at ¶ 10.

cell and handcuff him when Mr. Wilson said that he did not want to be transferred.[45] Mr. Allen

would like to be kept near a hospital.[46]

### III. LSP Is Not Equipped to Treat COVID-19 Patients, and It Is Located Over One Hour's Drive from a Hospital Capable of Providing Adequate Treatment for Life-Threatening Symptoms

LSP is not equipped to treat COVID-19 symptoms, especially if the symptoms become

severe—which can occur rapidly and unexpectedly. The care required to appropriately evaluate and

provide treatment to patients with COVID-19 includes lab testing, imaging, and treatment

individualized to the presentation of the patient.[47] Treatment may require oxygen therapy by nasal

cannula, high flow oxygen masks, and intubation and ventilator assistance.[48] Some patients develop

blood clots on the lungs and require anticoagulation.[49] Some patients require intravenous fluid

therapy.[50] Some patients require vasopressor treatment for low blood pressure, support for kidney

failure, and/or early antibiotics.[51] Treatment requires staff that have experience using this equipment

and accurately assessing what is needed.[52] The intensity of care and protracted length of care for

COVID-19 cannot be provided at LSP or any of the hospitals within an hour of LSP.[53]

Even if the DOC does not plan to attempt to treat severe COVID-19 symptoms at LSP,

there is no way to define or predict who will develop severe symptoms in the course of the illness

and require treatment and hospitalization.[54] Nor does Camp J have sufficient staffing and equipment

to monitor the COVID-19 positive patients for clinical deterioration, including signs of hypoxia.[55] It

---

[45] *Id.*
[46] *Id.* at ¶¶ 14-16.
[47] Ex. 2, Vassallo Decl. at ¶ 7.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at ¶ 16.
[52] *Id.*
[53] *Id.*
[54] *Id.* at ¶¶ 7, 12.
[55] *Id.*

is critical that patients be within easy transportable distance of hospitals that can provide the adequate level of care.[56] The likelihood of Plaintiff Julius Allen's symptoms continuing to be severe and ultimately requiring hospitalization is high; Mr. Allen's pre-existing medical conditions, including diabetes, hypertension, and high cholesterol, make him especially vulnerable to COVID-19 complications.[57] The likelihood of Plaintiff Ernest Roger's symptoms continuing to be severe and ultimately requiring hospitalization is high; Mr. Rogers is 65 years old and has a pre-existing medical conditions, which makes him especially vulnerable to COVID-19 complications.[58] If Plaintiffs' COVID-19 cases become severe, they will require hospitalization; LSP does not have the medical equipment or personnel necessary to treat severe COVID-19 symptoms.[59]

Although DOC has stated that if Plaintiffs' COVID-19 cases become severe they will be transported to a hospital, the nearest hospital capable of treating life-threatening COVID-19 symptoms is over one hour's drive from LSP.[60] Ambulance resources will be strained in the area; the parish where LSP is located has only two ambulances, and ambulance personnel everywhere have high rates of COVID-19 infection.[61] The nearest hospital to LSP, West Feliciana Parish Hospital, is not a reference hospital, meaning it is not equipped to accept patients who require a higher level of care, and is not suitable for a patient requiring intubation.[62] There are no ventilators at West Feliciana Hospital.[63] A patient requiring intubation would need to be sent to Baton Rouge or New Orleans, a one-hour hour or three-hour drive from LSP, respectively.[64]

---

[56] *Id.* at ¶ 7, 15.
[57] Ex. 5, Allen Decl. at ¶ 7; Ex. 2, Vassallo Decl., ¶ 19.
[58] Ex. 4, Rogers Decl. at ¶¶ 3, 7; Ex. 2, Vassallo Decl., ¶ 19.
[59] Ex. 2, Vassallo Decl. at ¶¶ 7, 14, 16.
[60] *Lewis v. Cain*, 15-cv-318, Rec. <u>Doc. 585 at 7</u> ("If an offender housed at Camp J begins to exhibit severe symptoms, he will be transport [sic] to an outside hospital. **Offenders transferred to Camp J will not be sent to the ATU or the treatment center at LSP.**"); Ex. 2, Vassallo Decl., ¶ 16.
[61] Ex. 2, Vassallo Decl. at ¶ 17.
[62] Ex. 1, Puisis Decl. at ¶ 14, 18.
[63] Ex. 2, Vassallo Decl. at ¶ 12.
[64] Ex. 1, Puisis Decl. at ¶¶ 14, 18.

Equally alarming, symptoms can rapidly worsen, with people who appear to have mild cases quickly developing severe symptoms that require medical intervention and life-saving measures immediately upon arrival to the hospital.[65] There are no lab tests that predict the course of a COVID patient's illness.[66] Some patients have adequate oxygen saturation for days and then deteriorate.[67] There are no signs or symptoms that can be used to predict clinical deterioration.[68] Given the lack of tell-tale signs or a timeline for subsequent deterioration, it is critical that patients who test positive or likely positive (known as persons under investigation) for COVID-19 or have been exposed and show symptoms, be within easy transportable distance of hospitals in the event that more critical care is necessary.[69] Yet, the Camp J plan does not account for these dangerous realities.

Even if the DOC intends to provide limited medical care, rather than just provide isolation at Camp J—or changes its plan and provides more robust care—the medical care at LSP has long been unconstitutionally deficient. Physicians are not credentialed appropriately and do not provide medical care in line with national standards.[70] Plaintiffs will not receive the medical attention needed to appropriately monitor their COVID-19 there and there are no plans for the DOC to staff Camp J with sufficient medical staff in order to monitor all patients for signs of clinical deterioration.[71] Kendrick Wilson observed two nurses per shift caring for him and approximately 39 other COVID-19 positive patients in an open dorm.[72]

---

[65] Ex. 2, Vassallo Decl. at ¶¶ 7, 12.
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.* at ¶ 13.
[71] *Id.* at ¶ 7; Ex. 1, Puisis Decl. at ¶ 14.

