## DECLARATION OF DR. MICHAEL PUISIS CONCERNING THE RISK OF THE SPREAD OF COVID-19 IN THE LOUISIANA STATE PRISON (LSP) AT ANGOLA

1. Dr. Michael Puisis is an internist who has worked in correctional medicine for 35 years. He began working at the Cook County Jail as a physician in 1985 and became the Medical Director of Cook County Jail from 1991 to 1996 and Chief Operating Officer for the medical program at the Cook County Jail from 2009 to 2012. He has worked in and managed correctional medical programs in multiple state prisons including in Illinois and New Mexico. He has worked as a Monitor or Expert for Federal Courts on multiple cases and has worked as a Correctional Medical Expert for the Department of Justice on multiple cases. He has also participated in revisions of national standards for medical care for the National Commission on Correctional Health Care and for the American Public Health Association. He also participated in revision of tuberculosis standards for the Center for Disease Control. Dr. Puisis has edited the only textbook on correctional medicine, Clinical Practice in Correctional Medicine. Dr. Puisis evaluated the Louisiana State Prison at Angola for The Promise of Justice Initiative in 2016 (and also conducted records review in 2018) and previously monitored Louisiana State Prison at Angola for the Department of Justice.

2. Coronavirus disease of 2019 (COVID-19) is a viral pandemic. This is a novel virus for which there is no established curative medical treatment and no vaccine.

3. The number of cases of COVID-19 in the United States are rising rapidly. On April 13, 2020, Johns Hopkins reported that there were 572,587 reported COVID-19 infections in the U.S. The number of deaths is over 23,000 but both cases and deaths are rising rapidly so by the time this declaration is read the numbers of both cases and deaths will be significantly larger. The number of cases of COVID-19 is the highest number of reported cases of any country in the world.

4. Louisiana has a rapidly accelerating rate of COVID-19 infections. A study from the University of Louisiana at Lafayette reported that COVID-19 cases grew at a 67.8% rate, the highest rate in the U.S.[1] The Louisiana Department of Health reported on April 13, 2020 that there were 21,016 cases of COVID-19 with 884 deaths. Louisiana has the third most deaths per capita of any state in the U.S.

5. UpToDate[2] reports an overall case mortality rate from the disease of 2.3. Louisiana has 884 deaths for 21,016 cases; more than 4.2% of persons diagnosed with the infection in Louisiana die.

---

[1] Coronavirus cases grew faster in Louisiana than anywhere else in the world: UL study, The Acadiana Advocate, Adam Daigle March 24, 2020, https://www.theadvocate.com/acadiana/news/coronavirus/article_94494420-6d4b-11ea-ac42-ff7dd722c084.html.

[2] UpToDate is an online medical reference widely used in hospitals, health organizations, and private physicians.

1

6. COVID-19 is transmitted by droplets of infected aerosol when people with the infection cough. Droplets of respiratory secretions infected with the virus can survive as an aerosol for up to three hours.[3][4] Droplets can be directly transmitted by inhalation to other individuals in close proximity. Droplets can land on surfaces and be picked up by the hands of another person who can then become infected by contacting a mucous membrane (eyes, mouth, or nose) with their hand. Infected droplets can remain viable on surfaces for variable lengths of time, ranging from up to 3 hours on copper, 24 hours on cardboard, and 2-3 days on plastic and stainless steel.[5]

7. Medical care for COVID-19 focuses on prevention, which emphasizes social distancing, handwashing, and respiratory hygiene. The current CDC recommendations for social distancing and frequent handwashing measures, which are the only measures available to protect against infection, are not possible in LSP. Furthermore, repeated sanitation of horizontal and touch surfaces in inmate living units and throughout LSP is not typically done based on our review and would be an overwhelming task. LSP has worse living conditions and higher comingling of people than cruise ships and nursing homes, where COVID-19 is known to have easily spread. Prevention of contact with an infected droplet is significantly more difficult in a prison than in the community.

