UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DANIEL GUMNS, MICHAEL VIDEAU,           *
REVON WILEY, IAN CAZENAVE,              *
REGINALD GEORGE, LIONEL TOLBERT,        *
OTTO BARRERA, KENTRELL PARKER           *
MICHAEL ROBINSON, JULIUS ALLEN,         *
ERNEST ROERS, ALFOANSO GARNER,          *
BRADLEY WINTERS, KENDRICK WILSON        *
JAMES HUGHES, on behalf of themselves and all *
similarly situation individuals         *
                                        *     NO. 3:20-cv-231-SDD-RLB
Versus                                  *
                                        *
JOHN BEL EDWARDS, in his official       *     CLASS ACTION
capacity as Governor of the State of  Louisiana; *
LOUISIANA DEPARATMENT OF PUBLIC         *
SAFETY & CORRECTIONS; JAMES LeBLANC,    *
in his official capacity as Secretary of the *
Department of Safety & Corrections; JOHN *
MORRISON, in his official capacity as Medical *
Director of the Department of Public Safety & *
Corrections; LOUISIANA DEPARMENT OF     *
HEALTH; and Stephen R. RUSSO, in his official *
capacity as Interim Secretary of the Louisiana *
Department of Health                    *


**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION**
**TO RESTRAIN DEFENDANTS FROM TRANSFERRING**
**COVID-19 CARRIERS TO LOUISIANA STATE PENITENTIARY**

**INDEX**

I.    INTRODUCTION                                                                          1

      FACTUAL BACKGROUND                                                                    2

      A.  DOC's coordination efforts to respond to the COVID-19 pandemic                    2

      B.  LSP's coordination of efforts to respond the COVID-19 pandemic                    5

      C.  Camp J                                                                            6

      D.  Status of the Named Plaintiffs and relationship with Camp J                       9

III.  ARGUMENT                                                                             11

      A.  The request for injunctive relief is moot both legally and factually             11

      B.  The request for injunctive relief should be denied on the merits                 12

          1.  The Plaintiffs cannot show a substantial likelihood of success on the
              merits                                                                       14

              a.  The Plaintiffs cannot show Camp J presents an objective substantial
                  risk of serious harm                                                     15

              b.  The Plaintiffs cannot show Camp J presents a subjective substantial
                  risk of serious harm                                                     16

          2.  The Plaintiffs cannot show a substantial threat of irreparable injury if
              the injunction is not granted                                                17

          3.  The Plaintiffs cannot show that the threatened injury to Plaintiffs
              outweighs the threatened harm the injunction may do to Defendants
              and/or that granting the injunction will not disserve the public interest    17

          4.  The Plaintiffs have not shown compliance with the PLRA                       20

IV.   CONCLUSION                                                                           21

**MAY IT PLEASE THE COURT:**

The Louisiana Department of Public Safety & Corrections, James LeBlanc and John Morrison (collectively the "Defendants" herein) respectfully request that the Court deny the Plaintiffs' motion to restrain Defendants from transferring COVID-19 carriers to Louisiana State Penitentiary for the reasons given herein and based upon the recent decision of *Valentine v. Collier*, 20-20207 (5th Cir. 4/22/20) and other authorities set forth below.

## I.   **INTRODUCTION**

The COVID-19 pandemic is obviously a serious public health crisis, and Louisiana is certainly one front in the nationwide fight against the pandemic. First responders are struggling with capacity and are being exposed.[1] The crisis has the capacity to overwhelm medical capacity within the state.[2] Personal protective equipment has been scarce.[3] Consistent with these concerns, the Louisiana Department of Health has ordered that any and all medical procedures shall be postponed until further notice, except for emergency procedures, "to preserve Personal Protective Equipment (PPE) and to utilize hospital staffing, equipment, and bed capacity for the transition to the COVID-19 emergency."[4]

---

[1] Chris Finch, *New Orleans first responders struggle as personnel exposed to COVID-19, some test positive*, WAFB9 (updated March 25, 2020 at 9:49 am), https://www.wafb.com/2020/03/25/new-orleans-first-responders-struggle-personnel-exposed-covid-some-test-positive; Jeff Adelson and Chad Calder, *With 1 in 6 workers under quarantine, New Orleans EMS to run lower-level ambulances*, THE NEW ORLEANS ADVOCATE (March 24, 2020) https://www.nola.com/news/coronavirus/article_f8440d22-6e3e-11ea-a2d2-f3fae48a0854.html..

[2] *New COVID-19 Forecasts: US Hospitals Could Be Overwhelmed in the Second Week of April by Demand for ICU Beds, and US Deaths Could Total 81,000 by July*, INSTITUTE FOR HEALTH METRICS AND EVALUATION (March 26, 2020) http://www.healthdata.org/news-release/new-covid-19-forecasts-us-hospitals-could-be-overwhelmed-second-week-april-demand-icu.

