UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DANIEL GUMNS, MICHAEL VIDEAU,        * | |
| TREVON WILEY, IAN CAZENAVE,        * | |
| REGINALD GEORGE, LIONEL TOLBERT,   * | |
| OTTO BARRERA, KENTRELL PARKER    * | |
| MICHAEL ROBINSON, JULIUS ALLEN,    * | |
| ERNEST ROERS, ALFOANSO GARNER,    * | |
| BRADLEY WINTERS, KENDRICK WILSON   * | |
| JAMES HUGHES, on behalf of themselves and all * | |
| similarly situated individuals              * | |
|                                * | NO. 3:20-cv-231-SDD-RLB |
| VERSUS                    * | |
|                                * | |
| JOHN BEL EDWARDS, in his official      * | CLASS ACTION |
| capacity as Governor of the State of Louisiana; * | |
| LOUISIANA DEPARTMENT OF PUBLIC   * | |
| SAFETY & CORRECTIONS; JAMES LeBLANC, * | |
| in his official capacity as Secretary of the    * | |
| Department of Safety & Corrections; JOHN   * | |
| MORRISON, in his official capacity as Medical * | |
| Director of the Department of Public Safety & * | |
| Corrections; LOUISIANA DEPARTMENT OF * | |
| HEALTH; and Stephen R. RUSSO, in his official * | |
| capacity as Interim Secretary of the Louisiana * | |
| Department of Health             * | |

**POST TRIAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION
TO RESTRAIN DEFENDANTS FROM TRANSFERRING
COVID-19 CARRIERS TO LOUISIANA STATE PENITENTIARY**

**MAY IT PLEASE THE COURT:**

The Louisiana Department of Public Safety & Corrections ("**DOC**"); James LeBlanc, in

his official capacity as Secretary of the Department of Safety & Corrections; and Dr. John E.

Morrison, in his official capacity as Medical Director of the Department of Public Safety &

Corrections (collectively, the "**DOC Defendants**") respectfully submit this post trial brief in

opposition of the Plaintiffs' request for a temporary restraining order and preliminary injunction.

The evidentiary record overwhelmingly shows that the request for injunctive relief should be

denied.

## I.    **BURDEN OF PROOF**

The Plaintiffs are required to show that: 1) they have a substantial likelihood of success on the merits; 2) they are subject to a substantial threat of irreparable injury if the injunction is not granted; 3) that the threatened injury outweighs the threatened harm to the Defendants; and 4) an injunction will not disserve the public interest. *Snow v. Lambert*, No. CV 15-567-SDD-RLB, 2015 WL 5071981, at *1 (M.D. La. Aug. 27, 2015). If the plaintiff fails to meet his burden regarding any of the necessary elements, the Court need not address the other elements necessary for granting a preliminary injunction. See *Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990); *Roberts v. Vannoy*, No. 16-CV-600-JWD-EWD, 2017 WL 2256962, at *2 (M.D. La. 2017). The Plaintiffs clearly failed to carry their burden on all four showings.

## II.    **FACTUAL EVIDENCE**

The case is now limited to the factual record developed at trial, not citations to internet articles. The record shows the following:

### A.  **Defendants responded and prepared for COVID-19 proactively and early.**

The Defendants proactively began to act long before COVID-19 had arrived in the United States or garnered public attention.

On 2/17/20, a full week before Mardi Gras (2/25/20) Dr. Morrison sent an email to Dr. Billioux with the Louisiana Department of Health which stated:

> Can you let me know if there is anything specific for the corona virus that we should be doing. I'm sure I am going to have questions about this. It appears that isolation 14 day, evaluation of contacts and symptomatic treatment are what everyone is recommending at this time. Thanks

(Ex. D-50, p. 3) Dr. Billioux responded explaining the steps that they were taking at that time (observing travelers from China and advising the public to "largely keep to their homes."). (Ex. D-50, p. 2)

On 2/27/20, Dr. Morrison again emailed Dr. Billioux,

Can you please send over something for us to send all Wardens regarding the corona virus? We have put together some things but would like to include information directly from LDH as well.

(Ex. D-50, p. 2) Dr. Billioux responded by sending the CDC briefing from that morning. Dr. Billioux noted that Louisiana had no cases anywhere in the state. Dr. Billioux further indicated that he would be "reviewing and updating the pandemic flu plans as those are most appropriate for managing this outbreak as COVID-19 is similar to pandemic flu." (Ex. D-50, p. 1) Dr. Morrison responded that he had already "asked our facilities last week to review the pandemic reg which was for H1N1 but it appears to be the same needs as this virus. We are going to have a conference call tomorrow with the facilities to reinforce this…" (Ex. D-50, p. 1) Dr Morrison further explained that he was in contact with Dr. Billioux with the LDH and activating a plan well before the threat arrived in Louisiana.