**IV. LSP's Camp J Is Notoriously Unfit for Housing even Healthy Individuals**

After more than 40 years as one of the most restrictive housing units within Louisiana's prison system, DOC closed Camp J in May 2018.[73] At Camp J's peak, it confined more than 400 individuals being disciplined in solitary cells for more than 23 hours a day.[74] Defendant Secretary James LeBlanc himself said of Camp J in 2018, "It's just not a good place to be."[75] The building is notorious for its lack of ventilation, heating, and cooling; people incarcerated in Camp J were forced out of necessity to "strip naked and lie on the cement floors to keep cool during the long, humid summer days; in the winter, the cells can be frigid."[76] Because Camp J's buildings do not have proper ventilation, those facilities are extremely inappropriate for housing patients with COVID-19, an illness that causes severe respiratory symptoms. There are ceiling fans to help circulate air, but large fans blowing air are likely to spread aerosolized agents around the facility, making it more likely that staff at Camp J will breathe in contagions.[77]

**V. Defendants' Camp J Plan Threatens the Lives of LSP's Medically Vulnerable Population.**

It will be very difficult, if not impossible, for the DOC to prevent the spread of COVID-19 at LSP.[78] For security purposes the prison has one entrance used by everyone. There is no indication that LSP intends to use a separate entrance for Covid-19 patients. While somewhat isolated on the LSP campus, Camp J is, and DOC has always treated it as, a part of the prison. Defendants' plan for

---

[72] Ex. 3, Wilson Decl. at ¶¶ 11, 14.

[73] Grace Toohey, *Angola Closes Its Notorious Camp J, "a Microcosm of a lot of Things that Are Wrong,"* THE ADVOCATE, (May 13, 2018, 8:01 PM), https://www.theadvocate.com/baton_rouge/news/crime_police/article_b39f1e82-4d84-11e8-bbc2-1ff70a3227e7.html.

[74] *Id.*

[75] *Id.*

[76] Brooke Shelby Biggs, *Camp J, Red Hats and the Hole: Inside Angola's three circles of solitary-confinement hell,* MOTHER JONES, (March 5, 2009), https://www.motherjones.com/politics/2009/03/camp-j-red-hats-and-hole.

[77] Ex. 1, Puisis Decl. at ¶ 10.

preventing staff from transmitting the virus is directly contrary to CDC guidelines. Defendants have directed employees found to have a fever to be sent home, and then return to work as soon as 24 hours after they are fever-free without the use of fever medication.[79] But the CDC recommends returning to work no less than *three* days after resolution of the fever—and at least *seven* days after symptoms first appeared (or after receiving multiple negative COVID-19 tests).[80]

LSP poses a particularly high risk of transmission. The CDC recommendations described above are not possible in LSP.[81] The majority of the people incarcerated at LSP live in dormitories of up to 86 people, where social distancing is functionally impossible, as the distance between beds is approximately 3 feet.[82] Large fans blow air through the units which is likely to spread contagious agents embedded in aerosol like COVID-19.[83] As a result, LSP is an environment that could not be more contrary to current public health recommendations and the President's Task Force recommendations.[84] Indeed, LSP has worse living conditions and higher commingling of people than cruise ships and nursing homes, where COVID-19 is known to easily spread and cause significant death.[85]

---

[78] Ex. 2, Vassallo Decl. at ¶ 11 ("Medical and custody staff are also at risk if they come into contact with infected transferred detainees and are likely to spread infection to the uninfected and vulnerable Angola population, no matter what measures are purportedly taken to isolate Camp J.").

[79] *Lewis v. Cain*, 15-cv-318, Rec. Doc. No. 580-4 at 31.

[80] Ex. 1, Puisis Decl. at ¶ 28 n.19; *see also* CDC, "What to Do If You Are Sick" (Mar. 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (under "How to discontinue home isolation"); CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (advising that symptomatic correctional staff should follow the guidance in "What to Do If You Are Sick").

[81] Ex. 1, Puisis Decl. at ¶ 7.

[82] *Id.* at ¶ 10.

[83] *Id.*

[84] *Id.*

[85] *Id.* at ¶¶ 7, 10.

Because LSP houses a very large elderly population with significant chronic illnesses, spread of the virus among these vulnerable populations would result in high rates of death.[86]

For example, Plaintiff Daniel Gumns is an LSP prisoner who lives in Falcon 1 dormitory at Camp D with approximately 80 other people and cannot practice social distancing.[87] There are only four or five communal toilets and sinks for the whole dormitory and they are not cleaned every day.[88] He does not have a face mask, gloves, hand sanitizer, or bleach.[89] Two people have been taken out of his dormitory after developing COVID-19 symptoms, including coughing, fevers, and sore throats, and Mr. Gumns has not seen them since.[90] Mr. Gumns is an epileptic and suffers from grand mal seizures.[91] He has had three seizures since arriving at Angola on February 21, 2020.[92] His last seizure was approximately a week and a half ago.[93] He also suffers from asthma, which is triggered when he has seizures and sometimes leaves him unable to breathe without medical support.[94] Mr. Gumns' asthma puts him at higher risk for severe illness if he contracts COVID-19.[95]

Plaintiff Ian Cazenave is an LSP prisoner who lives at Ash 2 dormitory at LSP main prison with approximately 86 other people and cannot practice social distancing.[96] Ash 2 is a dormitory in part for people who are handicapped or have medical needs.[97] There are approximately seven toilets, five sinks, and five or six showers for the whole dorm.[98] Mr. Cazenave has two face coverings made