8. With respect to transmission of disease by droplet inhalation, correctional environments, including LSP, actually promote spread of respiratory contagious disease. Jails and prisons are long known to be a breeding ground for infectious respiratory illness. Tuberculosis is a bacteria which is significantly less transmissible than COVID-19 yet has been responsible for numerous outbreaks of illness in prisons and jails over the years. Respiratory infectious disease like TB are thought to be made worse in prisons because of crowding and recirculated air. Because of transmissibility of TB in prisons the CDC still recommends screening for this condition in prisons. Proper screening for tuberculosis can control that disease in prison populations.

9. The COVID-19 virus is a different type of respiratory illness; its spread is rapid and it is more easily transmissible. Control through screening with a test as is done for TB in prisons would be optimal but current CDC guidance[6] does not recommend a test as a screening method. Likely, this is due to a critical shortage of testing material. The method of control in an intake of a correctional facility is quarantine for up to 14 days.[7] If testing material

---

[3] National Institute of Health, available at https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

[4] Neeltje van Doremalen and Others, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, Correspondence in New England Journal of Medicine, March 17, 2020, https://www.nejm.org/doi/full/10.1056/NEJMc2004973?cid=DM88773_&bid=171021451

[5] *Id.*

[6] Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19) Centers for Disease Control as found at https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html

[7] In their Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities guidance the CDC recommends "If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population

becomes readily available, I would recommend testing and a quarantine until the test is complete.

10. Jails and prisons promote spread of respiratory illnesses because of crowded congregate housing arrangements. LSP is the largest maximum security prison in the U. S. and has a population of approximately 6000 individuals. The main unit of LSP contains 32 dormitories. The remote camps C and D have a combination of dormitories and cellblocks. Camp F is a minimum dormitory. I have visited multiple inmate dormitories. All dormitories I visited were filled to capacity and were crowded. The dormitories are not arranged to provide social distancing as the distance between beds is approximately 3 feet. Large fans blow air through the units which is likely to spread contagious agents embedded in aerosol like COVID-19. Washing areas are shared. There is no privacy and it is not possible to remain 6 feet apart as recommended. Infirmary beds are in dormitory style setting and are close together. If inmates with COVID-19 are housed on the infirmary rather than outside hospitals, the infection is likely to spread throughout this unit of compromised patients. Photos in our prior 2016 report[8] show what some of these dormitories and showers look like.[9] Notable in these pictures is that soap is not consistently present on sinks used by staff and in showers used by inmates. Currently the President's Task Force on COVID-19 recommends limiting gatherings to no more than 10 persons. Inmates at LSP live in large dormitories with over 80 persons per dormitory. These dormitories are incapable of allowing inmates to follow current CDC recommendations regarding prevention against COVID-19. Officers guarding the inmates can carry the infection into the prison. One couldn't devise a system more contrary to current public health recommendations and the President's Task Force recommendations than a prison like LSP. The elderly and those with significant medical conditions are housed together in some of these dormitories creating a nursing home like environment; environments where COVID-19 is known to have rapidly spread. Dormitories with large numbers of persons with severe medical conditions are similar to nursing homes where COVID is known to have caused significant death.

11. There is a lack of information about what is occurring within LSP and testing is not being widely performed. A bullet point summary of the LSP COVID-19 plan states that "any LSP offender presenting with symptoms is given both a flu test and COVID-19 test." A news report on March 26, 2020 stated that two employees at different state prisons tested positive for COVID-19 but that no inmates have tested positive. The newspaper reported that only 32 inmates in the entire Louisiana Department of Corrections have been tested and all have tested negative. On April 13, 2020, the Louisiana Department of Corrections reported that

---

(SEPARATELY from other individuals who are quarantined due to contact with a COVID-19 case). As found at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[8] Louisiana State Penitentiary at Angola; Health Care Evaluation Submitted October 3, 2016; Lewis et al v. Cain et al Class Action Complaint. United States District Court, Middle District of Louisiana. Case No. 3:15-cv-00318-BAJ-RLB Document 133-1 10/14/16

[9] Photos PX006.0279, PX006.0280, PX006.0277

3

11. 57 inmates in DOC custody and 45 staff members across the DOC had tested positive. One staff member at LSP had died. Currently, transfers into LSP have been suspended absent extenuating circumstances and if an inmate is transferred into LSP, they are supposed to be quarantined for a 14-day period. LSP screens visitors and new inmates with symptom screening and a temperature. These measures are consistent with recommendations of the Centers for Disease Control (CDC) correctional guidelines.[10] However, based on our review of this facility in 2018, we noted ineffective medical care with several unqualified physicians, insufficient nurse staff, no infection control nurse, and lack of supervision of front line medical staff. While CDC procedures are in place I question the ability to effectively carry out the procedures as stated.