[3] Jeanne Whalen, Tony Romm, Aaron Gregg, and Tom Hamburger, *Scramble for medical equipment descends into chaos as U.S. states and hospitals compete for rare supplies*, THE WASHINGTON POST (March 24, 2020) https://www.washingtonpost.com/business/2020/03/24/scramble-medical-equipment-descends-into-chaos-us-states-hospitals-compete-rare-supplies/.

[4] Healthcare Facility Notice/Order Notice #2020-COVID19-ALL-17 (available at http://ldh.la.gov/assets/medicaid/hss/docs/Coronavirus_2019/LDH_Updated_Medical_Surgical_Procedures_032120 20.pdf). Even cancer and heart surgeries are being delayed. Marilyn Marchione, *Cancer, heart surgeries delayed as coronavirus alters care*, CHRON (March 20, 2020) https://www.chron.com/news/medical/article/Cancer-heart-surgeries-delayed-as-coronavirus-15140536.php.

1

With this background in place, the Louisiana Department of Corrections ("DOC") and Louisiana State Penitentiary ("LSP") have taken steps to protect both offenders and staff. Below is a detailed description of the efforts being coordinated Statewide to address this serious issue and to provide for the health and welfare of offenders at LSP and all DOC facilities. Plaintiffs have now filed two (2) virtually identical suits seeking to interfere with these efforts. The first such effort was filed in the matter entitled *Lewis v. Cain,* No. 3:15-cv-00318, United States District Court, Middle District of Louisiana. That motion was dismissed by the Court on April 2, 2020 [R. Doc. 587 in the Lewis case].[5] Plaintiffs have now filed this second action seeking injunctive relief based on affidavits by their own handpicked "experts" who spent all of two days at LSP some four (4) years ago. Like the first motion that was dismissed by this Court, Plaintiffs' second motion is filled with pure speculation and conjecture and should likewise be dismissed by this Court. Moreover, given recent rulings by the United States Fifth Circuit Court of Appeals, Plaintiffs' filings cannot meet the requisite Eight Amendment standard and should be dismissed as a matter of law.

## II.   FACTUAL BACKGROUND

### A.   DOC's coordination of efforts to respond to COVID-19 pandemic

In response to the COVID-19 pandemic, DOC has developed a plan to protect the health and safety of all offenders within the DOC system.[6] As part of its infection control program, DOC's Influenza and Pandemic Viral Outbreaks regulation provides a formal policy and procedure concerning the planning, preparation, and management of a pandemic viral disease or an influenza outbreak. DOC recognized that a pandemic or an influenza outbreak may not follow an expected course and may present new challenges. DOC activated this regulation to the highest

---

[5] In denying the motion in the *Cain* case, the Court found that "Plaintiffs' motion is based primarily on speculation and conjecture." [R. Doc. 587, p. 6]

[6] Affidavit of Secretary James LeBlanc at para. 2, attached as Ex. 1.

level, and DOC facility plans have been customized specifically to address COVID-19.[7]

Pursuant to the DOC regulation, each state prison has implemented a thorough and detailed Continuity of Operations Plan ("COOP"), which have been reviewed by DOC Headquarters Medical/Operations.[8] DOC is coordinating with the Governor's office and other state agencies to stay up to date on all COVID-19 related issues, developments, and discussions.[9] Secretary LeBlanc has engaged in daily phone calls with the Unified Command Group headed by the Governor. He, along with all other Cabinet Secretaries, participate in these phone calls.[10] DOC is actively involved in the statewide management and response through the Governor's Office of Homeland Security and Emergency Preparedness.[11] Moreover, DOC leadership has conference calls every Monday, Wednesday, and Friday with all Wardens, Louisiana State Police, and the Louisiana Sheriff's Association. These phone calls discuss updates from each institution, medical reports and updates, institutional reports, and strategy for continued management related to COVID-19.[12]

In an effort to proactively deal with the COVID-19 pandemic and to protect the safety and welfare of offenders housed in DOC facilities, DOC has suspended visitation, volunteering, tours, transfers between prisons/routine transfers from local level, and postponed the Angola spring rodeo, all in effort to minimize movement.[13] DOC has also limited new intakes to only those who must be housed in a state prison. Each intake is screened and assessed for symptoms, and then quarantined for 14 days before placed in general population.[14] DOC has created a

---

[7] *Id.* at para. 3.
[8] *Id.* at para. 4. A copy of the COOP Plan for Angola and relevant amendments were provided to Plaintiffs' counsel prior to their filing of this motion. *See* R. Doc. 580-4.
[9] *Id.* at para. 5.
[10] *Id.* at para. 6.
[11] *Id.* at para. 7.
[12] *Id.* at para. 8.
[13] *Id.* at para. 9.
[14] *Id.* at para. 10.