The preparation was not limited to the medical director or the medical team of DOC. On 2/28/20, Sec. LeBlanc sent a memo to All DPS&C Staff and All State Prison Offenders regarding COVID-19. (Ex. D-1) He advised that DOC was "taking precautions and reviewing our preparedness plans to begin now taking steps to prevent the possible spread and decrease exposure risks." He related personal protection measures recommended by the CDC. He warned offenders that risk screening would start and that such screening could result in visits being denied. He concluded by stating that DOC was "reviewing our emergency response plan to ensure that we are prepared should our preventive measures not be enough to keep us from having a confirmed case." (Ex. D-1)

Also, on 2/28/20, Sec. LeBlanc sent a letter to Michael Ranatza, Executive Director of the Louisiana Sheriffs' Association, in which he similarly stated that DOC was "taking precautions and reviewing our preparedness plans to begin now taking steps to prevent the possible spread and

decrease exposure risks, specifically in our secure care facilities." (Ex. D-2) Sec. LeBlanc again related the CDC guidelines as of that time. He further noted that DOC was "working to inventory and secure hygiene and protection supplies (soap, masks, gloves, etc.) and educating our incarcerated and supervision population…" He referenced the plan of suspending visitation and discontinuing non-emergent transfers. He concluded by asking that the plan be shared with local jail partners. Finally, in a foreshadowing of the use of Camp J, Sec. LeBlanc stated:

> In the event that a transfer is necessary for an individual that has symptoms, local jail staff should contact DPS&C's Medical Director, Dr. John Morrison, or DPS&C Chief of Operations, Seth Smith, to discuss transfer options/protocols.

(Ex. D-2)[1] On 2/28/20, Sec. LeBlanc also had an Update on Coronavirus Phone Conference that Dr. Morrison was required to attend. (Ex. D-50, p. 4)

On 3/3/20, Dr. Morrison attended a face-to-face Task Force Meeting at GOHSEP to form a response for a COVID-19 positive patient within DOC. (Ex. D-50, pp. 5–7.) On 3/6/20, Dr. Morrison attended yet another update on the Coronavirus (COVID-19). (Ex. D-50, p. 10)[2]

On 3/10/20, DOC through Sec. LeBlanc issued Regulation No. HCP26, Health Care Policy – Infection Control. (Ex. D-4) This foundational regulation put in place many of the preparatory steps needed to respond. The regulation directed that DOC, among other things, establish an incident command team, designate a pandemic coordinator, maintain adequate supplies (gloves, masks and hand sanitizers, among others), begin screening, waive healthcare copayment fee for offenders, ensure that health care personnel are updated with the latest CDC recommendations,

---

[1] As stated in Sec. LeBlanc's sworn testimony, he was directly involved in pandemic planning on the local level because: (1) local jails do not have the capacity to isolate COVID-19 positive patients; and (2) many of the inmates being housed on the local level are in fact wards of the DOC.

[2] On 3/8/20, Matthew F. Block, Executive Counsel, Office of the Governor, sent an email that he was drafting an emergency declaration for the Governor relating to COVID-19. He stated: "While we do not have a confirmed case in Louisiana, the Governor wants us to lean forward on our preparations . . ." (Ex. D-50, p. 12 This email confirms that all arms of State government were proactive in the response to the COVID-19 threat.

among many others.[3]

**B.  <u>The Governor declares an emergency.</u>**

On 3/11/20, Governor Edwards issued Proclamation Number 25 JBE 2020, Public Health

Emergency – COVID-19. (Ex. D-5) The proclamation noted that on 3/9/20, the first Louisiana

resident tested presumptively positive for COVID-19. That same day, 3/11/20, DOC issued a

Coronavirus (COVID-19) Screening Checklist to question persons seeking to enter a DOC facility.

(Ex. D-6) The very next day, 3/12/20, Sec. LeBlanc issued a memo to Leadership, All Wardens,

and All DPS&C Staff advising that DOC was "moving into the next step of response for our

PJDOC was working to expand access to telephone services." Further, off-site non-emergent trips,

including medical trips, were cancelled. (Ex. D-7) DOC issued a Press Release that same date,

3/12/20, advising that DOC suspended visitation, tours, and volunteering at Louisiana's State-Run

Prisons. (Ex. D-8) These steps were being taken even though there were "no confirmed cases

COVID-19 inside these institutions." DOC explained that it "made this decision to protect the

vulnerable incarcerated populations, staff, and to help reduce spread of this disease." DOC

educated "staff and inmates on social distancing and hand washing practices to reduce the potential

spread of coronavirus." Further, each state prison "identified areas to quarantine DOC's

incarcerated population." The Press Release concludes that:

> DOC, in partnership with the Louisiana Department of Health and the Louisiana
> Sheriff's Association, is following CDC guidance, and continues to monitor the
> situation and update its response as necessary.