---

[86] *Id.* at ¶ 12.
[87] Ex. 6, Gumns Decl. at ¶ 6.
[88] *Id.* at 8, 9.
[89] *Id.* at ¶¶ 7, 13.
[90] *Id.* at ¶ 12.
[91] *Id.* at ¶ 14.
[92] *Id.* at ¶¶ 16-17.
[93] *Id.* at ¶ 16.
[94] *Id.* at ¶ 14.
[95] People Who Are at Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 13, 2020) (noting that people who have asthma are at higher risk for severe illness).
[96] Ex. 7, Cazenave Decl., ¶ 6.
[97] *Id.* at ¶ 5.
[98] *Id.* at ¶ 8.

out of t-shirt material but does not have gloves or hand sanitizer.[99] The only soap available is the homemade soap made at LSP.[100] Ash 2 has been in lockdown for almost a month, but there are still medical staff and correctional staff coming in and out of the dormitory.[101] Not everyone is wearing masks.[102] Medical and correctional staff are also going back and forth between Camp J and other places in Angola.[103] One person has been taken out of the dormitory after developing COVID-19 symptoms and has not returned.[104] Mr. Cazenave has sickle cell disease and a heart murmur.[105] As a result of the sickle cell disease, he has open wounds on his legs and feet that require daily dressing changes.[106] He would normally go to the hospital at LSP for his dressing changes, but now the nurses are coming to the dorm.[107] He asked the nurses if they were also going to Camp J but they would not tell him.[108] Mr. Cazenave is at higher risk for severe illness if he contracts COVID-19 as respiratory viruses are known to cause severe complications – including higher rates of hospitalization, acute chest syndrome, and need for mechanical ventilation – for people with sickle cell disease.[109]

---

[99] *Id.* at ¶¶ 7, 12.

[100] *Id.* at ¶ 12.

[101] *Id.* at ¶ 9.

[102] *Id.*

[103] *Id.* at ¶ 10.

[104] *Id.*

[105] *Id.* at ¶ 13.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] Amy Sobota, *COVID-19, Sickle Cell Disease, and a Critical Need*, HEALTHCITY, (Mar. 25, 2020), https://www.bmc.org/healthcity/population-health/covid-19-sickle-cell-disease-and-critical-need ("When a respiratory illness causes poor oxygenation in areas of the lungs, it causes more sickling, which impedes blood flow, which in turn causes low oxygen levels, which then leads to sickling… and so on. This, combined with the original respiratory infection in a person with sickle cell disease, is called acute chest syndrome, and is one of the leading causes of death in people with SCD.").

## LEGAL STANDARD

In order to obtain a temporary restraining order or preliminary injunction, Plaintiffs must establish: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."[110] The Court may issue a temporary restraining order without awaiting for the adverse party's response if it finds that "immediate and irreparable injury … will result to the movant before the adverse party can be heard in opposition."[111]

## ARGUMENT

This Court should grant Plaintiffs' motion for a temporary restraining order immediately restraining Defendants from transferring patients with COVID-19 to Camp J because Plaintiffs have established a substantial likelihood of success on the merits, Plaintiffs will suffer irreparable injury absent emergency relief, and the equities and public interest weigh in Plaintiffs' favor.

### I. Plaintiffs Have Established a Substantial Likelihood of Success on the Merits of their Eighth and Fourteenth Amendment Claims.

To show a substantial likelihood of success on the merits, Plaintiffs "must present a prima facie case but need not show that [they are] certain to win."[112] Here, however, the evidence indisputably shows that the Camp J plan violates the constitutional rights of Plaintiffs by exposing them to a substantial risk of serious harm in violation of both the Eighth and Fourteenth Amendments.

---

[110] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-cv-23-SDD-EWD, 2018 WL 4701849, at *2 (M.D. La. Jan. 30, 2018) (standard for temporary restraining order same as standard for preliminary injunction).
[111] Fed. R. Civ. P. 65(b)(1).
[112] Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A Federal Practice & Procedure § 2948.3 (2d ed. 1995); *see also Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011) (noting that plaintiffs are "not required to prove [their] entitlement to summary judgment" to show likelihood of success on the merits).

To establish their entitlement to injunctive relief, Plaintiffs must show that Defendants Camp J plan *likely* constitutes deliberate indifference to a substantial risk of serious harm.[113] This inquiry consists of both an objective test and a subjective test. The objective test considers whether Plaintiffs have been "expos[ed] to a substantial risk of serious harm" due to their serious medical needs.[114] The subjective test can be satisfied by showing that prison officials had requisite knowledge of Plaintiffs' risk of harm and *either* disregarded the risk *or* "fail[ed] to take reasonable measures to abate it."[115] Here, the evidence plainly shows that Plaintiffs are likely to satisfy both tests and thereby establish a constitutional violation warranting emergency injunctive relief.

### A. Plaintiffs Satisfy the Objective Test Because COVID-19 Poses a Substantial Risk of Serious Harm.

There can be no serious dispute that COVID-19 poses a substantial—and lethal—risk of harm to Plaintiffs. COVID-19 is a novel, highly infectious and deadly disease without a cure.[116] "[I]t is impossible to predict the course of the illness, who will do well, and who will not."[117] These

---

[113] Here, Plaintiffs consist of people in pre-trial detention and also people who have been convicted of crimes. The Fourteenth Amendment's "substantive due process" protections apply to medical claims brought by individuals in pre-trial detention, whereas the Eighth Amendment applies to people in prison pursuant to convictions. *See Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648-49 (5th Cir. 1996). However, the Fifth Circuit has held that the same subjective deliberate indifference standard applies to both and, therefore, the analysis *infra* proceeds pursuant to the Eighth Amendment's "deliberate indifference" analysis. *Id.* The pre-trial Plaintiffs note that the Fifth Circuit's decision in *Hare* is contrary to the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Following *Kingsley*, other circuits have held that a more protective "objective" deliberate indifference standard should apply to medical claims of individuals in pre-trial detention. *See, e.g., Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 33-36 (2d Cir. 2017). Nevertheless, this Court need not resolve that tension here, because the pre-trial Plaintiffs can easily show that Defendants' Camp J plan constitutes subjective deliberate indifference for the same reasons that the convicted Plaintiffs can show an Eighth Amendment violation.