12. An individual's immune system is the primary defense against this infection. As a result, people over age 65 years of age and persons with impaired immunity may have a higher probability of death if they are infected. Age related risk is a result of impaired immunity with aging. The older a person is the greater the apparent risk. In LSP 90% of inmates are incarcerated for life and approximately 50% of inmates are over age 50. People on immunosuppressive medication, with diseases causing impaired immunity, or with significant cardiac or pulmonary medical conditions also are at increased risk of death. It has recently been reported that younger patients with cardiovascular disease or hypertension may have unappreciated risk for severe disease.[11] This has significant implications for correctional facilities with high rates of hypertension. Persons with severe mental illness in prisons are also, in my opinion, at increased risk of acquiring and transmitting infection because they are unable to understand social distancing and hand hygiene and may be unable to communicate symptoms appropriately. Also, by classification, like other prison systems, LSP houses inmates who are elderly, have disabilities, are mentally ill or have severe chronic illness profiles in specific housing areas, making this population at great risk if one of them becomes infected. Because LSP has a very large elderly population with significant chronic illness spread of infection in LSP would result in high rates of death.

13. Based on our review of care at LSP through 2018, inmates lacked access to hospital care under ordinary circumstances; the COVID-19 pandemic will only make that worse. Currently, severe COVID-19 disease is treated only with supportive care including respiratory isolation, oxygen, and mechanical ventilation as a last resort. LSP is a remote prison which is also remote from hospitals. There are reports that Louisiana's hospitals could be overwhelmed by COVID-19 cases.[12] The reports of possible lack of hospital beds

---

[10] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention posted March 23, 2020 as found at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[11] ACE2 is the SARS-CoV-2 Receptor Required for Cell Entry, Summary, New England Journal of Medicine, March 18, 2020  Review of article of Hoffman, M et al in Cell 2020 Mar 5

[12] Louisiana's hospitals could be overwhelmed by COVID-19 virus in all but best scenario; Daily Adviser March 26, 2020 as found at

4

would place LSP inmates in a dire predicament.[13]  Also, LSP is not set up to manage hospital level care including managing patients on ventilators.  The infirmary is a dormitory and housing a COVID-19 patient on this unit would result in spread to other uninfected but medically compromised patients. There is therefore no place to treat an ill person with COVID-19 except in a general housing unit or on the infirmary, both of which would expose other patients to infection.  The existing staff at LSP could not manage any hospital-level patient and getting a patient to a hospital from LSP will be challenging under current circumstances.  This will invariably place inmates at risk of death.

14. The state is proposing transferring detained individuals with COVID-19 from the state's numerous jails to Angola. This would entail transportation of COVID-19 infected detainees to Angola for housing.  It is my opinion that transferring detainees from jails to LSP for medical isolation and clinical management is not a good idea for multiple reasons.  First, because the process for transporting COVID positive cases to a parish and a prison without cases—or with few cases—would increase the risk of transmission of positive cases to a location without cases or few cases, thereby increasing risk of spread including to West Feliciana Parish and the surrounding communities.  Second, LSP has a particularly vulnerable population with over 50% of inmates over 50 years of age and many vulnerable persons with high risk medical conditions.  Staffing deficiencies will likely result in medical and custody staff working with infected transferred detainees as well as LSP prisoners, which is likely to spread infection to the uninfected prisoners currently housed at LSP.  This places them at significant risk.  Third, medical care at LSP is not good and transferred inmates are unlikely to receive the medical attention needed to appropriately monitor their disease.  LSP had insufficient staff in 2016 and was unable to adequately provide medical care such that officers and inmates were used to provide medical care.[14]  Introduction of a COVID-19 infected population into a system without adequate medical staff can only result in less attention being paid to both the existing LSP patients who have substantial medical needs as well as the newly transferred inmates who should be monitored multiple times daily.  Additionally, the quality of care at LSP was substandard in 2016 when we produced a report of our investigation and again in 2018 based on selected record reviews.  Physicians were not credentialed appropriately and did not perform consistent with existing standards of care.  On record reviews, we noted failure to recognize indications for hospitalization which is critical in the COVID-19 population.  There was failure to recognize typical signs of respiratory decompensation which is also critical for COVID-19 patients.  There were delays in transfer of patients to a hospital when indicated.  Both physicians and other staff (nurses and emergency medical technicians) failed to recognize "red flag" signs resulting in adverse events.  Also, LSP is not set up to manage acutely ill patients.  Laboratory services are only