COVID-19 webpage on its website and updates it frequently with the latest information. This has proven useful for staff and offenders' families during this pandemic.[15]

In an effort to educate and assist offenders during this difficult time, DOC has created two COVID-19 informational videos for offenders. These videos include an introduction by the Secretary and the onsite physician at Angola, an overview of the Department's response to the pandemic, and proactive ways offenders can reduce risk of infection. These videos are available in both English and Spanish. These videos are played on loop at all prisons and are also available on the Department's website for families to view.[16] DOC is also working in conjunction with Securus Technologies, Inc. to provide offenders in state-run prisons two (2) free 15-minute phone calls per week and two (2) free email stamps per week to allow offenders to maintain communication with family and friends during this event.[17] DOC has suspended medical visit co-payments in state prisons and has also ensured that ample hand sanitizer and anti-bacterial soap are readily available at all state prisons.[18]

DOC has been proactive in its fight against the COVID-19 pandemic and is following the guidelines of the United States Centers for Disease Control and Prevention ("CDC").[19] In addition to the CDC guidelines, DOC has instituted reverse isolation for the most vulnerable of the inmate population. DOC has identified offenders most at risk for infection and began reverse isolation of those offenders.[20]

DOC has obtained from the Louisiana Department of Health ("LDH") COVID-19 test sample collection kits, which have been issued to all prison facilities.[21] Inmate testing criteria

---

[15] *Id.* at para. 11.
[16] *Id.* at para. 12.
[17] *Id.* at para. 13.
[18] *Id.* at para. 14-16.
[19] *Id.* at para. 17.
[20] *Id.* at para. 18.
[21] *Id.* at para. 19.

guidelines have been issued to all state facilities, which are based upon the direction of LDH. The guidelines require that any inmate exhibiting symptoms of an influenza-like illness, such as fever or fever and a cough shall be tested for COVID-19 and influenza.[22] Personal Protective Equipment ("PPE") has been distributed to staff and offenders, as needed.[23] DOC has issued COVID-19-specific guidelines and trained all state prisons regarding screening, isolation, quarantine, housing, proper use of PPE, and precautionary measures. These guidelines are revised and updated as the CDC issues new information.[24] Each DOC facility has quarantine and isolation capabilities, which are used as needed.[25] DOC has implemented daily tracking of all inmate influenza and COVID-19 testing at each facility and delivers the COVID-19 test samples to LDH for laboratory testing.[26]

## B. LSP's coordination of efforts to respond the COVID-19 pandemic

LSP has coordinated its efforts to comply with the guidance and direction of DOC to address the COVID-19 pandemic.[27] LSP has implemented its COOP plan and COOP isolation plan.[28] LSP is following the CDC guidelines. In addition to the CDC guidelines, LSP has instituted, per DOC directives, reverse isolation for the most vulnerable of the inmate population in order to protect those offenders from unnecessary exposure to staff. LSP has identified offenders most at risk for infection and began reverse isolation. LSP staff in these areas are required to wear masks and only make contact when absolutely necessary.[29]

LSP's current procedures ensure that proper housing, housekeeping, nutrition, medical care, and sanitation requirements are met, despite the additional challenges to staff and the

---

[22] *Id.* at para. 20.
[23] *Id.* at para. 21.
[24] *Id.* at para. 22.
[25] *Id.* at para. 23.
[26] *Id.* at para. 24.
[27] See generally the Affidavit of Tracy Falgout, attached as Ex. 2.
[28] *Id.* at para. 5.
[29] *Id.* at para. 17-18.

offender population. As the situation created by the pandemic evolves, LSP staff are prepared to adapt as necessary. LSP has restricted offender movement within the facility. LSP has suspended visitation, volunteering, tours, transfers between prisons, routine transfers from local level, most programming, and postponed the Angola spring rodeo, all in effort to minimize movement. [30]

DOC has limited new intakes to only those who must be housed in state prison and each intake sent to LSP is screened and assessed for symptoms, and then quarantined for 14 days before placed in general population.[31]  Any LSP offender presenting with symptoms of an influenza-like illness is given both an influenza test and a COVID-19 test. The offender is then sent to the appropriate isolation area. Once test results are obtained, the offender is treated per Healthcare Practitioners Orders.[32]  All employees entering the facility are screened daily through a series of questions regarding COVID-19 symptoms and recent travel. All staff entering the Treatment Center have their temperatures checked prior to entering.[33]