(Ex. D-8) On 3/12/20, Sec. LeBlanc transmitted his order to DOC staff in an email that stated, "As

I've stated before, the health of our agency (staff and population) is important and our preparedness

should not be taken lightly." (Ex. D-50, p. 15) Dr. Morrison's email on 3/12/20 stated that, "We

---

[3] In March of 2020, LSP updated its Continuity of Operations Plan the ("**COOP**").  (Ex. D-3) The Pandemic Flu Plan
is Attachment 8 to the COOP.  (Ex. D-3)

are taking any measures we can in an attempt to keep the virus from entering our state-run facilities." (Ex. D-50, p. 16.) DOC identified quarantine areas for DOC. (Ex. D-50, p. 23) On that same day, Dr. Morrison discussed criteria for COVID-19 tests on inmates. (Ex. D-5, p. 24)

On 3/13/20, Governor Edwards issued Proclamation Number JBE 2020 – 27, Additional Measures for COVID-19 Public Health Emergency. (Ex. D-9) On 3/13/20, The Board of Pardons and Parole suspended hearings due to COVID-19 in order minimize movement and issued a corresponding Press Release. (Exs. D-10 & D-11) On the same day, DOC-HQ Medical Division issued guidance for Testing Inmates for COVID-19 "based upon CDC guidance." (Ex. D-12) This document, like many others, shows that DOC acted based upon CDC guidance as it responded. Indeed, Dr. Morrison testified to speaking directly with the CDC to develop his response.

On 3/14/20, Dr. Morrison sent an email to Sec. LeBlanc that he had "just spoken with Dr. Billioux from LDH regarding testing of our inmates for coronavirus." (Ex. D-50, p. 33) On the same date, Governor Edwards issued Proclamation Number JBE 2020 – 29 Additional Measures for COVID-19 Public Health Emergency. (Ex. D-13)[4]

On 3/16/20, DOC updated its Coronavirus (COVID-19) Screening Checklist originally issued on 3/10/20 and its requirements for testing inmates originally issued on 3/13/20. (Exs. D-15 & D-16) Also, on 3/16/20, Dr. Morrison exchanged emails with Dr. McVea about where to send inmates who developed symptoms beyond their capabilities. (Ex. D-50, p. 35) A COVID-19 meeting was held. (Ex. D-50, p. 36)

On 3/17/20, Dr. Morrison directed that he be notified of any flu or COVID-19 testing as well as the number in quarantine per day. (Ex. D-50, p. 37) Dr. McVea sent a detailed report to

---

[4] On 3/16/20, Governor Edwards issued Proclamation Number JBE 2020 – 30 Additional Measures for COVID-19 Public Health Emergency. (Ex. D-14) All actions were being taken "in line with the best guidance and direction of the White House, the Centers for Disease Control, and state health officials."

Dr. Morrison on 3/17/20. (Ex. D-50 p. 40)

On 3/17/20, a telephone conversation was held for the following:

Governor's offices are closely coordinating with correctional leadership for potential COVID-19 outbreaks within correctional populations. As corrections officials develop and implement prevention and response plans, continued communication and collaboration between the governor's office and department of corrections can help mitigate potential issues and improve public health outcomes.

(Ex. D-50, p. 43.)

Significantly, on 3/18/20, DOC issued a COVID-19 FAQ and Guidance to Prisons Re: Screening, Assessment, Testing and Infection Control. (Ex. D-18) This important document followed CDC guidelines and provided guidance specific to COVID-19. Plaintiffs' allegations that the Defendants had only a generic pandemic plan are not true. On the same day, DOC revised its Coronavirus (COVID-19) Screening Checklist. (Ex. D-17)[5]

### C. DOC ramps up Covid-19 response.

On 3/23/20, DOC updated its Testing Inmates for COVID-19 guidance. (Ex. D-24) DOC decided to test "**any inmate** that presents **signs or symptoms** of an **influenza like illness (fever of 100.0)** for **both influenza and COVID-19**." (Emphasis in original.) Dr. Morrison testified that his decision to test any inmate with flu symptoms and a fever of 100.0 was greater than that required by the CDC. CDC's guidance was to test for the flu first and then for COVID-19 if the flu test was negative.[6]

In addition to testing more aggressively than recommended by CDC, Dr. Morrison also developed a plan to reverse isolate offenders at risk. The concept of reverse isolation involves a

---

[5] On 3/19/20, Governor Edwards issued Proclamation JBE 2020 – 32 Additional Measures for Public Health Emergency. (Ex. D-19) COVID-19 calls were held on 3/19/20 and 3/20/20. (Ex. D-50, pp. 51 & 53) On 3/20/20, DOC issued laboratory guidance and Camp J transportation directions. (Exs. D-20 & D-21) On 3/21/20, LDH ordered that all medical and surgical procedures were suspended. (Ex. D-22)

[6] The day before, 3/22/20, Governor Edwards issued Proclamation 33 JBE 2020 which closed all state office buildings and placed all individuals in Louisiana under a general stay at home order. (Ex. D-23)

proactive quarantine of those members of the DOC population that are most vulnerable to the effects of COVID-19. By taking such action, DOC was able to isolate vulnerable inmates and avoid exposure risks before there were any reported cases in the DOC system. Dr. Morrison's reverse isolation plan is above and beyond guidance from the CDC. Dr. Morrison testified that CDC officials were impressed and were considering incorporating his reverse isolation plan.