[114] *Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018).

[115] *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also, e.g., Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1250 (M.D. Ala. 2017) (("To establish deliberate indifference, plaintiffs must show that defendants had subjective knowledge of the harm or risk of harm, and disregarded it or failed to act reasonably to alleviate it.")

[116] Ex. 2, Vassallo Decl. at ¶ ¶ 2, 7; Ex. 1, Puisis Decl. at ¶¶ 2-6.

[117] Ex. 2, Vassallo Decl. at ¶ 7.

already substantial risks of COVID-19 are exponentially compounded for Plaintiffs and the rest of Louisiana's prison population for numerous reasons including: social distancing is virtually impossible in prisons; the virus's aerosol transmission promises rampant spread in prisons; the high number of medically vulnerable people in Louisiana's prisons, especially LSP; and already inadequate medical resources that will be further strained by the virus.[118]

Plaintiffs themselves face a particularly acute risk as a result of COVID-19. Kendrick Wilson has already tested positive and been transported to Camp J;[119] but his former cellmates Plaintiffs Ernest Rogers and Julius Allen are medically vulnerable to complications of the disease given their underlying conditions of age, hepatitis C, diabetes, and hypertension.[120] In addition, although Plaintiffs Daniel Gumns and Ian Cazenave have not yet tested positive for COVID-19, the Camp J plan substantially threatens to expose them to COVID-19, because they are currently imprisoned at LSP and also suffer from various medical conditions—including asthma and sickle cell disease[121]—that make them highly vulnerable to complications and even death from COVID-19. In sum, the evidence easily establishes that Defendants' Camp J plan threatens Plaintiffs with a substantial risk of serious harm in satisfaction of the Eighth Amendment's objective test.

**B. Plaintiffs Satisfy the Subjective Test for Deliberate Indifference, Because Defendants Are Aware of the Risks of COVID-19 and the Camp J Plan Constitutes a Medically Unreasonable Response to that Risk.**

The evidence overwhelmingly shows that Defendants are not only subjectively aware of this substantial risk but also that the Camp J plan constitutes an unreasonable response to the COVID-19 pandemic, thereby constituting deliberate indifference. In addition to the risks being obvious,[122] there can be no question that Defendants are in fact aware of the significant risk of harm caused by

---

[118] *Id.* at ¶¶ 10-14, 16-19; Puisis Dec at ¶¶ 13-14, 22.
[119] Ex. 3, Wilson Decl. at ¶¶ 8-10.
[120] Ex. 4, Rogers Decl. at ¶¶ 3, 7, 9, 11; Ex. 5, Allen Decl. at ¶¶ 7-9, 13.
[121] Ex. 6, Gumns Decl. at ¶¶ 14-20; Ex. 7, Cazenave Decl. at ¶¶ 13-17.

COVID-19.[123] Indeed, Governor Edwards has issued a State of Emergency as a result of the COVID-19 outbreak in Louisiana;[124] the Louisiana Department of Health has publicly recognized the risks of COVID-19 outbreaks in Louisiana's prisons;[125] and DOC Secretary James Le Blanc has publicly observed that "we are all at risk to the virus" following infections of DOC employees.[126] Accordingly, the sole remaining question is whether Defendants' deliberate decision to isolate all COVID-19 patients at Angola's Camp J is a reasonable response. It is not.

The evidence shows that Defendants' Camp J transfer plan is medically unreasonable, contrary to public health recommendations, and dangerous both to COVID-19 patients and to other LSP patients, staff, and the surrounding community.[127] For example, in their attached declarations, Plaintiffs medical experts Mike Puisis[128] and Susi Vassallo[129] detail the dangers of transferring COVID-19 patients to a remote prison far removed from hospitals and necessary specialty care.

---

[122] "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

[123] *See* Letter to Governor John Bel Edwards re COVID 19 Prevention and Protection in Louisiana Facilities (with CC to, *inter alia*, DOC Secretary James Le Blanc and DOH Acting Secretary Steve Russo) (Mar. 16, 2020) (detailing COVID-19 risks in Louisiana prisons), https://www.splcenter.org/sites/default/files/coalition_letter_to_governor_edwards_re_covid_19_prevention_and_protection_in_louisiana_facilities.pdf;

[124] Office of the Governor, *Gov. Edwards Declares Public Health Emergency in Response to COVID-19* (Mar. 11, 2020), https://gov.louisiana.gov/index.cfm/newsroom/detail/2400.

[125] LA Department of Health Memo to Louisiana Department of Public Safety and Corrections re COVID-10; recommendations regarding prisons and juvenile detention centers (Apr. 8, 2020).

[126] *Two DOC employees test positive for COVID-19*, KATC3 (Mar. 26, 2020), https://www.katc.com/news/covering-louisiana/two-doc-employees-test-positive-for-covid-19.

[127] Defendants have actual notice of substantial risks inherent in their plan as counsel for Plaintiffs raised them in a filing last week and Secretary LeBlanc and Dr. Morrison both issued defensive declarations. *See Lewis v. Cain*, 15-cv-318, Rec. Doc. 585-1, 585-3.

[128] Dr. Puisis is a doctor and expert in correctional medicine with over 35 years of experience. He has managed correctional systems across the country, drafted standards for the provision of correctional medicine, and is the editor of the only textbook on correctional medicine. Dr. Puisis is deeply familiar with medical care at LSP and evaluated the medical care system there between 2016 and 2018 in connection with systemic litigation. *See* Ex. 1, Puisis Decl. at ¶ 1.