---

https://www.theadvertiser.com/story/news/local/2020/03/26/coronavirus-louisiana-hospitals-overwhelmed-under-all-covid-19-scenarios/2884019001/

[13] Who gets a ventilator? Hospitals facing coronavirus surge are preparing for life-or-death decisions. NBC News as found at https://www.nbcnews.com/health/health-care/who-gets-ventilator-hospitals-facing-coronavirus-surge-are-preparing-life-n1162721

[14] Officers passed medications on most units, and inmates assisted in providing some services to inmates on the infirmary during our 2016

5

available weekdays during working-day-hours and not at all on weekends. Blood gas assessments, critical for managing acute respiratory distress are not available at LSP. Physician evaluations during evening and nights were mostly telephonic and inadequate for patient needs. Also, the higher-level-of-care infirmary houses many long-term ill patients. These patients are at very high risk of death in the event of COVID-19 making the infirmary not useable for COVID-19 patients who deteriorate. Further, the local hospital is not a reference hospital and patients requiring intubation would need to be sent to Baton Rouge or New Orleans, an hour to three hour ride, respectively, a long ride with a potentially decompensating patient. For these reasons, detainees involved in these transfers would not be transferred into a situation that would include improved medical services. Services would likely be worse. Fourth and last, there is no evidence that the Louisiana Department of Health was involved in this decision. This appears to be a custody decision without consultation during a pandemic crisis with the Louisiana Department of Health. I have listed multiple reasons why this decision make little sense from a medical perspective. It also is not a good decision from a public health perspective. Custody leadership should not be making a decision that is likely to have great impact on a public health crisis, both with respect to introduction of active COVID-19 cases into a naïve and vulnerable population, and because the impact on local hospital resources could overwhelm the local community and reduce availability of ICU beds to community residents. For all of these reasons, it is my opinion that this transfer is not a good idea and will worsen the impact of this pandemic.

15. I have reviewed the plan submitted by the state, as well as the affidavits of Secretary James M. LeBlanc, Tracy Falgout, and Dr. John E. Morrison.[15] None of these documents changed in any way my opinion that using LSP as a statewide isolation unit, specifically at Camp J, will worsen the impact of the pandemic and poses a serious public health risk.

16. First, there is still no evidence that the Department of Health is involved in making the decision to use Camp J. This is a public health emergency, not a custody or other non-medical emergency. For this reason, the Department of Health should be directing decisions around transfers between facilities rather than custody officials. While Dr. Morrison is a medical doctor, his specialty is in general surgery and advanced cardiac life support, not epidemiology, pulmonology, or emergency medicine, and he has no relevant expertise in correctional medicine. I noted that the affidavits do not reference a public health official in attendance at the daily phone meetings – Dr. Morrison simply claims that the DOC is in "direct contact" with the Department of Health. Lack of coordination with the Department of Health puts at risk the lives of patients at LSP or who will be transferred to LSP and who may need to be hospitalized at some point. The Department of Public Health should have been part of the development of this plan in conjunction with their other statewide decision-making and planning around COVID-19.[16]

---

[15] *Lewis v. Cain*, 15-cv-318 (M.D.La.), Docket No. 585.
[16] On April 8, 2020, the Department of Health Office of Public Health issued recommendations regarding prisons and juvenile detention centers. These recommendations were rescinded without explanation on April 9, 2020.