### C. Camp J

Camp J began accepting patients for isolation on or about April 2, 2020.[34]  Prior to the re-occupancy of Camp J, the facility was thoroughly cleaned and equipped to serve as a COVID-19 occupational facility.  Additionally, those parts of Camp J that will house inmates for isolation have been fully climate controlled with central air-conditioning purchased/leased by DOC for these purposes.[35]

Camp J is currently being used as an isolation facility to house offenders from local jails who test positive for COVID-19 and who cannot be safely isolated at the local facilities.[36]

---

[30] *Id.* at para. 7-9.
[31] *Id.* at para. 10.
[32] *Id.* at para. 20,
[33] *Id.* at para. 21.
[34] Supplemental Affidavit of Tracy Falgout at para. 9; attached as Ex. 3
[35] *Id.* at para. 13.
[36] *Id.* at para. 9.

Offenders housed at local facilities who test positive for COVID-19 are transported to Camp J for isolation, only if they cannot be isolated at the facility in which they are housed. Camp J also serves as an isolation facility for those offenders within the LSP population who test positive and require isolation from the general population at LSP.[37]

Camp J is a standalone facility located on LSP's 1800-acre campus. Camp J is located at least a mile away from any other offender-occupied buildings located at LSP. Camp J is being operated as independent prison separate and apart from the rest of DOC and LSP as part of DOC's current COVID-19 response plan. During this period, Camp J will not be considered part of Angola.[38]

Camp J is being used only as an isolation and monitoring facility. It does not act as a hospital and does not provide treatment to any Covid-19 patients that require ventilators, oxygen, or IV's. Any patients showing serious medical symptoms beyond isolation monitoring are sent to an appropriate outside hospital (typically Our Lady of the Lake Regional Medical Center in Baton Rouge) for any necessary medical care.[39]

Camp J is currently operating a two-prong isolation plan for inmates isolated there. All initial intakes are housed that the "Bass" unit for early isolation and monitoring. Inmates generally remain at the Bass unit for approximately seven (7) days during which time they are regularly monitored by staff that include one (1) nurse practitioner and two (2) to three (3) registered nurses. After this initial isolation period, those patients that continue to remain stable and show signs of improvement are moved to the "Gar" unit for "step-down" isolation for approximately an additional seven (7) days. In step down isolation, offenders are monitored daily by medical staff as they continue their recovery. Offenders are then tested after they complete the

---

[37] *Id.* at para. 9-10.
[38] *Id* at para. 11.
[39] *Id* at para. 12.

full 14-day isolation regimen. Those who test negative are then discharged and appropriate transport and placement is determined by DOC headquarters. These offenders are considered recovered upon this negative COVID-19 test result.[40]

The above referenced process has worked very well thus far. Nearly all of the patients admitted to Camp J have continued to improve and have not had any serious complications. No one who has been admitted to Camp J has died. Only two offenders who were sent to Camp J have required hospitalization. Both of those offenders were transported to OLOL immediately upon intake because their symptoms were more severe upon intake than those allowed by the Camp J isolation criteria. [41]

The offenders and employees assigned to Camp J do not have interaction with other employees or offenders of LSP so as to limit the potential for exposure to COVID-19. Employees assigned to Camp J report directly to that facility daily for work. Healthcare workers who interact with offenders are given clothing to wear upon reporting for a shift. They change into this clothing, which they wear along with proper Personal Protective Equipment ("PPE"), while in contact with offenders. At the end of a given shift, employees then take a decontamination shower, leave behind the clothing provided so that it can be cleaned and sanitized, and then put on their personal clothing before leaving the facility. This practice has been implemented to take even further precautions to avoid any cross contamination while entering and leaving the facility.[42] Camp J has its own ambulance that has been assigned as the designated transport for those offenders who are transported to or from the facility for COVID-19 isolation.[43] All offenders housed at Camp J are being provided with masks and are being

---

[40] *Id* at para. 14.
[41] *Id* at para. 15.
[42] *Id* at para. 16.
[43] *Id* at para. 17.

encouraged to use them by staff.[44]

The then-medical director of DOC, Dr. Morrison was involved in the decision to use Camp J in this fashion. In Dr. Morrison's opinion, this course of action is both medically appropriate and the most prudent course of action available to ensure the health and safety of DOC offenders and staff.[45]