Significantly, on 3/23/20, CDC issued Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. (Ex. D-25) Two days later, DOC updated its FAQ and Guidance Screening Assessment and Infection Control guidance. (Ex. D-26) The document included information from the CDC.[7]

On 3/27/20, Dr. Billioux sent the CDC Guidelines to Dr. Morrison with message that:

> The CDC sent out this guidance for correctional facilities. It looks like this is likely what you are already doing, but sharing regardless. I know that you are all over this, but let me know if you have a chance to talk today in case there is anything you need.

(Ex. D-50, p. 62)[8]

On 3/30/20, CDC issued CDC Guidance on Management of COVID-19 in Correctional and Detention Facilities (Ex. D-29), and a meeting was held. (Ex. D-50, p. 69) A day later, Governor Edwards issued Proclamation Number 38 JBE 2020 with additional measures for COVID-19 (Ex. D-30), and Dr. Morrison sent an email to the various wardens regarding reusable masks for inmates who test positive. (Ex. D.50, p. 70)[9] On 4/1/20, Dr. Morrison inquired about the potential new COVID-19 testing product. (Ex. D-50, pp. 71–73)[10]

---

[7] On 3/26/20, Governor Edwards issued Proclamation Number 37 JBE 2020. (Ex. D-27)
[8] On 3/28/20, DOC issued a Press Release stating that the first inmate at DOC tested positive for COVID-19. (Ex. D-28) The steps taken in response to the positive test including medical isolation were set forth.
[9] On 4/2/20, Governor Edwards issued Proclamation Number 41 JEB 2020 State of Emergency for COVID-19 Extension of Emergency Provisions. (Ex. D-31)
[10] On 4/7/20, Governor Edwards issued Proclamation Number 43 JBE 2020 COVID-19 State of Emergency. (Ex. D-35)

On 4/7/20, DOC provided guidance that offenders who may be released early by the parole board needed to complete the quarantine process. (Ex. D-50, p. 82) Also on 4/7/20, Dr. Billioux suggested that Dr. Morrison coordinate with Dr. Marcus Bachhuber, who had some expertise; Dr. Morrison welcomed his suggestions. (Ex. D-50, p. 81) On 4/8/20, coordination between DOC and LDH continued as Dr. Billioux provided additional information to Dr. Morrison. (Ex. D-50, pp. 84–88) Dr. Morrison forwarded the information on to Sec. LeBlanc with the note that the information "was pretty much what we have already been doing." (Ex. D-50, p. 86)

On 4/8/20, DOC updated its FAQ and Guidance Screening Assessment and Infection Control Inmates and Staff. (Ex. D-36; Ex. D-50, p. 90) Again, this important document followed CDC guidelines. Dr. Morrison and Dr. Bachhuber exchanged emails regarding available hospitals in the state to send patients. (Ex. D-50, pp. 91–92)

On 4/9/20, DOC provided a Summary of COVID-19 Response (Ex. D-37) Dr. Morrison coordinated with Stone Clinical Laboratories regarding COVID-19 testing procedures. (Ex. D-50, pp. 97–98)

On 4/14/20, Sec. LeBlanc issued a Press Release that DOC had created a COVID-19 Furlough Review Panel. (Ex. D-38) Sec. LeBlanc is quoted as saying that, "We have worked hard to reduce the potential risk of COVID-19 throughout Louisiana prisons and jails." On 4/15/20, Department Regulation PS-J-2 for Special Releases and Offender Temporary Furlough Program: COVID-19 Emergency was issued. (Ex. D-39)[11]

---

[11] On 4/18/20, DOC reported its first imprisoned inmate death related to COVID-19. (Ex. D-40) The inmate was 69 years old with underlying medical conditions compounded by a positive COVID-19 diagnosis. Sec. LeBlanc is quoted as saying that:

> The entire Department is focused on minimizing the potential impact of this disease on our correctional systems. We understand that this is a very trying time for everyone in Louisiana including our employees, prison population and their loved ones. We are making every effort to ensure that inmates in our state prisons are informed and able to remain connected to their loved ones throughout this time.

(Ex. D-40)

On 4/28/20, DOC updated its FAQ and Guidance Screening Assessment and Infection Control Inmates and Staff. (Ex. D-43)

**D. Other related information to the Defendants' COVID-19 response**

Throughout the COVID-19 crisis, State and DOC officials have met and discussed the crisis on a regular basis. Sec. LeBlanc testified that he had calls with DOC leadership on Mondays, Wednesdays, and Fridays, in addition to other as needed calls.[12] Sec. LeBlanc attended the Unified Command Group meetings with the Governor and other department heads. The State responded as a whole.

DOC took steps to keep the public, offenders, and offenders' families informed. Many of the press releases are addressed above. In addition, DOC has maintained a Novel Coronavirus (COVID-19) information page on its website. (Ex. D-51) The information page includes, among much other information, (i) a link to LDH's page with coronavirus information, (ii) a link to CDC's coronavirus information page, (iii) a summary of DOC COVID-19 response, (iv) COVID-19 testing results on all positive tests within DOC, and (v) a COVID-19 information hotline number. DOC updates the website with new information daily. DOC has created two informational videos, one with Spanish subtitles, in which Sec. LeBlanc explains the COVID-19 situation for inmates and their families. (Exs. D-52 & D-53) Dr. Lavespere at LSP also created an information video for inmates in which he explains the COVID-19 situation. (Ex. D-54)

**E. Camp J is an integral part of DOC's COVID-19 response plan.**

On 4/2/20, Dr. Morrison approved the first transfer of a COVID-19 positive patient to Camp J. (Ex. D-50, p. 74) The use of Camp J was part of the pandemic plan from the beginning.