[129] Dr. Vassallo is a board-certified emergency room physician and medical toxicologist who works in the emergency room at Bellevue Hospital in New York City. Dr. Vassallo has substantial experience treating patients with COVID-19. She is also deeply familiar with the medical care system

According to Dr. Vassallo and Dr. Puisis, COVID-19 patients require ready access to hospitals, particularly because "severe COVID-19 disease is treated only with supportive care including respiratory isolation, oxygen, and mechanical ventilation as a last resort."[130]  Even if COVID-19 patients do not require immediate placement in the ICU, they may still require critical specialists and specialized treatment not available, such as vasopressor treatment for low blood pressure, intravenous fluid therapy, support for kidney failure, respiratory therapists, and/or early antibiotics.[131] Yet Camp J is located in a remote and rural area far from such specialized medical services, and the closest adequate emergency room with numerous ventilators is over an hour away in Baton Rouge.[132] Plaintiffs' experts' conclusions in this regard are consistent with the guidance of Defendant Department of Health, which itself noted that anyone expected to have COVID-19 should be transported to a *healthcare* facility.[133]

The evidence also establishes that Defendants' plan to only transfer COVID-19 patients at Camp J who are "not displaying serious symptoms"[134] is based on fundamental misunderstandings of COVID-19 and how it operates. As Dr. Vassallo notes, the DOC's plan provides "no information or medical criteria on how to identify patients as meeting that definition.  In fact, at this

---

at LSP, and evaluated the medical care system there between 2016 and 2018 in connection with systemic litigation. *See* Ex. 2, Vassallo Decl. at ¶¶ 1, 7, 11-14.

[130] Ex. 1, Puisis Decl. at ¶ 13; Ex. 2, Vassallo Decl. at ¶¶ 7, 16.

[131] Ex. 2, Vassallo Decl. at ¶ 16.

[132] *Id.* at ¶ 12; Ex. 1, Puisis Decl. at ¶ 20.

[133] Ex. 2, Vassallo Decl. at ¶ 11.

[134] *Lewis v. Cain*, 15-cv-318, Rec. Doc. 585 at 7 ("If an offender housed at Camp J begins to exhibit severe symptoms, he will be transport [sic] to an outside hospital. **Offenders transferred to Camp J will not be sent to the ATU or the treatment center at LSP**."). Further, to the extent Defendants may contend that the majority of COVID-19 patients transported to Camp J will be young and healthy, this action is also medically unreasonable. As Dr. Vassallo notes, "the relatively young and healthy are also in the intensive care units and die. . . . [I]ncreasing evidence in the US has shown the dire risk that COVID-19 poses to younger patients. Young patients ages 20-54 years old can have serious complications from COVID-19 including hospital admission, admission to an intensive care unit, invasive ventilation, or death." Ex. 2, Vassallo Decl. at ¶ 9.

time, there is no way to define who will do well and who will do poorly."[135] Moreover, this policy wholly ignores that COVID-19 patients "can deteriorate very rapidly"[136] and it is impossible to "determine whether patients will abruptly need escalated medical care requiring hospitalization."[137] As Dr. Vassallo explains, "[g]iven the lack of tell-tale signs or a timeline for subsequent deterioration, it is absolutely critical and necessary that patients who test positive or likely positive . . . for COVID-19 or have been exposed and show symptoms, be within easy transportable distance of hospitals in the event that more critical care is necessary."[138] Further, by crowding large numbers of COVID-19 patients into a packed facility, Defendants' plan substantially increases the likelihood that COVID-19 patients at Camp J will have higher viral loads and thereby develop more serious symptoms, thus requiring access to faraway hospitals.[139] Making matters worse, in addition to the long distance to adequate hospitals from Camp J, scarcities in access to ambulance services will make transfer to faraway hospitals even more difficult—if not impossible.[140]

The evidence also shows that Camp J most lacks sufficient, qualified and competent medical staff to provide necessary care to COVID19 patients. A "robust" number of medical staff are needed to appropriately treat COVID-19.[141] Yet, Angola has a history of insufficient medical staffing and there is nothing in Defendants' plans reflecting increased staffing.[142] As Dr. Puisis notes, "[i]t is not clear from a practical matter how they would provide sufficient medical personnel at Camp J, who would have no contact with patients at the rest of LSP, without further diminishing the capacity

---

[135] Vassallo Dec at ¶ 12.
[136] *Id.* at ¶ 7.
[137] *Id.* at ¶ 15.
[138] *Id.* at ¶ 7.
[139] James D. Walsh, *Is 'Viral Load' Why Some People Get a Mild Case of COVID-19?*, NY MAG (Mar. 27, 2020), https://nymag.com/intelligencer/2020/03/is-viral-load-key-to-understanding-coronaviruss-severity.html.
[140] Ex. 2, Vassallo Decl. at ¶ 17; *see also* Ex. 1, Puisis Decl. at ¶ 13 ("getting a patient to a hospital from LSP will be challenging under current circumstances.").
[141] Ex. 2, Vassallo Decl. at ¶ 20.
[142] *Id.* at ¶ 11; Ex. 1, Puisis Decl. at ¶ 14.

of the already over-taxed LSP doctors and nurses."[143]  In addition, LSP medical staff are not qualified or equipped to manage patients needing hospital-level care.[144] Relatedly, the evidence also shows that LSP medical staff would be unable to consistently determine when patients are medically decompensating as a result of COVID-19; in fact, both Dr. Vassallo and Dr. Puisis previously observed LSP staff failing to recognize typical signs of respiratory decompensation and other "red flags", which is critical for COVID-19 patients.[145] These defects are ever further exacerbated by Defendants' failure to adequately provide guidance when hospitalization of COVID-19 patients is warranted.[146]