17. Second, the pandemic plan they reference in their plan and affidavits is dated and not consistent with requirements of COVID-19.  For COVID-19, three distinct types of special housing are needed: quarantine, isolation for people with known COVID019, and isolation for persons under investigation ("PUI").  The PUI group are people who are symptomatic (fever, symptoms of cough, shortness of breath, etc.) but have not yet been tested or test results are pending.  These three groups should be housed separately.  The current plan does not address this.

18. Third, the state's plan and affidavits do not address hospitalization.  Specifically, they did not discuss how the PUI group or the COVID-19 positive groups would be monitored and, when and if they would be sent to a hospital, what arrangements would be made.  Because LSP is so remote, an earlier admission is probably indicated due to the expected long distance they would have to travel to Baton Rouge or New Orleans if the patient required hospitalization or intubation.  The West Feliciana Hospital does not support mechanical ventilation.

19. Fourth, the state's plan and affidavits did not address the capacity of LSP to provide appropriate medical care, particularly while maintaining isolation and quarantine from the rest of LSP.  It is not clear from a practical matter how they would provide sufficient medical personnel at Camp J, who would have no contact with patients at the rest of LSP, without further diminishing the capacity of the already over-taxed LSP doctors and nurses.  Nor was there any indication how the state plans to monitor the patients at Camp J in any of the three groups mentioned above.  If hospitalization becomes necessary the travel time to the hospital delays initiation of care with resultant risk.  In my previous reviews of medical records documenting the quality of care at LSP, I noted the failure to recognize indications for hospitalization and typical signs of respiratory decompensation, both of which are critical for COVID-19 patients.  There were also many examples of delays in transfer of patients to a hospital when indicated.

20. Finally, the state's plan and affidavits do not lay out adequate protocols for medical isolation of Camp J from the rest of LSP's population, the majority of whom are elderly or otherwise at high risk because of their medical conditions.  The state's plan and affidavits also do not describe who will provide medical care for the population expected to be housed at Camp J; whether and how workers serving the population at Camp J will be separate from workers serving the remainder of the prison; what the clinical monitoring will consist of; whether and how these known COVID-19 patients will receive hospital care if necessary; and where they will find medical staff and providers to care for the population.  Most troubling in the state's plan is the lack of coordination with the Louisiana Department of Health.  Creating an isolation unit for COVID-19 in a remote rural area with few cases and with a lack of reference hospital resources risks increased transmission and increased risk for individuals transferred as well as risk of infecting the local LSP inmate population which is high risk because of age and disease burden.  There is also the increased risk of spillover into the local civilian population.  Further, even assuming Defendants ultimately utilized different staff at Camp J, that staff will be at high risk of infecting the community, including staff that serve the rest of LSP.  Because this is a pandemic, the Louisiana Department of Health should

approve of such a transfer as part of its broader effort to control the pandemic statewide. This is not something correctional officials should do without consultation and approval of the Department of Health.

**Recommendations**

21. <u>Steps should be taken to release any inmate who is a low risk to the community.</u> The additional risk to inmates by virtue of crowding in prisons and the risk of promoting spread of the infection to the inmate population, and thereby to the community, needs to be weighed against the reason for not releasing the inmate from incarceration. Release based on risk should prioritize inmates over 65 years of age, inmates with immune disorders, inmates with significant cardiac (including hypertension) or pulmonary conditions, or inmates with cognitive disorders. Keeping healthy individuals in prison for short sentences, or for parole violations or other marginal public safety reasons only promotes crowding. Crowding decreases the ability of maintaining distancing of prisoners which risks spread of the virus. Therefore, healthy prisoners with low risk sentences are best sent home as a preventive measure.