## D. Status of the Named Plaintiffs and relationship with Camp J

There are currently 15 named plaintiffs in this lawsuit. As set forth below, nearly all of them are not and have not ever been to Camp J. Plaintiff, Kendrick Wilson is an offender who was transported from East Baton Rouge Parish prison ("EBR") to Camp J on or about April 11, 2020. He has been at Camp J since that date and is currently in the "step-down" unit awaiting full recovery. Thereafter, he will be returned to EBR for continued incarceration.[46] Plaintiff Ernest Rogers has not been transported to or housed at Camp J.[47] Plaintiff Julius Allen has not been transported to or housed at Camp J.[48] Plaintiff Daniel Gumns has not been transported to or housed at Camp J.[49] Plaintiff Ian Cazenave has not been transported to or housed at Camp J.[50]

Although they have not submitted affidavits, named Plaintiffs, Michael Videau, Trevon Wiley, Reginald George, Lionel Tolbert, Otto Barrera, Kentrell Parker, Alfonso Garner, Bradley Winters and James Hughes have also not been transported to or housed at Camp J.[51] Additionally, although not listed as a plaintiff, Paul Nash (who submitted an affidavit) is currently at Camp J and he is stable and improving in "step down" isolation. Once retested (and receiving a negative result) he will be transported back to Bienville Parish where he was housed

---

[44] *Id* at para. 18.
[45] Affidavit of Dr. Morrison, attached as Ex. 4.
[46] Supplemental affidavit of Tracy Falgout at para 19.
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*

prior to contracting COVID-19.[52]  Finally, while Camp J plans to continue to accept offenders from local jails, Camp J is no longer accepting offenders from EBR for isolation.  Arrangements have been made by EBR officials to manage and maintain their own onsite isolation facility.[53]

As discussed below, Plaintiffs' motion has no merit.  It is nothing more than a vain effort to direct the response of the State, DOC and LSP, through the use of their hired gun litigation experts.  The plaintiffs had Michael Puisis, D.O. submit an affidavit to allegedly support their motion.  The affidavit is incredible in that it actually shows that DOC's and LSP's actions are in compliance with CDC guidelines and that no relief is necessary. Paragraph 11 of Dr. Puisis' original affidavit acknowledges that:

> transfers into LSP have been suspended absent extenuating circumstances and if an inmate is transferred into LSP, they are supposed to be quarantined for a 14-day period.  LSP screens visitors and new offenders with symptom screening and a temperature.  **These measures are consistent with recommendations of the Center for Disease Control (CDC) correctional guidelines**.

(Emphasis added.)  After stating his litigation position that LSP provides ineffective medical care (which is denied in the strongest terms possible), Dr. Puisis states that:

> While **CDC procedures are in place** I question the ability to effectively carry out the procedures as stated.

(Emphasis added.)  Thus, plaintiffs' own expert witness admits that DOC and LSP measures and procedures are consistent with CDC recommendations and procedures. Instead, he relies on conjecture that LSP is either unwilling or unable to implement the guidelines.

In their most recent affidavits, Dr. Puisis and Dr. Vassallo give the opinion that movement of prisoners to Camp J is not prudent.  The basis of these opinions is fraught with unsupported assumptions, speculation and just plain falsities.  The opinions are not based on fact and do not even take into consideration DOC efforts to protect all offenders, not just those

---

[52] *Id.*
[53] *Id.* at para. 20.

housed at LSP. Plaintiffs' current filing is nothing more than an effort to usurp State powers and prohibit a plan that has been well thought out and vetted by Louisiana medical professionals who are doing everything in their power to safely respond to this crisis.

## III.  ARGUMENT

The Plaintiffs seek solely to restrain the Defendants from transferring inmates with COVID-19 to Camp J at LSP. That is the sole issue presented by Plaintiffs' emergency motion for a TRO. [Doc. 15]

### A.  The Request for injunctive relief is moot both legally and factually.

Plaintiffs generally seek injunctive relief to restrain Defendants from transferring DOC offenders who test positive for COVID-19 to Camp J. It is well-settled law that a request for injunctive relief becomes moot upon the happening of the event sought to be enjoined. *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998); see also, *Cervantes v. Dixon*, No. 5:13-CV-205-C, 2014 WL 5285699, at 3 (N.D. Tex. Oct. 15, 2014) (In case where inmate alleged unreasonable delay in provision of reference to a specialist and surgical procedure, the court found the request for injunctive relief moot because plaintiff was "examined by a specialist and underwent surgery" after filing of complaint). Such is the case here.

Plaintiff Kendrick Wilson has been at Camp J since on or about April 11, 2020 and is currently in the "step-down" unit awaiting full recovery, after which he will be returned to EBR for continued incarceration. Though not a named plaintiff, Paul Nash submitted an affidavit in support of the TRO. Like Kenrick Wilson, Nash is stable and improving in "step down" isolation unit. Upon being retested and receiving a negative result, he will be transported back to Bienville Parish where he was housed prior to contracting COVID-19. Thus, any request for injunctive relief relating to Wilson's and Nash's transfer to Camp J is moot.