---

[12] The record notes calls or meetings on 2/28/20 (Ex. D-50, p. 1), 3/17/20 (Ex. D-50, p. 38), 3/18/20, (Ex. D-5, p. 44), 3/25/20 (Ex. D-50, p. 61), 4/3/20 (Ex. D-50, p. 75), 4/6/20 (Ex. D-50, pp. 77–78), 4/8/20 (Ex. D-50, p. 89), and 4/9/20 (Ex. D-50, p. 96).

(Ex. D-3) Camp J was designed to accept offenders who tested positive for COVID-19 with mild symptoms. The plan was to isolate the COVID-19 positive patients in the open bay dorm called Bass. Once an offender met the CDC requirements, he would then be transferred to Gar (and later Shark) to complete the quarantine. Upon meeting the CDC criteria, the offender could be returned to his original location.[13]

DOC spent thousands of dollars to provide air conditioning and other upgrades such as new beds and the like for Camp J. (Ex. D-45) The beds in the Bass open bay dorm were placed six feet apart to comply with CDC social distancing guidelines. Camp J was cleaned prior to occupancy. Self-serving testimony of inmates that Camp J contains mold and the like is refuted by testimony of NP Practitioner Park and photographs of Camp J. (Exs. D-31 & 32) Inmates who are working as staff at Camp J are being housed at Camp J in a tier separate from the patients at Camp J and have volunteered to work at Camp J. (Exs. D-47 & D-48) Defendants have provided unrefuted testimony that these workers are living at Camp J and are not going back to Camp F or any other general population location at LSP.[14]

Camp J is staffed by NP Cindy Park, a staff of registered nurses and a respiratory therapist. NP Park and her team are assigned to work only at Camp J and are provided full personal protection equipment ("PPE"). Just like health care providers at outside hospitals, NP Park testified that the providers don jumpsuits, rubber boots, and PPE upon arrival. Upon leaving, they take decontamination showers.

NP Park and her nurses make rounds in Bass at least two times and day and at least once a

---

[13] In fact, DOC once again went beyond CDC criteria by requiring that Camp J patients receive two negative tests before being returned to their original location.

[14] In fact, Plaintiffs' original witness list included three Camp J workers – Peter Davis, Ronald Adams and Andre Coleman (identified as Arti Cole). R. Doc. 33. It is without question that Plaintiffs' counsel interviewed all three of these witnesses prior to the hearing and ultimately removed all of them from Plaintiffs' final witness list. R. Doc. 40. If these witnesses had contrary evidence, they would have been called to testify.

day in Gar (and later Shark), all in compliance with CDC guidelines. If an offender gets sick, NP Park has an ambulance assigned to Camp J to send the offender out for needed medical attention.

Two offenders were transported to Camp J whose symptoms were more severe than intended for Camp J. NP Park stabilized the two offenders and then had them transported to Our Lady of the Lake Hospital. Even Dr. Vassallo had to agree that NP Park's actions were appropriate.

On 4/27/20, a memo was issued which stated that:

> offenders that are being quarantined at Camp J due to the COVID-19, are placed in an area that is totally isolated from the orderlies assigned to Camp J. It is our goal to keep everyone safe and that includes the offenders as well as the staff. We are taking all necessary precautions to prevent the spread of COVID-19.

(Ex. D-41) The memo then explains that offenders are provided with meals, ice, cokes, and entertainment, including television and games. Additional phone lines were added. Each offender was issued new clothing supplies along with a care package. Additional cleaning supplies were provided to all areas. The offenders' laundry was kept separate and garbage was placed directly into a secure dumpster. (Ex. D-41)

There have been no deaths in Camp J, and the majority of the patients in Camp J are in the step down portion heading toward recovery.[15]

### F. Plaintiffs' experts' opinions are speculative and contrary to the evidence.

---

[15] Camp J has been a success story as attested by the families of inmates. On 4/27/20, Deborah and all of Prentice's family wrote a letter regarding Prentice Robinson which states:

> To the doctors and nursing staff I Deborah and all of the family of our love one "THANK' each of you from the bottom of your hearts from the care you gave Prentice from April 15 through April 25, 2020. He ever expressed how well he was taken care of. Words can't express our gratitude and appreciation for the medical treatment he received to help him recover. I also thank you for the kindness shown to me Each time I called to check his condition, you never made me feel as if I was a bother, you were so very kind and compassionate towards me. I'd like to thank J.C., Stuart, Blaire, and Lucy. If I missed a name please charge it to my head not my heart.
>
> Your work may often go unnoticed and you may not hear much appreciation, please note it did not go unrecognized by us. God Bless each of you for the work you are doing each and every day especially during this crisis that is challenging for all of us. Take care of yourselves and your families.