The evidence further establishes that the present conditions at Camp J make it no place for the transfer of people with a highly infectious and deadly disease. The state's plan and affidavits do not lay out adequate protocols for medical isolation of Camp J from the rest of LSP's population, the majority of whom are elderly or otherwise at high risk because of their medical conditions.[147] The state's plan and affidavits also do not describe who will provide medical care for the population expected to be housed at Camp J; whether and how workers serving the population at Camp J will be separate from workers serving the remainder of the prison; what clinical monitoring will be provided; whether and how these known COVID-19 patients will receive hospital care if necessary; and where they will find medical staff and providers to care for the patients.[148] Kendrick Wilson is being housed on an open dorm with approximately 39 other people who have tested positive for COVID-19, many of whom are coughing and some of whom have or had required fluid therapy or

---

[143] Ex. 1, Puisis Decl. at ¶ 19.
[144] *Id.* at ¶ 13.
[145] Ex. 2, Vassallo Decl. at ¶ 13; Ex. 1, Puisis Decl. at ¶ 14.
[146] Ex. 1, Puisis Decl. at ¶ 18.
[147] *Id.* at ¶ 14.
[148] *Id.* at ¶P 15-20.

oxygen.[149] There are only two nurses per shift and a nurse checks on him approximately twice a day.[150] He has not seen any doctors or observed anyone being taken to the hospital.[151]

Although the evidence summarized above is alone sufficient to demonstrate that the Camp J plan is medically unreasonable, the dangers of that plan are exponentially compounded by indisputable evidence showing systemic and unconstitutional inadequacies in LSP's overall medical care, which would be treating COVID-19 patients. As detailed in their declarations, Dr. Vassallo and Dr. Puisis have both comprehensively examined the medical care system at LSP and found it to be wholly inadequate. Dr. Puisis summarizes some of these inadequacies as follows:

> Physicians were not credentialed appropriately and did not perform consistent with existing standards of care. On record reviews, we noted failure to recognize indications for hospitalization which is critical in the COVID-19 population. There was failure to recognize typical signs of respiratory decompensation which is also critical for COVID-19 patients. There were delays in transfer of patients to a hospital when indicated. Both physicians and other staff (nurses and emergency medical technicians) failed to recognize "red flag" signs resulting in adverse events. Also, LSP is not set up to manage acutely ill patients.[152]

Consistent with these assessments of LSP's inadequate medical system, this Court recently observed that medical care at LSP is "unconstitutional in some respects."[153] Yet, Defendants are *knowingly* and unreasonably placing additional strains on LSP's already broken medical system by transferring COVID-19 patients who require significant and complex levels of care. This dangerous course of conduct will inevitably threaten the lives of not only COVID-19 patients but also of other people

---

[149] Ex. 3, Wilson Decl. at ¶ 11.
[150] *Id.* at ¶ 14.
[151] *Id.* at ¶¶ 11, 14.
[152] Ex. 1, Puisis Decl. at ¶ 14; *see also* Ex. 2, Vassallo Decl. at ¶¶ 13-14.
[153] *Lewis v. Cain*, 15-cv-318, Docket No. 578 (Feb. 21, 2020 order directing parties to meet and confer).

imprisoned at LSP, who were already suffering as a result of LSP's constitutionally inadequate medical system.[154]

In addition, the evidence further establishes the medical unreasonableness of Defendants' Camp J plan given that the plan substantially threatens the health of LSP's population—especially medically vulnerable people. "[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease."[155] The Eighth Amendment "require[s] a remedy" where their jailors knowingly expose them to a risk of contracting serious infectious diseases, even if "it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed."[156] Here, the evidence shows that Defendants have failed to lay out adequate protocols to ensure that COVID-19 is not transmitted from Camp J to the rest of LSP's population.[157] Nor could they given the high likelihood that staff will intermingle between facilities,[158] and also that LSP has only a single entry which could serve as vector point even in the unlikely event of separate staffing.[159] The risk of further spreading COVID-19 at LSP is especially dangerous to LSP's medically vulnerable population.[160] As Dr. Puisis explains, "LSP has a particularly vulnerable population with over 50% of inmates over 50 years of age and many vulnerable persons with high risk medical conditions."[161] As a result, increased spread of COVID-19 via the Camp J plan "would result in high rates of death" for LSP patients.[162] Plaintiffs Daniel Gumns and Ian Cazenave are currently imprisoned at LSP and suffer from various medical

---

[154] *See Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948 (1975) (finding that when systematic deficiencies in staffing, facilities or procedures make unnecessary suffering inevitable, a court will not hesitate to use its injunctive powers).

[155] *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996).

[156] *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

[157] Ex. 1, Puisis Decl. at ¶ 20; Ex. 2, Vassalo Decl. at ¶ 11.

[158] Ex. 7, Cazenave Decl. at ¶ 10.

[159] Ex. 2, Vassallo Decl. ¶ 11.

[160] Ex. 1, Puisis Decl. at ¶¶ 12, 14.

[161] *Id.* at ¶ 14; *see also* Ex. 2, Vassalo Decl. at ¶ 11.

[162] Ex. 1, Puisis Decl. at ¶ 12.

conditions—including asthma and sickle cell disease[163]—that make them highly vulnerable to complications and even death from COVID-19.[164] Mr. Gumns and Mr. Cazenave are concerned that transferring COVID-19 patients to Camp J will increase their risk of exposure.[165] The Fifth Circuit has repeatedly recognized that unreasonably subjecting detained people to infectious diseases constitutes deliberate indifference.[166]

Finally, as the evidence makes clear, this is not a situation where Defendants have chosen a medically reasonable alternative with which Plaintiffs merely disagree.[167] Rather, the evidence summarized *supra* and the attached declarations indisputably show that the Camp J plan is medically unsound and poses a grave danger to Plaintiffs and the putative Class. Nor is this a situation where there are simply no better precautionary measures that can be taken by the State. The State has taken significant—and unprecedented—measures to ensure adequate treatment of people who are not incarcerated—for example, by repurposing the New Orleans Convention Center[168] and hotels[169] into field hospitals in proximity to actual hospitals with ICUs. And yet, it is incarcerated people to

---

[163] Ex. 6, Gumns Decl. at ¶¶ 14-20; Ex. 7, Cazenave Decl. at ¶¶ 13-17.