22. Because LSP is a maximum security prison with a 90% of inmates having a life sentence, depopulation of low risk inmates may not yield many inmates who can be released. Depopulating should be done at other Louisiana prisons to permit LSP to reassign inmates to other prisons that will permit appropriate distancing in dormitories. Such reassignment is permissible under CDC guideline on the basis of depopulation. Current dormitory arrangements are inconsistent with current public health and CDC recommendations regarding social distancing and if COVID-19 transmission penetrates the prison, the infection will spread widely.

23. If and when COVID-19 testing becomes readily available, expanded testing should be done.

24. All persons over 65, with severe mental illness, with immune disorders, with serious cardiac or pulmonary disease, or with any cognitive disorder should have daily symptom screening and temperature screening. Any positive symptom or temperature should require respiratory isolation and testing for COVID-19. Temperatures should be taken with infrared no-touch thermometers so that symptom screening and temperatures can be taken without touching the patient.

25. Persons suspicious for or known to be infected with COVID-19 should NOT be transferred to LSP.[17] As of April 13, 2020, West Feliciana Parish only had 46 cases and 0 deaths. LSP had 24 cases between staff and inmates. To send patients infected with COVID-19 to a parish and correctional facility with few known cases risks spreading the disease further into Louisiana and has ramifications for the community at large. Furthermore, approximately

---

[17] Louisiana plans to house local and state inmates with coronavirus at Angola and Allen Correctional; Emily Lane, WDSU News March 27, 2020; as found at
https://www.wdsu.com/article/louisiana-plans-to-house-inmates-with-coronavirus-at-angola-and-another-prison/31960114

      50% of the LSP population is over age 50 with many high risk medical conditions and a majority of inmates live in dormitories. This increases risk of transmission into an uninfected population and increases risk of death.

26. The CDC recommends suspending all transfers between facilities or jurisdictions.[18] LSP should enact this recommendation. However, if a transfer must be done, any person is transferred from one prison to another, they should have a negative COVID-19 test result or be quarantined for 14 days prior to transfer and known to not have COVID-19.

27. LSP needs to develop guidelines for when to send patients to a hospital. These should be developed with the reference hospital. Contact information with the reference hospital should be established as soon as possible. Criteria for hospital referral should be established in advance and posted so that all physicians, physician assistants and nurse practitioners are aware.

28. The current Pandemic Flu Plan (PFP) of LSP is a generic influenza-like-illness plan which is not consistent with guidance regarding COVID-19[19] and should not be used. Instead, rather than re-writing a document at this late stage, I recommend the existing CDC guidelines should be used as a plan and appropriately adapted to LSP conditions. The adaptions and CDC guidelines should be widely distributed to health and custody staff.

29. A point of contact with the Louisiana Department of Health should be established and contact information shared with medical leadership. The Department of Health should have contact information of DOC and LSP medical leadership and an update conference call with the Department of Health should occur every few days or more frequently if needed.

---

[18] In the Operations item of the Management section of the CDC correctional guidance, it states, "Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release where relevant), unless necessary for medical evaluation, medical isolation/quarantine, care, extenuating security concerns, or to prevent overcrowding". LSP is not a location ideal for medical isolation or medical care due to poor service history, lack of nearby hospitals, and because the prison and surrounding area have no cases. Sending patients with COVID-19 to this facility risk spread and places them in a facility with less medical resources than a facility closer to a large city.

[19] I give only one example. Item 4.a, of the Yellow/Orange Phase of the LSP plan states that "employees will complete a self-screening at roll call. Employees who state they are sick shall be triaged by medical staff or health trained staff, and if found to have a fever shall be sent home. Staff with ILI shall remain at home at least 24 hours after they are free of fever (100F) or signs of fever, without the use of fever medication". This is incorrect information with respect to COVID-19 and could result in increased transmission of infection. The CDC recommends not returning to work until there is resolution of fever without use of medication *and* improvement of symptoms *and* negative COVID-19 tests on at least two consecutive occasions 24 hours apart OR at least 3 days since resolution of fever without use of medication *and* improvement of respiratory symptoms *and* at least 7 days have passed since symptoms first appeared.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on April 13, 2020 in Chicago, Illinois.

<u>/s/ Michael Puisis</u>

Michael Puisis D.O.