Camp J is no longer accepting offenders from EBR for isolation and arrangements have been made by EBR officials to manage and maintain their own onsite isolation facility. Defendants have also confirmed that Plaintiffs Rogers and Allen have not and will not be transferred to Camp J. Accordingly, any relief requested specific to Rogers and Allen is likewise moot.

The remaining plaintiffs are current inmates housed at LSP who argue that the transfer of COVID-19 positive offenders to Camp J threatens the health of the rest of LSP's population. Defendants show that Camp J has been in operation since April 2, 2020. One of two things is true: either any cross-contamination that was going to occur has already occurred or, alternatively, the mitigation plan in connection with Camp J is working as intended. At this time, no one admitted to Camp J has died or even gotten worse.[54] When intervening circumstances render the court no longer capable of providing meaningful relief the plaintiff, a request for injunctive relief is moot. See *Harris*, 151 F.3d at 189.

Plaintiffs' request for injunctive relief is therefore moot and should be dismissed based upon current conditions.

## B. __The request for injunctive relief should be denied on the merits.__

The United States Supreme Court in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376–77 (2008) held that:

> A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."

---

[54] To be clear, two offenders were offenders who were transported to OLOL immediately upon intake because their symptoms were more severe upon intake than those allowed by the Camp J isolation criteria. Those two offenders should not have been sent to Camp J in the first instance.

(Citations omitted.) Similar to the United States Supreme Court, the Fifth Circuit has noted that an injunction is an extreme remedy:

> A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four *Callaway* prerequisites. The decision to grant a preliminary injunction is to be treated as the exception rather than the rule.

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

"The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally demonstrate the need for its issuance." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). One district court captured the extraordinary nature of the remedy in stating that standard for granting an injunction

> "is a 'difficult' and 'stringent' standard for the movant to meet." *Humana Ins. Co. v. Tenet Health Sys.*, No. 3:16–CV–2919–B, 2016 WL 6893629, at *11 (N.D. Tex. Nov. 21, 2016 (citing *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir. 2013) and *Janvey v. Alguire*, 647 F.3d 585, 591, 595 (5th Cir. 2011)).

*Texas v. Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. Mar. 29, 2018).

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24, 129 S. Ct .at 376–77. Indeed, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The Fifth Circuit in *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) set forth the prerequisites for issuance of injunctive as:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

The Fifth Circuit's recent decision in *Valentine v. Collier*, 20-20207 (5th Cir. 4/22/20) provides important guidance and is ultimately dispositive. In *Valentine*, the plaintiffs sought an injunction against a prison for the elderly and the infirm, those particularly susceptible to COVID-19. The plaintiffs sought and the district court entered a detailed injunction which required the Texas Department of Criminal Justice ("TDCJ") to undertake steps beyond those required by the CDC. The defendants sought a stay of the injunction with the Fifth Circuit. In considering whether to stay the preliminary injunction, the court considered four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

These four factors are essentially the same as the four factors required for issuance of an injunction in the first instance. The Fifth Circuit ruled in favor of the defendants and stayed the injunction pending appeal.

Using *Valentine* as a guidepost, the plaintiffs cannot carry their burden of proving the elements necessary for the Court to grant the extraordinary remedy of issuance of a TRO to prevent the Defendants from transferring inmates with COVID-19 to LSP.

### 1. <u>The Plaintiffs cannot show a substantial likelihood of success on the merits.</u>

The Fifth Circuit in *Valentine* set forth the following applicable law:

> In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the "subjective and objective requirements" of the Eighth Amendment inquiry. *Farmer v. Brennan*, 511 U.S. 825, 846 (1994). To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Ibid*. To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any

densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009). Instead, the plaintiff must show a denial of "basic human needs." *Ibid.* "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020).

*Valentine*, pp. 5-6.

a. **The Plaintiffs cannot show Camp J presents an objective substantial risk of serious harm.**

The Plaintiffs have not proven that the use of Camp J presents a substantial risk of serious harm to their clients. The Plaintiffs' counsel and their experts assume, without factual basis, that the use of Camp J will infect all offenders at LSP. According to the Plaintiffs, this alleged cross contamination presents an objective substantial risk of serious injury.

However, just as this Court found in response to the first motion filed in the *Lewis v. Cain* litigation, these concerns are based primarily upon speculation and conjecture. [*Lewis* R. Doc. 587] The Plaintiffs have no evidence that Camp J has actually caused the spread of COVID-19 outside of Camp J.