(Ex. D-42)

Prior to trial, the Plaintiffs submitted affidavits by their litigation experts, Dr. Puisis and Dr. Vassallo. Neither had been to LSP since 2016, and neither has ever been to Camp J. Indeed, Dr. Puisis' affidavit specifically acknowledges a lack of information. (Ex. P-24, ¶ 11) Both of the affidavits were based on nothing more than a combination of the worst-case scenarios of COVID-19, speculation, and conjecture.

Dr. Vassallo testified at trial. Her testimony was remarkable in that it confirmed the lack of foundation as set forth in the affidavit. Dr. Vassallo assailed the open bay dorm of Camp J as medically inappropriate. However, Dr. Vassallo had to admit on cross examination that the CDC guidelines allow for cohorting, i.e., housing patients with similar symptoms in a single location. Dr. Vassallo weakly responded that individual isolation was the "best," although CDC guidance recognizes and provides for cohorting, exactly as is being done in Bass dorm in Camp J.

Dr. Vassallo was critical that NP Park and her team were monitoring fever of the patients at Camp J. However, monitoring fever is an explicit CDC guideline used to determine when to end medical isolation. (Ex. D-29)

Dr. Vassallo further testified regarding rapid decompensation and other dire potential outcomes with COVID-19. Because the offenders at Camp J have mild symptoms and are being cared for, none of the dire consequences which Dr. Vassallo and Dr. Puisis speculated about have occurred. Indeed, Dr. Vassallo concluded her testimony on cross examination by acknowledging that she had no information as to how Camp J was being operated. More telling was her testimony that she had not analyzed, and provided no opinion, as to the effect on the DOC system as a whole if Camp J was prohibited from accepting future Covid-19 positive inmates.

**G. The care provided to Otto Barrera was appropriate.**

A very large portion of Plaintiffs' arguments center on Otto Barrera. Barrera was sent to OLOL on 4/20/20 after testing positive for COVID-19. OLOL evaluated Barrera and sent him

back to Camp J. On 4/22/20, Barrera was sent to the ATU unit for medical treatment. After being treated for two hours in a negative pressure room, he was returned to Camp J. Dr. Morrison testified that Barrera's treatment at the ATU was exactly what should have occurred. Plaintiffs' complaints that transporting Barrera from Camp J to the ATU for treatment would result in cross-contamination are without foundation. Barrera tested positive for COVID-19 while at LSP. The ATU initially receives and treats offenders at LSP who may test positive. The cross-contamination argument is meritless.

On the morning of 4/30/20, Barrera was again transmitted to OLOL as his oxygen level had decreased. Barrera did not use his oxygen as instructed while at Camp J.

Dr. Vassallo was critical that LSP did not transport Barrera to the hospital sooner. Yet, she had no response to the fact that LSP did send Barrera to OLOL on 4/20/20 and that OLOL returned him to Camp J, completely contrary to what Dr. Vassallo said should have occurred.

## III.   LAW AND ARGUMENT

### A.  The Plaintiffs cannot show a substantial likelihood of success on the merits.

The Plaintiffs' claim that the DOC Defendants' plan of isolating LSP offenders and offenders from local prisons with COVID-19 and minimal symptoms at Camp J constitutes a violation of the Eighth Amendment. Specifically, they claim that this plan constitutes "deliberate indifference." The evidence and testimony clearly established that the DOC Defendants' isolation plan utilizing Camp J does not pose an objective substantial risk of serious harm.

The Fifth Circuit has issued two opinions within the last two weeks. *Valentine v. Collier*, No. 20-20207, 2020 WL 1934431 (5th Cir. 4/22/20); *Marlowe v. LeBlanc*, No. 20-30276, 2020 WL 2043425 (5th Cir. 4/27/20). Those cases establish that the Plaintiffs cannot show that the Defendants were deliberately indifferent to the risk posed by COVID-19.

The Fifth Circuit's recent decision in *Valentine* provides important guidance and is

ultimately dispositive. In *Valentine*, the plaintiffs sought an injunction against a prison for the elderly and the infirm, those particularly susceptible to COVID-19. The plaintiffs sought and the district court entered a detailed injunction which required the Texas Department of Criminal Justice ("TDCJ") to undertake steps beyond those required by the CDC. The defendants sought a stay of the injunction with the Fifth Circuit. The Fifth Circuit ruled in favor of the defendants and stayed the injunction pending appeal. The Fifth Circuit held that:

> The "incidence of diseases or infections, standing alone," do not "imply unconstitutional confinement conditions, since any densely populated residence may be subject to outbreaks." *Shepherd v. Dallas Cty.*, 591 F.3d 445, 454 (5th Cir. 2009).

The Fifth Circuit further held that the TDCJ was likely to prevail on the merits because after accounting for the protective measures TDCJ has taken, the plaintiffs had not shown a "substantial risk of serious harm" that amounted to "cruel and unusual punishment." *Valentine*, p. 6.