[164] *See* People Who Are at Higher Risk for Severe Illness, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 13, 2020).

[165] FN 165: Ex. 6, Gumns Decl. at ¶¶ 11, 14-20; Ex. 7, Cazenave Decl. at ¶¶ 9-10, 17.

[166] *See, e.g., Gomez v. Warner*, 39 F.3d 320 (5th Cir. 1994) (per curiam) (prisoner alleged deliberate indifference by prison officials where the prison's razor-swapping program created the mere "risk" of "possible spread" in the transmission of deadly "infectious diseases such as HIV, AIDS, and hepatitis."); *Johnson v. Epps*, 479 F. App'x 583, 589-92 (5th Cir. 2012) (allegations that inmate was exposed to "serious, communicable diseases" and that prison officials were aware of the risk and did nothing to prevent it were sufficient to state a claim for violation of Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300-03 (5th Cir. 1974) (affirming district court's holding that allowing "[s]ome inmates with serious contagious diseases . . . to mingle with the general prison population," alongside maintaining a host of other unsanitary and inhumane conditions, "constitute[d] cruel and unusual punishment").

[167] *Compare Thompson v. Basse*, 202 F. App'x 654 (5th Cir. 2006) (unpub.).

[168] Josh Roberson, *TODAY: New Orleans Convention Center accepting COVID-19 patients*, FOX8 (Apr. 6, 2020), https://www.fox8live.com/2020/04/06/today-new-orleans-convention-center-accepting-covid-patients/.

24

whom the State owes an affirmative constitutional obligation to provide adequate care during this COVID-19 pandemic.[170] Therefore, as the evidence shows, the Camp J plan represents yet another dark chapter in the State's long history of failing to fulfill that constitutional obligations to incarcerated people.[171] Indeed, rather than providing a medically necessary and reasonable response to this crisis, Defendants are simply shipping COVID-19 patients to a remote out-camp—far removed from adequate and necessary medical care—as though they are mere afterthoughts or inconveniences in this deadly pandemic. For all these reasons, Plaintiffs are likely to succeed on their constitutional claims that Defendants' conduct constitutes deliberate indifference.

## II. Plaintiffs Will Suffer Irreparable Injury Absent an Emergency Injunction.

The evidence also establishes that Plaintiffs and putative class members will suffer irreparable injury—including severe infections, serious medical complications and even death—unless this court enjoins the Camp J plan. As detailed above, Defendants' Camp J plan will result in COVID-19 patients being shipped to a remote facility far from necessary hospitals and adequate medical care for this deadly disease. In addition to threatening the lives of COVID-19 patients, the Camp J plan also threatens the health and safety of LSP's medically vulnerable population. Plaintiffs need not await severe infections, complications or even outright denial of medical care in order to obtain an injunction. As the Supreme Court has long recognized, "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the

---

[169] *Sheraton New Orleans to be used as coronavirus field hospital, report says*, WWLTV (Apr. 6, 2020), https://www.wwltv.com/article/news/health/coronavirus/sheraton-new-orleans-to-be-used-as-coronavirus-field-hospital/289-e1a61b70-d597-478d-96a7-1b2d07fb565d.

[170] *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (Incarcerated people "must rely on prison authorities to treat [their] medical needs" because "if the authorities fail to do so, those needs will not be met.").

[171] *See generally Lynn v. Williams*, 92-cv-001 (M.D. La.)

25

ground that nothing yet had happened to them. . . . [A] remedy for unsafe conditions need not await a tragic event."[172]

Nor can there be any question that the threatened harm is irreparable. Likely hundreds of putative Class members have risk factors making death or severe illness likely if they contract COVID-19. "It goes without saying that . . . death is an irreparable injury."[173] Even for those who recover—a touch-and-go proposition, given the demonstrated seriousness and spread of COVID-19, particularly for vulnerable populations—the extreme suffering that they may experience during their illness and the possibility of long-term respiratory impairment could not be erased.

For these reasons, the evidence firmly establishes that the Camp J plan threatens Plaintiffs and the putative class with irreparable harm. An immediate injunction is the only way to abate that substantial and life-threatening risk.

### III. The Equities and Public Interest Clearly Favor Plaintiffs.

The third and fourth TRO factors, "harm to the opposing party and weighing the public interest …[,] merge when the Government is the opposing party."[174] Here, those factors weigh heavily in favor of granting relief.

As an initial matter, the requested injunction would protect Plaintiffs' constitutional rights under the Eighth and Fourteenth Amendments, and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."[175] Because "confidence in the humane application of

---

[172] *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred.")

[173] *East v. Blue Cross & Blue Shield of La.*, No. 14-cv-115-BAJ-RLB, 2014 WL 8332136, at *2 (M.D. La. Feb. 24, 2014); *accord, e.g.*, *Turner v. Epps*, 842 F. Supp. 2d 1023, 1028 (S.D. Miss. 2012) (describing death as "the single most irreparable harm of all").

[174] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[175] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)); *accord, e.g.*, *June Medical Servs., LLC v. Caldwell*, No. 14-cv-525-JWD-RLB, 2014 WL 4296679, at *8 (M.D. La. Aug. 31, 2014).

the governing laws of the State must be in the public's interest,"[176] there is a clear public interest in preventing Defendants from exposing Plaintiffs and putative class members to cruel and unusual punishment in the form of inadequate medical care and willful exposure to a serious risk of severe harm.