In addition, the Plaintiffs ignore the mitigation steps that the Defendants have undertaken in setting up and operating Camp J. Employees and offenders in Camp J do not interact with those outside of Camp J. Employees shower, decontaminate and change clothes prior to leaving Camp J. Camp J has its own dedicated ambulance. All of these steps mitigate against the substantial risk of harm. Indeed, Camp J has been in operation since April 2, 2020 with no known negative impacts to LSP to date. Considering all of the steps taken by Defendants to isolate Camp J and prevent the spread of COVID-19 outside of Camp J, the Plaintiffs cannot show an objective substantial risk of serious from the operation of Camp J.

The Fifth Circuit in *Valentine* held that the TDCJ was likely to prevail on the merits of the appeal because after accounting for the protective measures TDCJ has taken, the plaintiffs

had not shown a "substantial risk of serious harm" that amounted to "cruel and unusual punishment." *Valentine*, p. 6. Similarly, here, the Court should find that the Plaintiffs have not shown a substantial risk of serious harm that amounts to cruel and unusual punishment as a result of the operation of Camp J.

b. **The Plaintiffs cannot show Camp J presents a subjective substantial risk of serious harm.**

Even assuming that there is a substantial risk of serious harm (which is denied), the Plaintiffs cannot show that the Defendants are subjectively deliberately indifferent to the risk from operation of Camp J. In response to the potential risk of transfer of COVID-19 outside of Camp J, the Defendants devised a plan which keeps Camp J as a separate facility to mitigate against spread of COVID-19 through LSP. Employees and offenders at Camp J do not interact with employees or offenders at LSP. Employees at Camp J decontaminate, shower and change clothes before leaving Camp J. The Defendants subjectively believe that the use of Camp J is working as shown by the facts that offenders are getting better at Camp J that there have been no known negative impacts to LSP from operation of Camp J. Thus, the Plaintiffs have failed to prove that the Defendants are subjectively indifferent to a substantial risk of serious harm from the operation of Camp J.

Again, the Fifth Circuit's ruling in *Valentine* is significant. The Fifth Circuit found that the defendants' general awareness of the dangers posed by COVID-19 was insufficient since the plaintiffs presented no evidence that the defendants subjectively believed that the measures they were taking were inadequate. *Valentine*, at p. 8. Here, just as in *Valentine*, there is no evidence that the Defendants believe that the measures that the Defendants are taking in setting up Camp J and in mitigating against cross contamination outside of Camp J are inadequate. Indeed, to the

contrary, the Defendants believe that the State and the DOC are benefitting from the operation of Camp J. In short, Camp J is fulfilling its intended role in mitigating the spread of COVID-19.

The Plaintiffs cannot prove that the Defendants are subjectively deliberately indifferent to a substantial risk of serious harm from operation of Camp J.

### 2. The Plaintiffs cannot show a substantial threat of irreparable injury if the injunction is not granted.

Speculative injury is not a sufficient basis to grant an injunction; there must be more than an unfounded fear on the part of the applicant. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

As stated above, the Defendants have shown that Camp J will be a separate standalone facility with no interaction with LSP facilities. With these facts established, the Plaintiffs cannot show that they will suffer irreparable harm if the injunction is not granted. The Court found in the *Lewis v. Cain* litigation, that the Plaintiffs' concerns are based primarily upon speculation and conjecture. [*Lewis* R. Doc. 587]. The case remains that the Plaintiffs continue to present nothing more than a case of speculation and conjecture that Camp J will harm them. That unfounded fear is an insufficient basis to grant injunctive relief, particularly with the additional facts that Camp J has operated since April 2, 2020 with no known negative impacts on the Plaintiffs.

### 3. The Plaintiffs cannot show that the threatened injury to Plaintiffs outweighs the threatened harm the injunction may do to Defendants and/or that granting the injunction will not disserve the public interest.

When the government is a defendant, the third factor (harm the injunction may do to defendant) and the fourth factor (granting the preliminary injunction will not disserve the public interest) merge into one. *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009).

The threat to the public if the injunction is not granted is significant. Camp J is being used to isolate offenders from locations which cannot safely isolate offenders. The Defendants have determined that the use of Camp J is medically necessary to mitigate the impact of COVID-19 throughout the DOC facilities statewide. Without Camp J in operation, these other facilities throughout the state would be at an even greater risk of spread of COVID-19. In short, the use of Camp J is in furtherance of the public health. Plaintiffs did not address the serious risk posed by COVID-19 in other facilities or the overall public health concerns that the Defendants are attempting to address.