Five days later, in *Marlowe*, the Fifth Circuit stayed an injunction from the Hon. Brian Jackson regarding Rayburn Correctional Center ("RCC") citing the reasoning in *Valentine* as controlling. In *Marlowe*, the plaintiff sought supervised release until after the spread of COVID-19 was no longer a threat at DOC. *Id.* at 1. The plaintiff argued that the defendants' procedures to contain COVID-19 were "woefully inadequate" and "deliberately indifferent" to his medical needs. The plaintiff requested that the Court order RCC to create conditions that would allow for proper social distancing to protect him. In the words of the Fifth Circuit:

> The district court latched on to this eleventh-hour request. After determining that Plaintiff was likely to prevail on the merits of his deliberate indifference claim, it ordered Defendants to "comply with the Governor's recommendations and their own internal policies concerning disinfection of common areas and the wearing of masks by staff and certain categories of offenders." Dist. Ct. Order at 13. It further ordered Defendants to "submit to the [c]ourt a [p]lan to ensure the implementation of proper hygiene practices in the dormitory in which Plaintiff is assigned, and to implement social distancing practices to limit the spread of COVID-19." *Id.* at 14.

*Id.*

15

The Fifth Circuit granted a stay noting that a district court cannot enjoin a state facility to follow state law. *Id.* at *2. Addressing the Eighth Amendment particularly, the Fifth Circuit explained:

> But, for purposes of resolving Plaintiff's Eighth Amendment claim, we are not tasked with resolving whether, absent RCC's precautionary measures, the COVID-19 pandemic presents a substantial risk of serious harm to prisoners like Plaintiff. Rather, the question here is whether the Eighth Amendment requires RCC to do more than it has already done to mitigate the risk of harm. The district court's laconic analysis provides little basis for concluding that RCC's mitigation efforts are insufficient.

*Id.* (internal footnotes omitted.)

Finally, the decision of *Amos v. Taylor*, 2020 WL 1978382 (N.D. Miss. 4/24/20) is important. There, the court noted the steps that MDOC had taken to address COVID-19 and acknowledged that the implementation of the steps had been "inconsistent or ineffectual." The court found that the evidence of sporadic incomplete implementation of procedures failed to show a policy or custom to justify a facility-wide injunction. In addition, elements of the steps that appeared to conflict with CDC guidelines were insufficient on their own for the plaintiffs to show a likelihood of success regarding deliberate indifference.

Considering the significant mitigation efforts undertaken by the Defendants, there is simply no evidence of deliberate indifference.

1. **The use of Camp J is not objectively unreasonable.**

Dr. Morrison testified that the use of Camp J was medically effective and appropriate. NP Park, the only witness who has been onsite at Camp J since the first patients arrived, opined that the Camp J plan has kept the inmates housed there safe.

Most significantly, the Plaintiffs have identified nothing that is contrary to CDC guidelines. Dr. Puisis admitted that the Defendants' procedures and measures are consistent with CDC guidelines. (Ex. P-24, ¶ 10) Plaintiffs complain about transporting offenders into Camp J as being

16

contrary to CDC guidelines. In reality, the CDC guidelines advise to restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation and medical isolation/quarantine. (Ex. D-25) The most that can be said is that Dr. Vassallo wants the Defendants to use the most stringent CDC guidelines in the array of options the CDC has authorized,[16] ignoring that the CDC has allowed for alternatives such as cohorting.[17]

Dr. Vassallo admitted that she has no idea what is going on at Camp J. Her opinions are baseless, divorced from the facts, and, thus, completely unhelpful. She failed to identify any single substantial risk of serious harm.

As evidence that the use of Camp J is objectively reasonable, Dr. Morrison noted the sad situation with the federal facility at Oakdale. The Oakdale facility has had a difficult outbreak of COVID-19 with poor results. Allen Correction Center, a DOC facility located less than 30 miles from the federal Oakdale facility, had zero positive COVID-19 inmates as of the day of trial. (Ex. D-51) The only reasonable interpretation of these circumstances is that the Defendants' plan, including the use of Camp J, has been objectively reasonable.

Considering the overwhelming evidence of efforts undertaken to respond to COVID-19 in conjunction with the operation of Camp J and the lack of harm thus far, the Plaintiffs cannot show that the operation of Camp J is objectively unreasonable.

---

[16] The Constitution does not require that the Defendants selected the "best" alternatives under the CDC guidelines. *Amos v. Taylor*, 2020 WL 1978382 (N.D. Miss. 4/24/20) ("However, mere departure from recommended best practices is insufficient to show deliberate indifference.").

[17] The Court in *Mays v. Dart*, 2020 WL 1812381 *10 (N.D. Ill. 4/9/20) explained that:
> the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail. Space constraints at the Jail do not allow for the more preferable degree of social distancing that exists in the community at large. The Court concludes that plaintiffs have failed to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing.

See also, *Plata v. Newson*, No. 01-cv-01351, Doc. 3291, p.10 (N.D. Cal. 4/17/20) ("there is no basis in the record to conclude that planning for anything less than six-foot distancing between all prisoners (and staff) at all times constitutes deliberate indifference.").