In addition to the public interest in protecting Plaintiffs and putative class members themselves, minimizing risk of transmission of COVID-19 is inarguably in the public interest. As already explained, the transfer plan is likely to spread COVID-19 to the staff of LSP and then to the broader West Feliciana and central Louisiana community.[177] "[A] COVID-19 outbreak at a detention facility could quickly overwhelm" not only the facility's medical system, but "surrounding community hospitals" as well.[178] The resulting effect on "public health and safety" would plainly harm the public interest.[179] Indeed, courts across the country have recognized the significant threat to public safety that outbreaks in detention centers pose.[180]

By contrast, there is no substantial harm to Defendants in enjoining the transfer plan. Defendants can have no interest in implementation of a plan that will expose not only Plaintiffs and putative class members but hundreds of their own staff to COVID-19 as well as the public at large. Moreover, Defendants have other, safer options than transferring persons with COVID-19 to a

---

[176] *Harris v. Johnson*, 323 F. Supp. 2d 797, 810 (S.D. Tex. 2004).

[177] Ex. 2, Vassallo Decl. at ¶ 18.

[178] *Coronel v. Decker*, No. 20-cv-2472 AJN, 2020 WL 1487274, at *7 (S.D.N.Y. Mar. 27, 2020).

[179] *Id.*

[180] *See, e.g., Mays v. Thomas*, 20-cv-2134, Dkt. No. 47 (N.D. Ill. April 9, 2020) (finding that "the interest of the public in containing the further spread of this highly contagious virus also favors granting relief to the plaintiffs"); *Francisco Hernandez v. Wolf*, No. 20-cv-617-TJH, Dkt. No. 17 (C.D. Cal., Apr. 1, 2020); *Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's] favor" and thus ordering release); *Thakker v. Doll*, No. 1:20-cv-480-JEJ (M.D. Pa. Mar. 31, 2020) (granting TRO releasing high-risk immigration detainees from custody due to the dangers of COVID-19); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) (finding "[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *Castillo v. Barr*, No. 20-cv-605-TJH-

prison distinctly ill-suited to house and treat them, and to prevent transmission.[181]  And even if there were some harm to Defendants, it would be greatly outweighed by the catastrophic risk to Class members.

## IV. The Court Should Immediately Enter a Temporary Restraining Order While It Adjudicates This Motion

Defendants have already begun transferring people with COVID-19 to LSP,[182] threatening the lives of not only COVID-19 patients but also other LSP patients, staff and community members. Even on an expedited briefing schedule, by the time the Court can receive full briefing and hold a preliminary injunction hearing, Defendants' Camp J plan may result in substantial spread of the virus at LSP and also severe infections, complications, and even death for Plaintiffs and putative class members. For this reason, "[a] hearing *weeks* from now may be no relief at all."[183]

Plaintiffs are prepared to proceed to a preliminary injunction hearing as soon as Defendants and the Court are able. But in the interim, a temporary restraining order is the only way to ensure that Defendants' dangerous plan does not threaten the lives of Plaintiffs and the putative class prior to a hearing.

## V. The Court Should Waive the Security Bond.

Plaintiffs also request that the Court exercise its broad discretion to waive any security bond for issuance of the TRO.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

---

AFM, Dkt. No. 32 (C.D. Cal. Mar. 27, 2020); *Ronal Umana Jovel v. Decker*, 12-cv-308-GBD, Dkt. No. 27 (S.D.N.Y. Mar. 26, 2020).

[181] *See* Ex. 1, Puisis Decl. at ¶¶ 21-29; *see also* Ex. 2, Vassallo Decl. at ¶¶ 1-8 (under "My recommendations for the DOC to mitigate the spread of the coronavirus among Louisiana's incarcerated population are"); *supra* n.169.

[182] *See* Ex. 3, Wilson Decl. at ¶ 8-11.

[183] *Coronel*, 2020 WL 1487274, at *7.

wrongfully enjoined or restrained." However, "[t]he amount of security required is a matter for the discretion of the trial court; *it may elect to require no security at all.*"[184]

Here, Plaintiffs are incarcerated individuals who are seeking to vindicate their constitutional rights. Furthermore, the requirement of a bond is contrary to the proposition that inadequate resources under no circumstances justify a prison's deprivation of constitutional rights.[185] Under these circumstances, waiver of the security bond is proper, and Plaintiffs therefore respectfully request that the Court exercise its broad discretion to do so.[186]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court immediately issue an order temporarily restraining Defendants from transferring Plaintiffs and any patients with COVID-19 to Camp J; and, after a hearing, preliminarily enjoin Defendants from doing so.

Respectfully submitted this 14th day of April, 2020.

/s/ Mercedes Montagnes

Mercedes Montagnes, La. Bar No. 33287
Jamila Johnson, La. Bar No. 37953
Nishi Kumar, La. Bar No. 37415
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Jared Davidson, La. Bar No. 37093

---

[184] *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978) (emphasis added).

[185] *See, e.g., Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977) (inadequate resources can never be a justification for depriving an inmate of his constitutional rights). *See* Ex. 7, Cazenave Decl. at ¶ 4 (declaring indigency); Ex. 6, Gumns Decl. at ¶ 4 (declaring indigency).

[186] *See, e.g., Molton Co v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (approving waiver of bond given strength of case and "the strong public interest" involved); *Campos v. INS*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998) (because plaintiffs were indigent and sought to vindicate their constitutional rights, consistent with the public interest, the court did not require a bond).

Southern Poverty Law Center
201 Saint Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (504) 486-8982
Facsimile: (504) 486-8947
Email: jared.davidson@splcenter.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Mercedes Montagnes, an attorney, hereby certify that on April 14, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system.

I further certify that I, or another one of Plaintiffs' attorneys, will promptly electronically serve a copy of the same, along with all other pleadings and papers filed in the action to date to the General Counsel for the Louisiana Department of Corrections, the General Counsel for the Louisiana Governor, and the General Counsel for the Louisiana Department of Health, as well as the Louisiana Department of Justice Director of Litigation via email.

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287