Individual states are vested with police powers, which allow states to enact reasonable regulations established to protect the public health and public safety of its citizens. *Jacobson v. Massachusetts*, 197 U.S. 11, 25, 25 S.Ct. 358, 361 (1905). States may also invest local bodies— such as the Department of Health or the Department of Corrections—with the authority to carry out such regulations and safeguard public health and safety.[55] *Id.*

Response to infectious disease outbreaks and epidemics has long been recognized as a function of the state's police power, and federal courts should not intervene in the state's response unless the response is deemed to be arbitrary or in violation of clearly established Constitutional law. *Morgan's La. & T.R. & S.S. v. Bd. of Health of State of La.*, 118 U.S. 455, 464–65, 6 S. Ct. 1114, 1118–19 (1886); *Jacobson*, 197 U.S. at 28, 25 S. Ct. at 361; *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016). Indeed, the Supreme Court held that to intervene in the state's disease control measures

> would usurp the functions of another branch of government if it adjudged, as matter of law, that the mode adopted under the sanction of the state, to protect the people at large was arbitrary, and not justified by the necessities of the case. We say necessities of the case, because it might be that an acknowledged power of a

---

[55] Granted, all state action taken under the guise of police powers must yield to Constitutional protections and provisions. *Id.*

local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons.

*Jacobson*, 197 U.S. at 28; 25 S. Ct. at 362.

As to correctional institutions, the Supreme Court has held that it is "difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S. Ct. 2378, 2388 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S. Ct. 1827, 1837 (1973); *Valentine*, pp. 8-9. Courts often find that "evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S. Ct. 2400, 2404 (1987) (internal citations omitted). In addition, the Supreme Court has acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84–85; 107 S.Ct. 2254, 2259 (1987). "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." *Id.* Moreover, when a state penal system is involved, the federal court has an "additional reason to accord deference to the appropriate prison authorities." *Id.* These longstanding principles of separation of powers and deference must not be ignored, especially in the current crisis.

Louisiana has adopted administrative regulations advising the response to communicable diseases that may pose a serious threat to public health, including provisions for mandating isolation or quarantine of individuals who are suspected of being cases or carriers of disease. 51 La. Admin. Code II:117. The Supreme Court recognized the "authority of states to enact quarantine and health laws of every description" as early as 1905. *Jacobson*, 197 U.S. at 25, 25 S. Ct. at 361. The *Jacobson* court has been cited approvingly, even as recently as 2016 during the Ebola outbreak. *Hickox v. Christie*, 205 F.Supp.3d 579 (D.N.J. 2016). *Hickox* quoted *Jacobson* for the proposition that state-enacted measures to protect public health "will not be struck down unless it 'has no real or substantial relation to [that goal], or is, beyond all question, a plain, palpable invasion of rights' secured by the Constitution." *Hickox*, 205 F.Supp.3d at 591 (quoting *Jacobson*, 197 U.S. at 31).

The Plaintiffs' concerns cannot override the public interest. In this case, the public interest is public health, probably the most serious concern there could be. Defendants' decision to set up Camp J made in the interest of public health for the State and DOC outweigh Plaintiffs' concerns.

### 4. **The Plaintiffs have not shown compliance with the PLRA.**

The Prison Litigation Reform Act (the "PLRA") requires inmates to exhaust "such administrative remedies as are available" before filing suit in federal court to challenge prison conditions. 42 U.S.C. § 1997e(a). This exhaustion obligation is mandatory—there are no "futility or other [judicially created] exceptions [to the] statutory exhaustion requirements . . . ." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). The Fifth Circuit in *Valentine* rejected the argument that the administrative process was too lengthy to provide timely relief under the special

circumstances of the COVID-19 crisis. *Valentine*, pp. 11-12. Thus, Plaintiffs' suit is premature since they have not shown that they have exhausted administrative remedies available.

The PLRA further mandates that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). And the PLRA says courts "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief." *Id.*; *Valentine*, pp. 13-14. The Defendants contend that the injunctive relief sought is not narrowly drawn, adversely impacts public safety, and would impede the principles of comity owed to the State of Louisiana. *See, Valentine*, at pp. 13-14 ("These may be salutary health measures. But that level of micromanagement, enforced upon threat of contempt, does not reflect the principles of comity commanded by the PLRA.").

## IV.  CONCLUSION

The Fifth Circuit's decision in *Valentine* should control. For the foregoing reasons, Defendants respectfully ask the Court to deny the relief sought by Plaintiffs in the instant motion.

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By:  *s/Randal J. Robert*
　　　　Randal J. Robert (#21840)
　　　　Connell L. Archey (#20086)

Julie M. McCall (#29992)
Keith J. Fernandez (#33124)
*Special Assistant Attorneys General*
Email: randy.robert@butlersnow.com
connell.archey@butlersnow.com
julie.mccall@butlersnow.com
keith.fernandez@butlersnow.com

Counsel for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 24th day of April, 2020, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Randal J. Robert*
Randal J. Robert

52728850.v1