2.  **The Defendants are not subjectively indifferent to substantial risk of serious harm.**

The Plaintiffs' testimony did nothing to show a subjective substantial risk of serious harm exists. No testimony or evidence demonstrated that a serious medical need exists and that the relevant officials are both "aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and . . . [actually] draw the inference." *Barnett v. Luttrell*, 414 Fed.Appx. 784, 787–88 (6th Cir. 2011). Speculative injury is not a sufficient basis to grant an injunction; there must be more than an unfounded fear on the part of the applicant. *Holland Am. Ins. Co. v. Succ. of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

The evidence refuted any suggestion of subjective indifference. The Defendants engaged early and proactively to mitigate the effects of COVID-19 within DOC. The existing pandemic plan was activated. (Ex. D-3) Sec. LeBlanc issued HCP 26. (Ex. D-4) Dr. Morrison stayed abreast of developments from the CDC. He issued guidance specific to COVID-19 and continued to update the guidance as the CDC guidance evolved. (Exs. D-18, D-23, D-26, D-36 & D-43) Dr. Morrison took actions above and beyond those required by the CDC in at least two instances: he required testing for flu **and** COVID-19 when an offender had a fever of 100.0 degrees, and he initiated reverse isolation of vulnerable offenders. Sec. LeBlanc, Dr. Morrison, and NP Park all believe that they had a good plan and that it is working to save lives and mitigate the effect of COVID-19 within DOC. The Plaintiffs cannot establish that the Defendants' were subjectively deliberately indifferent to the Plaintiffs' serious medical needs when they decided to implement the Camp J plan, considering the efforts undertaken to mitigate the effects of COVID-19.

B.  **The Plaintiffs did not establish that they would suffer irreparable harm if the injunction is not granted.**

The actual operation of Camp J since 4/2/20 shows that the Plaintiffs cannot establish irreparable harm if no injunction is granted. Speculative injury is not a sufficient basis to grant an

injunction; there must be more than an unfounded fear on the part of the applicant. *Holland Am. Ins. Co*, 111 F.2d at 997. The case remains that the Plaintiffs continue to present nothing more than speculation and conjecture that Camp J will harm them. That unfounded fear is an insufficient basis to grant injunctive relief, particularly with the additional fact that Camp J has operated since 4/2/20 with no known negative impacts on the Plaintiffs.

**C.  The Plaintiffs failed to show that their hypothetical injuries outweigh the real threatened harm to the Defendants and the public.**

The evidence and testimony clearly demonstrated that the injury to the Defendants far outweighs the speculative concerns of the Plaintiffs. Dr. Morrison and Sec. LeBlanc made clear that an injunction would be devastating for offenders housed at facilities that cannot safely isolate/quarantine COVID-19 positive patients. When asked about the impact of halting the Camp J plan, Sec. LeBlanc described the spread of COVID-19 at local facilities and said with respect to the very serious outcomes of this prospect that one could easily use their imagination to picture the catastrophic consequences of illness and death.

Plaintiffs' experts did not consider the effect on the remainder of DOC and the state as a whole if Camp J were to be closed. The fact is that the very real harm of closing Camp J outweighs any alleged injuries to the Plaintiffs, particularly considering the evidence of how well the Camp J plan has worked.

The Supreme Court has stated that prison administrators are to be accorded "wide-ranging deference in their adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security." *Block v. Rutherford*, 468 U.S. 576, 584–85 (1894); *Roberts v. Vannoy*, No. 16-CV-600-JWD-EWD, 2017 WL 2256962, at *2 (M.D. La. 2017). The Defendants' response has been successful thus far, and their diligence, expertise, cooperation, and adaptability will continue to minimize the impact of

COVID-19 on the Department of Public Safety and Correction's offenders, staff, and the public.

**D. Plaintiffs' claims should be dismissed for failure to exhaust administrative remedies.**

The Defendants maintain their position that Plaintiffs' claim should be dismissed because they did not exhaust their administrative remedies. The Fifth Circuit in *Marlow* noted that the time to respond to ARPs has been suspended, but that ARPs are still being heard, contrary to the assertions that the COOP plan at LSP has suspended the process itself, rather than just the deadlines.  *Id.* at 3. See also¸ *United States v. Wright*, 2020 WL 1976828 (W.D. La. 4/24/20) ("Accordingly, this Court cannot forgive Wright's failure to exhaust, and without exhaustion, the Court lacks jurisdiction over his motion."); *United States v. Edwards*, 2020 WL 1987288 (M.D. Tenn. 4/27/20) (Courts "have overwhelming found that the exhaustion requirement cannot be disregard[ed].")

## IV. CONCLUSION

The documentary record shows that the DOC Defendants engaged early and that they undertook prudent steps to mitigate the risk of COVID-19 to offenders throughout DOC.

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: */s/ Randal J. Robert*
    Randal J. Robert (#21840)
    Connell L. Archey (#20086)
    Julie M. McCall (#29992)
    Keith J. Fernandez (#33124)
*Special Assistant Attorneys General*
    Email: randy.robert@butlersnow.com
           connell.archey@butlersnow.com
           julie.mccall@butlersnow.com

keith.fernandez@butlersnow.com

Counsel for Defendants

52850089.v1