# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

DANIEL GUMNS, MICHAEL VIDEAU, TREVON WILEY, IAN CAZENAVE, REGINALD GEORGE, LIONEL TOLBERT, OTTO BARRERA, KENTRELL PARKER, MICHAEL ROBINSON, JULIUS ALLEN, ERNEST ROGERS, ALFOANSO GARNER, BRADLEY WINTERS, KENDRICK WILSON, and JAMES HUGHES, on behalf of themselves and all similarly situated individuals,

Plaintiffs,

v.

JOHN BEL EDWARDS, in his official capacity as Governor of the State of Louisiana; LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS; JAMES LEBLANC, in his official capacity as Secretary of the Department of Safety and Corrections; JOHN MORRISON, in his official capacity as Medical Director of the Department of Safety and Corrections; LOUISIANA DEPARTMENT OF HEALTH; and STEPHEN R. RUSSO, in his official capacity as Interim Secretary of the Louisiana Department of Health,

Defendants.

CIVIL ACTION NO. 3:20-cv-00231-SDD-RLB

CLASS ACTION

## PLAINTIFFS' POST-HEARING MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER

**INTRODUCTION**

On April 30, this Court held an evidentiary hearing on Plaintiffs' Motion for a Temporary Restraining Order to halt transfers of COVID-19 patients to Louisiana State Penitentiary's Camp J. Prior to the hearing, Plaintiffs had already submitted substantial evidence in support of the TRO, including the declarations of two medical experts, Dr. Michael Puisis and Dr. Susi Vassallo, detailing the dangers of the Camp J plan. At the hearing, in addition to documentary evidence, Plaintiffs presented the testimony of four Class Members at LSP—Paul Nash, Patrick Courtney, Duong Cao, and Otto Barrera—and Defendants presented the testimony of witnesses Dr. John Morrison, Secretary LeBlanc, and Nurse Practitioner Cindy Park. This Court accepted Plaintiffs' rebuttal witness Dr. Vassallo as an expert in both correctional medicine and in the management and treatment of COVID-19. The Court then ordered post-hearing briefing. Based on the evidence before this Court, as detailed below, Plaintiffs move that Plaintiffs' Motion for a TRO be granted.

**I. Summary of Undisputed Facts**

The parties have stipulated to the following (*see generally* Dkt. 41): LSP's Camp J is currently being used as a medical isolation facility to house patients from jails and prisons who test positive for COVID-19, including patients within the LSP population who test positive. COVID-19 is a viral pandemic and is highly infectious. The symptoms of COVID-19 can include fever, cough, chest pain, headache, loss of smell, diarrhea, aches, vomiting, and difficulty breathing, and COVID-19 can also present with no symptoms. The virus can be deadly. People who are over the age of 65 or who have certain pre-existing medical conditions[1] may be at higher risk of developing serious symptoms if they contract COVID-19.

As of April 27, there were approximately 108 COVID-19 patients at Camp J, which has one nurse practitioner on staff and two to three registered nurses on site per shift. There are no

ventilators, and there is only one ambulance. Bass, the unit where all initial intake patients are housed, is an open dormitory with no dividers between the beds. There are approximately 40 patients currently housed at Bass. In Gar, the cellblock where patients are held in "step down" isolation, there are no call buttons in the cells. Some residents from LSP's Camp F are working at Camp J. The Camp J medical staff is not housed at Camp J. At least one LSP resident, Otto Barrera, was moved to Camp J and taken back to LSP's Ward 1 that same day. LSP has only one entrance.

In evidence, the Parties agree that it would take millions of dollars to retrofit Camp J to make it appropriate for housing medically vulnerable people.

## II. Plaintiffs' Evidence Is More Credible than Defendants'

Plaintiffs' evidence is more credible than Defendants' because (A) most of Defendants' witnesses lacked personal knowledge, and their testimony included numerous indications of a lack of credibility; (B) Defendants' documentary evidence is largely irrelevant; and (C) Plaintiffs' witnesses have credible firsthand knowledge and reliable medical expertise.

### A. Defendants' Witnesses Lack Personal Knowledge and Credibility

Of Defendants' four witnesses, only one, Cindy Park, had any personal knowledge of conditions at Camp J since it became the state's hub for incarcerated COVID-19 patients. The other three witnesses—Dr. Morrison, Secretary LeBlanc, and Warden Falgout—testified in sweeping, conclusory statements regarding the effectiveness of the Camp J plan; most of their testimony is too vague and uninformed to be credible, and some is simply untrue.

#### i. Dr. John Morrison

Defendants presented Dr. Morrison as both a percipient witness and a medical expert to support their Camp J plan.[2] The hearing made clear that neither Dr. Morrison's opinion as a medical expert nor his factual testimony is in any way reliable for the purposes of this TRO. Dr. Morrison is

---

[1] Including chronic lung disease, asthma, heart conditions, immune deficiencies, severe obesity, diabetes, chronic kidney disease, liver disease, HIV/AIDS, prolonged use of corticosteroids, cancer, smoking, and marrow or organ transplant.

not an expert in correctional medicine, as this Court concluded. Nor is he an impartial expert rendering an opinion regarding the Camp J plan; he admitted the plan was his own.[3] Indeed many of Dr. Morrison's opinions and interpretations regarding COVID-19 treatment is based on misunderstanding of the guidance and treatment—which will be discussed *infra*, Section III.A.

Moreover, many of the facts Dr. Morrison relied upon in rendering his opinion are demonstrably false, eroding his credibility even as a fact witness. For example, in his affidavit, Dr. Morrison declared that COVID-19 patients would be housed "under strict cell isolation," and that "every other cell will be utilized in order to maintain proper distancing."[4] But he then admitted during the hearing that he did not know that Bass, the unit where all patients are initially held upon transfer to Camp J, is an open dormitory.[5] Dr. Morrison further declared that the patients and employees at Camp J "will not have interaction with other employees or offenders of LSP so as to limit the potential for exposure to Covid-19."[6] That is not true either. Defendants admitted that at least one patient, Otto Barrera, was moved between Camp J and LSP's Ward 1 and that some residents from LSP's Camp F are working at Camp J.[7] Nurse Park testified that one of the nurses working at Camp J lives with a member of the LSP staff, and Ms. Park was herself present in an LSP building, interacting with LSP staff, on the day of the hearing. These factual inaccuracies are unsurprising, since Dr. Morrison lacks firsthand knowledge of the day-to-day operations at Camp J.

Finally, Dr. Morrison's testimony that the Camp J plan is "both medically appropriate and the most prudent course of action available to ensure the health and safety of DOC offenders and staff" is in tension with his admitted knowledge that architectural consultants found in 2018 that Camp J could not be used to safely house medically vulnerable people absent substantial renovations

---

[2] Pls.' Ex. 32, Morrison Decl. at ¶ 41.
[3] *See, e.g.*, *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425 (E.D. Tex. 1986) ("[W]here an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness.").
[4] Pls.' Ex. 32, Morrison Decl. at ¶ 40.
[5] *Cf.* Stipulated Facts, Dkt. 41 at ¶¶ 14, 21, 22.

(that have not occurred). Further, the first Camp J transfers began only 12 days before Dr. Morrison left the DOC on April 14. He has no knowledge regarding over half of the time the Camp J plan has been in effect. Given this, together with his misunderstandings of fundamental aspects of how Camp J is being run, Dr. Morrison is not a reliable witness for the purposes of this TRO.

### ii. James LeBlanc

Most of the testimony Secretary LeBlanc provided at the hearing was either irrelevant, lacking credibility, or both. He primarily discussed the DOC's broader response to the pandemic, not the Camp J plan. When the Secretary did refer to the Camp J plan, he was, at best, uninformed. For example, after misunderstanding Plaintiffs' witness Patrick Courtney's reference to renovations of the Camp F kitchen, Secretary LeBlanc testified that the kitchen had been remodeled at Camp J. Upon cross-examination, he admitted he had no personal knowledge of this renovation and had misheard Mr. Courtney; indeed, based on the information presented by Defendants, no such remodel has occurred. Secretary LeBlanc therefore testified to at least one (false) fact of which he had no personal knowledge. This calls the credibility of his testimony into question.

The Secretary provided no explanation for his assertion that local sheriffs have nowhere else to send COVID-19 patients. Defendants provided no evidence to support this assertion. The Secretary testified that officers from the Louisiana Division of Probation and Parole are on site at the Medical Monitoring Station ("MMS") in New Orleans. Other than claiming without explanation that the public probably would not "be happy" about moving prisoners to an MMS, Secretary LeBlanc offered no explanation for rejecting that option. Indeed, a simple scan of the FAQ from the MMS indicates that they anticipate receiving incarcerated people at the facility and that incarcerated people can be accommodated.[8] The Secretary also failed to provide any detail on assessments of the

---

[6] Pls.' Ex. 32, Morrison Decl. at ¶ 38.
[7] Stipulated Facts, Dkt. 41 at ¶¶ 31, 32.
[8] Louisiana Department of Health, Medical Monitoring Stations, http://ldh.la.gov/index.cfm/page/3911 (last visited May 4, 2020).

capacity to achieve proper medical isolation at jails and prisons across the state. Nor did he discuss any guidance to those facilities on how to make space for medical isolation.

Secretary LeBlanc was correct about two things: one, that he is responsible for all 31,600 inmates in the state, including those in parish jails and prisons; and two, that Mr. Courtney should not have been disciplined for refusing to work among the COVID-positive prisoners at Camp J. Beyond that, the Secretary offered only conclusory and unsupported assertions that the Camp J plan is working and the situation is under control, an assertion that was fatally undermined by Plaintiffs' firsthand testimony about the dungeon-like conditions, rampant cross-contamination, and woefully insufficient medical treatment at Camp J. The Secretary has no firsthand knowledge of any of this, having testified that he has not even been to Camp J since the pandemic began.

### iii.  Tracy Falgout

Warden Falgout's testimony—presented by affidavit—is simply unreliable. Warden Falgout is not assigned to Camp J and lacks personal knowledge of conditions there. Yet he made a number of sweeping claims in his affidavit that are clearly untrue. For example, Warden Falgout claimed that "DOC, including LSP, is following the guidelines of the [CDC]."[9] As explained *infra* in Section III.A, however, conditions at Camp J do not adhere to CDC guidance. In his April 23 affidavit, Warden Falgout claimed that "Camp J is being used only as an isolation and monitoring facility. It does . . . not provide treatment to any Covid-19 patients that require ventilators, oxygen, or IV's."[10] This is plainly untrue. Ms. Park testified that patients at Camp J have been administered oxygen and IV fluids. Warden Falgout also claimed that "[a]ny patients showing serious medical symptoms beyond isolation monitoring are sent to an appropriate outside hospital . . . for any necessary medical care."[11] Yet, on April 22, a patient was taken from Camp J, not to a hospital, but to LSP's Ward 1.[12]

---

[9] Pls.' Ex. 30, Falgout Aff. at ¶ 17.
[10] Pls.' Ex. 31, Falgoutt Supp. Aff. at ¶ 12.
[11] *Id.*
[12] Stipulated Facts, Dkt. 41 at ¶ 32.

That fact also contradicts Warden Falgout's claims that "Camp J is being operated as [an] independent prison, separate and apart from the rest of LSP" and that "offenders and employees assigned to Camp J do not have interaction with other employees or offenders of LSP."[13] It is clear that Warden Falgout does not understand the conditions at Camp J, and thus his statements cannot be credited.

### B.  Defendants' Documentary Evidence Is Largely Irrelevant

Like the testimony of Defendants' witnesses, the documentary evidence—including 500 pages of previously undisclosed materials submitted on the eve of the hearing—have little to do with the Camp J plan. Only seven of Defendants' 54 Exhibits even reference Camp J. Only four of Defendants' Exhibits substantively discuss the suitability of Camp J for medical isolation.[14] Defendants' documentary evidence is therefore largely irrelevant.

The four exhibits that do mention Camp J in any detail provide support for Plaintiffs' claims that the use of Camp J puts the putative Class, as well as Defendants' employees, at substantial risk of serious harm. For example, guidance to sheriffs regarding the transport of COVID-19 positive patients Camp J instructs correctional officers to wear PPE only if it does not limit access to their duty belt and gear.[15] An April 9 update from the DOC falsely claims that "existing Angola inmates have no contact with the Camp J facility housing sick [sic] these sick inmates,"[16] when in fact people at LSP had been moved Camp J to work. In an April 27 memo, DOC employees represent that the orderlies assigned to Camp J are placed in an area that is "totally isolated" from those with COVID-19.[17] But on April 30, Nurse Park testified that both orderlies and COVID-19 patients were being housed in Shark unit as of about one week earlier. The April 27 memo also reports that in addition to the food, clothing, hygiene products, and other necessities that COVID-19 patients are being

---

13 Pls.' Ex. 31, Falgout Supp. Aff. at ¶¶ 11, 16.
14 Defs.' Ex. 3, 21, 37, and 41.
15 Defs.' Ex 21, Camp J Transportation Directions.
16 Defs.' Ex. 37, Summary of COVID-19 Response 4/9/20 at 2.

provided, as Defendants are constitutionally required to do, Defendants are providing the patients with games that contravene any social distancing measures that are taking place. Nurse Park testified that she has observed patients sitting on other patients' beds in order to play cards.

### C.  Plaintiffs' Witnesses Have Credible Firsthand Knowledge and Medical Expertise

Plaintiffs' witnesses at the hearing included reliable fact witnesses with firsthand knowledge of the facts to which they testified and a qualified medical expert. Plaintiffs presented live testimony of two putative Class Members, Paul Nash and Duong Cao, who had tested positive for COVID-19 and were being held at Camp J, in addition to testimony by declaration of Otto Barrera. These witnesses have firsthand knowledge of the conditions at Camp J. Plaintiffs also presented live testimony of Patrick Courtney, a resident of LSP who was disciplined for refusing to work at Camp J. Dr. Susi Vassallo testified as an expert in both correctional medicine and in the management and treatment of COVID-19, medical expertise that Defendants failed to rebut in any way.

### III. Plaintiffs Have Proven that Camp J Creates a Substantial Risk of Serious Harm

#### A.  There Is Ample Evidence to Show that the Conditions of Confinement at Camp J Present a Substantial Risk of Serious Harm to Patients Housed There

The hearing provided irrefutable evidence that, despite Defendants' characterization of Camp J as only an isolation and monitoring facility, medical care is being provided there, and Plaintiffs' medical expert testified that it does not meet the standard of care.

Defendants represented to this Court in their opposition that "Camp J is being used only as an isolation and monitoring facility. It does not act as a hospital and does not provide treatment to any COVID-19 patients that require ventilators, oxygen, or IV's."[18] This statement is false. There are no ventilators at Camp J, but there are patients receiving oxygen and IV treatment. Through his declaration, Otto Barrera, a COVID-19 patient diagnosed with pneumonia, testified that he is "being given supplemental oxygen" at Camp J and that he is aware of at least one other Camp J patient who

---

[17] Defs.' Ex. 41.

is receiving oxygen.[19] Paul Nash also testified that people at Camp J are receiving oxygen and that some are on IVs. Even Nurse Park testified that "three or four" patients at Camp J have been on IVs and that there are patients receiving oxygen at Camp J. Patients who are receiving oxygen and IVs are not merely being isolated and monitored—they are being treated. Dr. Susi Vassallo, who has treated hundreds of patients with COVID-19, testified that the medical care being provided to COVID-19 patients at Camp J falls short of the community standard in various ways.

First, Dr. Vassallo testified that the ratio of nurses to patients at Camp J is insufficient. Nurse Park testified that there are "two to three" nurses per shift, and Defendants have admitted that as of April 27, there were 108 patients housed at Camp J.[20] The reasons for ensuring an appropriate ratio of medical staff to patients are obvious; if there are not enough nurses to monitor patients, a patient's distress or decompensation may be caught too late. Indeed, Plaintiffs have presented evidence that Camp J's inadequate ratio is already causing harm. For example, Paul Nash testified that he and the other patients witnessed a man in distress, and it took them at least ten minutes of yelling to get the attention of the staff and another ten minutes for a nurse to come. Dr. Vassallo testified that COVID-19 patients decompensate rapidly and unpredictably; even patients do not always know the extent to which their bodies may be lacking in oxygen, and thus may be very sick even if they are not complaining.[21] It is essential for such patients to be monitored closely, and Camp J does not have sufficient medical staff to ensure close monitoring. This is particularly true where the patients in Camp J cannot decide for themselves to go to the hospital.

Second, Dr. Vassallo testified that the medical records provided by Defendants indicated a failure to meet community standards for COVID-19 patients. Dr. Vassallo testified that Defendants failed to properly manage Otto Barrera's oxygen saturation and recognize indicators that he needed

---

[18] Dkt. 24 at 7.
[19] Pls.' Ex. 49, Supp. Barrera Decl. at ¶ 18.
[20] Stipulated Facts, Dkt. 41 at ¶ 25.

hospitalization for five days. Although Mr. Barrera was finally taken to the hospital the morning of April 30, Dr. Vassallo explained that, based on his medical records, his oxygen saturation levels had been at levels indicating a need for hospitalization for many days prior. Dr. Vassallo described the skill and intense monitoring required to administer oxygen to COVID-19 patients, which Secretary LeBlanc had erroneously characterized as "basic." Dr. Vassallo also explained that fever checks, which Class Member witnesses testified is the only regular monitoring they receive, is not sufficient to meet the standard of care for COVID-19 patients.[22]

Third, the evidence shows that Defendants are not appropriately accommodating COVID-19 patients at Camp J who are at higher risk of severe symptoms. The CDC guidance specifies that if confirmed COVID-19 patients cannot be medically isolated individually, it is important to "be especially mindful of cases who are at higher risk of severe illness from COVID-19."[23]

> Ideally, they *should not be cohorted with other infected individuals*. If cohorting is *unavoidable*, make *all possible accommodations* to prevent transmission of other infectious diseases to the higher-risk individual. (For example, allocate more space for a higher-risk individual within a shared medical isolation space.)[24]

Despite this warning, Nurse Park testified that Camp J's medical staff has no additional policies or procedures in place for patients with comorbidities that put them at higher risk of developing severe cases of COVID-19, such as Mr. Barrera and Mr. Nash.

Finally, Dr. Vassallo testified that Defendants' decision to isolate many COVID-19 patients together at Camp J is contrary to CDC guidance. Dr. Morrison attempted to establish that concentrating patients at Camp J is consistent with the CDC's description of "cohorting" confirmed

---

[21] *See, e.g.*, Pls.' Ex. 25, Vassallo Suppl. Decl. at ¶ 7.

[22] Not only is this contrary to CDC guidance, which takes into consideration both fever and other symptoms such as cough and shortness of breath (Pls.' Ex. 34 at 17), but it also is not in line with the DOC's own guidelines for assessment and monitoring of COVID-19 patients. Defs.' Ex. 43 at 7 ("Each inmate in COVID Positive Unit shall have Temperature readings and Sp02 *every 6 hours* and as needed.") (emphasis added).

[23] Pls.' Ex. 34 at 16.

[24] *Id.* (emphases added).

COVID-19 cases.[25] But Dr. Vassallo testified that Dr. Morrison's understanding of cohorting is inaccurate. The concept of "cohorting" does not mean that housing many infected patients in a single, open-air dormitory is in line with the standard of care. As an initial matter, the CDC makes clear that all possible steps should be taken to medically isolate COVID-19 patients in individual cells, even when cohorting. Only as a last resort should individuals be cohorted in a group space and, even then, cohorts should be no larger than *ten* patients: "Cohorts should be no larger than could be cared for by the facility and/or surrounding healthcare systems should every member of a cohort be infected. . . very few correctional facilities, if any, have access to sufficient healthcare resources to allow for cohorts of larger than 10 people."[26] There are currently 40 patients being housed in Bass, an open dorm.[27] Social distancing of six feet between all individuals, as recommended by the CDC guidance when cohorting is necessary,[28] is impossible. Although Nurse Park testified that the beds were placed six feet apart at least initially, patients are not confined to their beds and must come get closer to each other to use the restroom and to clean. Also, Nurse Park testified that not all patients are wearing masks, and are not required to, which is contrary to CDC guidance for cohorting.[29] Even in Gar, a cellblock, Defendants are not implementing cohorting appropriately. Although the patients are being housed individually in single cells, the "airflow between cells essentially makes it a cohort arrangement in the context of COVID-19,"[30] and there is not an empty cell between each occupied cell, per CDC guidance.[31]

---

[25] Even if Camp J's cohorting did comport with CDC guidance, the CDC guidance itself does not establish the standard of care that Defendants are constitutionally required to provide.

[26] AMEND and Berkeley Public Health, Limiting COVID-19 Transmission and Mitigating the Adverse Consequences of a COVID-19 Outbreak in Correctional Settings: RELEASE · COHORT · TEST at 3 (Apr. 26, 2020), *available at* https://amend.us/wp-content/uploads/2020/04/Cohorting-Guidance.Amend_.UCB_.pdf.

[27] Stipulated Facts, Dkt. 41 at ¶ 15.

[28] Pls.' Ex. 34 at 11, 15-16.

[29] *Id.* at 16 ("if cohorting is necessary . . . [e]nsure that cohorted cases wear face masks at all times.").

[30] *Id.* at 16.

[31] *Id.*

Moreover, under the CDC guidance, cohorting is meant to be an absolute last resort. The guidelines state that "[f]acilities should make *every possible effort* to place suspected and confirmed COVID-19 cases under medical isolation *individually*. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should *only* be practiced if there are *no other available options*."[32] Defendants are aware of at least one "other available option," as Secretary LeBlanc testified that there are Probation and Parole officers currently staffed at the MMS in New Orleans. Secretary LeBlanc is therefore aware that the MMS, a facility that is specifically set up for medical isolation and would allow for appropriate physical divisions between patients, is equipped to house incarcerated individuals.

Dr. Vassallo's expert testimony shows that Defendants are providing medical care inconsistent with the community standard for medical treatment, isolation, and monitoring of COVID-19 patients. Paul Nash and Duong Cao provided a firsthand account of the experience of living at Camp J as COVID-19 patients and the unsanitary and unsafe conditions there.

Mr. Nash and Mr. Cao have both been housed in Bass and testified that the dormitory was dilapidated and the conditions there were unhealthy. They testified that, when they were there, Bass had about 40 patients, some of whom were on IVs or receiving oxygen. The patients are responsible for cleaning the dorm and the bathrooms. Patients walk around, not all wearing masks and not keeping six feet apart. When Mr. Nash was in Bass, only two of the four toilets were working— particularly concerning because diarrhea and vomiting are symptoms of COVID-19, and fecal matter can be a source of transmission.[33] Mr. Cao said he did not even want to use the bathrooms.

---

[32] *Id.* at 15 (emphases added).
[33] Alexandra Sternlicht, *Why You Should Flush with the Lid Down: Experts Warn of Fecal-Oral Transmission of COVID-19*, FORBES, (Apr. 2, 2020, 4:59 PM), *available at* https://www.forbes.com/sites/alexandrasternlicht/2020/04/02/why-you-should-flush-with-thelid-down-virologist-warns-of-fecal-oral-transmission-of-covid-19/#7540cef34b0e

Mr. Nash and Mr. Cao also described in detail the conditions in the Gar cellblock, which is being used as a "step down" unit. The bars at the front of the cells are open. The ventilation system is not working and there is no air circulation—Mr. Cao described it as a "dungeon." The air quality is poor. People are coughing and the droplets are remaining in the air, increasing the risk of transmission to staff, as well as COVID-negative Class Members who are working at Camp J.[34] The cells have rust and mold, which can cause respiratory issues even for healthy people. Mr. Nash testified that he is confined to his cell 23 hours a day. The water is discolored and brown. The patients clean their own cells. There are rats and spiders coming in and out of the cells.

Both Mr. Nash and Mr. Cao indicated that the medical monitoring and care being provided at Camp J is inadequate. The nurses do fever checks once a day, and there is otherwise very little monitoring. Mr. Nash described an incident where a patient was in distress, and Mr. Nash and the other patients had to repeatedly yell for security to come, which took at least ten minutes. It took another ten minutes for the nurse to come. The nurse initially said there was nothing wrong. When the symptoms continued, she finally took his vital signs before taking him out on a stretcher.

Nurse Park was either unconcerned about the conditions and medical care or does not possess the training and experience to understand why both are lacking. She equated Camp J with self-quarantining at home and denied that the facility was accepting any seriously ill or decompensating patients. Most patients who are self-isolating at home have the ability to decide for themselves when they need to go to the hospital, are not sharing space with dozens of other patients, have access to clean water, and are not sleeping with mold and rats. Ms. Park was unfamiliar with the cleaning and sanitation procedures, did not know whether the orderlies at Camp J were able to properly decontaminate after their shifts, and seemed unconcerned that all she and her team were doing was checking temperatures and blood pressure and monitoring self-reported

---

[34] *See* Pls.' Ex. 24, Puisis Decl. at ¶ 6.

breathing issues (practices which Dr. Vassallo testified were utterly insufficient for COVID patients). Ms. Park's suggestion that the patient who observed mold "should clean his cell," was similarly cavalier, and only serves to underscore the absurdity and inhumanity of the Camp J plan. Ms. Park's attitude may have been influenced by the fact that she was testifying in the presence of her supervisors and other officials high up in the DOC, and she may have felt pressure to be helpful to them. When asked whether her job overseeing 108 patients in the midst of a pandemic, while simultaneously managing intake and discharge, was hard, Ms. Park told the Court it was not.

### B. Plaintiffs Have Presented Ample Evidence to Show that the Camp J Plan Exposes LSP to an Increased Risk of Transmission.

The Camp J plan revolves around the faulty premise that it is somehow possible to isolate Camp J from the rest of LSP.[35] Plaintiffs' evidence and Defendants' own testimony have shown that that is not the case. Defendants have been on notice since before transfers even began that the use of Camp J to house COVID-19 patients increases the risk of transmission to LSP's vulnerable population. LSP houses far more people who are at risk of serious medical complications if they become infected—due to age or other medical conditions—than any other facility in the state.[36]

Defendants' own testimony and evidence established that cross-contamination between Camp J and the rest of LSP is already occurring. Defendants admitted that Otto Barrera, who had tested positive for COVID-19, was taken from Hospital Ward 1 at LSP's Treatment Center to Camp J and then back to Ward 1 that same day.[37] Defendants' witnesses confirmed that no separate facility in which to treat COVID-19 patients (for example the portables which are currently set up just outside the hospital) has been set up; instead, COVID-19 patients are placed in the middle of the hospital ward with the sickest residents, creating innumerable opportunities for cross contamination.

---

[35] *See, e.g.,* Pls.' Ex. 31, Supp. Falgout Aff. at ¶ 11 ("Camp J is being operated as [sic] independent prison separate and apart from the rest of DOC and LSP as part of DOC's current COVID-19 response plan. During this period, Camp J will not be considered part of Angola.")

[36] Pls.' Ex. 24, Puisis Decl. at ¶ 12.

[37] Stipulated Facts, Dkt. 41 at ¶ 32; Defs.' Ex. 46 at 29.

Nurse Park provided testimony at the April 30 hearing from the administration building near the entrance to LSP. She was in the same room as Warden Falgout, who is presumably interacting with staff and providing treatment to LSP patients outside Camp J. This disproves Defendants' assertion that "offenders and employees assigned to Camp J do not have interaction with other employees or offenders of LSP so as to limit the potential for exposure to COVID-19."[38] Medical staff at Camp J are not being housed at Camp J.[39] Nurse Park testified that at least one nurse working at Camp J is married to a nurse who works elsewhere at LSP. Medical staff at Camp J, including Nurse Park, who lives on LSP grounds, are taking their clothes home with them from Camp J to wash.[40] Per CDC guidance, dirty laundry should be handled by someone wearing gloves and can disperse the virus through the air if shaken.[41]

    Defendants' use of Camp J also creates a substantial risk of serious harm for the COVID-negative Class Members who were previously housed at Camp F and were moved to Camp J to work. The Court heard testimony from Patrick Courtney, who is held at Camp F and works as a baker. Mr. Courtney testified that on April 17, he was told he was moving to Camp J for a new work assignment. Mr. Courtney testified that he feared COVID-19 exposure because he has high blood pressure, so he refused. As a result, Mr. Courtney was disciplined for the first time in 15 years (his last infraction was for taking too many cinnamon rolls from the kitchen) and held in administrative segregation for five days. He also had his phone privileges taken for four days and was sentenced to a 90-day suspended cell sentence.[42] This put Mr. Courtney—who has a pardon pending on the governor's desk—at risk of losing his parole and pardon board clemency recommendation.

---

[38] Pls.' Ex. 31, Supp. Falgout Aff. at ¶ 16.
[39] Stipulated Facts, Dkt. 41 at ¶ 26.
[40] Nurse Park testified to this fact in direct contradiction to Defendants' previous representations that employees were leaving their clothes at Camp J to be washed there as an additional precaution. Pls.' Ex. 31, Supp. Falgout Aff. at ¶ 16.
[41] Pls.' Ex. 34 at 18-19.
[42] Mr. Courtney's board-approved pardon application is awaiting Defendant Governor John Bel Edwards' approval, and the disciplinary write up would have affected his chances of clemency. Mr. Courtney's appeal was pending for

At least three other Class Members from Camp F are currently working at Camp J. The fact that the Secretary apologized for jeopardizing Mr. Courtney's clemency chances is irrelevant.[43] It is also not relevant that one of the four Camp F residents at Camp J says he volunteered. Moving Class Members to Camp J knowingly puts them at substantial risk of serious harm, regardless of whether they volunteered. Moreover, when that Class Member volunteered, Defendants' written representation stated that they would have separate housing and no contact with COVID-19 patients,[44] which has since been proven false. Nurse Park testified that both COVID-19 patients and orderlies are staying in the Shark cellblocks, which share a single, inadequate ventilation system.[45] Duong Cao also testified that a worker from LSP came into Bass to fix the toilet.[46]

Since transfers to Camp J began on April 2, the number of COVID-19 cases at LSP has gone from zero to 67 (which does not include the patients at Camp J who were transferred from other facilities).[47] And these numbers are artificially low, as discussed further below. Three LSP patients have died.[48] 33 staff members at LSP have tested positive, and one has died.[49] These numbers are likely to increase significantly in the next few weeks even as the numbers across the rest of the state flatten. The infection is likely to rapidly spread through the large dormitories, which hold more than 80 people and do not allow for social distancing.[50] Defendants' attempt to establish at the hearing that Mr. Barrera contracted the infection in Ash 2 before being brought to Camp J simply reinforces Plaintiffs' contention that the infection has already begun to spread throughout the rest of

---

approximately 9 days. After Plaintiffs listed Mr. Courtney as a witness, LSP employees informed him the day before the TRO hearing that they would remove the write up from his record.

[43] *See, e.g.*, Defs.' Ex. 18.

[44] *See* Defs.' Ex. 48.

[45] Pls.' Ex. 27, MASS Report at 6.

[46] That exposure places that Class Member at particular risk as COVID-19 can be transmitted into the air by aerosolized feces when a toilet is flushed. *See* Alexandra Sternlicht, *supra* note 33.

[47] COVID-19 Positive Inmates, LA DPS&C, https://doc.louisiana.gov/doc-covid-19-testing/ (last visited May 4, 2020).

[48] *Id.*

[49] *Id.*

[50] Pls.' Ex. 24, Puisis Decl. at ¶ 10.

LSP, straining the already substandard healthcare system. Any additional transfers to Camp J must be halted immediately to prevent further spread.

### C. Defendants' Celebration of the "Success" of Camp J Is Both Premature and Unwarranted

As in their opposition memorandum, Defendants attempted at the hearing to present their COVID-19 response as a glowing example of unique success among correctional institutions across the country—but there is no evidence to support this bloviation. Secretary LeBlanc emphasized that "look[ing] at our numbers statewide" shows the "very positive mitigating effect" of the Camp J plan. He also insisted that "[the DOC's] numbers [of confirmed COVID-19 cases] compared to what's happening in our nursing homes, what's happening in our mental health facilities, what's happening in our federal prisons [are much better]." There is little evidence to support this self-congratulation.

One reason Defendants are able to present an inflated image of their success is the low rate of testing. Secretary LeBlanc testified that everyone who ends up at Camp J has symptoms; the DOC is "not testing anybody that's asymptomatic." He did not indicate that these testing criteria would be changed in the near future, even though other correctional systems around the country are moving to mass testing.[51] But Dr. Vassallo testified that many COVID-19 cases present with no symptoms; limiting testing only to symptomatic individuals necessarily undercounts the number of confirmed cases. Indeed, while it is true that only 278 individuals within the state prison population had tested positive as of April 30, the DOC had tested only 523.[52] Undertesting keeps the number of confirmed cases low, and Defendants are only too proud to flaunt those low numbers.

Moreover, Defendants obscure the true number of confirmed COVID-19 cases among the state prison population by only publishing numbers from its eight state-run facilities on their

---

[51] *See* Cary Aspinwall and Joseph Neff, *These Prisons Are Doing Mass Testing For COVID-19—And Finding Mass Infections*, THE MARSHALL PROJECT (Apr. 24, 2020, 5:32 PM), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections.

[52] Situational Awareness Report, LA. BUSINESS EMERGENCY OPERATIONS CENTER, https://www.labeoc.org/alerts/Alert_Details.aspx?id=1575 (last visited May 1, 2020).

website. Of the roughly 31,600 in DOC custody, more than half are housed in local jails that the

DOC pays to hold people on the state's behalf.[53] Secretary LeBlanc testified at the hearing that he is

responsible for these jail-housed inmates as well as those in state facilities. But the DOC does not

report on its website the number of confirmed COVID-19 cases among its jail-housed population—

which comprises putative Class Members at risk of being transferred to Camp J if they contract the

virus. Nor does the DOC website report the number of confirmed COVID-19 cases *at Camp J*.[54]

## IV. Plaintiffs Have Proven that Defendants Are Deliberately Indifferent to the Substantial Risk of Serious Harm Created by the Camp J Plan

### A. Defendants Had Actual Knowledge[55] that Camp J Was Not Suitable for Housing Medically-Vulnerable People

Plaintiffs have demonstrated that Defendants had actual knowledge that Camp J was not

suitable for housing medically-vulnerable people.[56] First, Dr. Morrison testified that he knew that

architects had said Camp J was unsuitable for medically vulnerable populations and made a number

of recommendations. Although he was unsure what those specific recommendations were, he knew

that there had been professional advice to the DOC that the building would be unhealthy and

unsuitable for people who were medically vulnerable.

Secretary LeBlanc also testified that he was aware that the building's physical infrastructure is

unsuitable for housing medically vulnerable people. He knew the recommendations from the

architects brought in by Vera—the DOC's grant partner—but explained that appropriately

rehabilitating Camp J would have cost "millions" of dollars. He admits being instrumental in the

---

[53] Jerry Iannelli, *Louisiana's Data on Coronavirus Infections Among Prisoners Is Troubled and Lacks Transparency*, THE APPEAL (May 1, 2020), https://theappeal.org/louisiana-doc-covid-19-data/.

[54] COVID-19 Positive Inmates, LA DPS&C, https://doc.louisiana.gov/doc-covid-19-testing/ (last visited May 2, 2020).

[55] Although the evidence below makes clear that Defendants did have direct knowledge of Camp J's dangers, Plaintiffs need not provide direct evidence that Defendants had knowledge of the dangers of the Camp J plan. As the Fifth Circuit has held, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004).

[56] Defendants' knowledge of the risks of the Camp J plan meets the standard for deliberate indifference. *See* Pls.' Memo. in Support of TRO, Dkt. 15-1 at 16-25; *see also* Pls.' TRO Reply, Dkt. 26-2 at 2-4.

decision to use Camp J for COVID-19 patients, despite those recommendations. He also admitted to having previously called Camp J, "not a good place to be."

Plaintiffs' Exhibit 27 is a document prepared by MASS Design Group, the architects who advised the DOC on the unsuitability of Camp J for holding medically vulnerable people. That document—the admissibility of which Defendants did not challenge—provides some of the many reasons that the conditions at Camp J are unsuitable.[57] For instance,"[a]lthough each of Camp J's five restrictive buildings primarily rely on mechanical ventilation, the resulting airflow is inadequate for infection control" and "the lack of sealed barriers between each cell in the restrictive housing structures increases the likelihood of the virus being suspended in air throughout these structures."[58] The report walks through a number of ventilation and dorm structure issues. "Early studies suggest that the ultraviolet light of the sun can disinfect the contaminated air. However, the inadequacy of natural ventilation in both Bass and the cellblocks at Camp J means that existing ventilation can't effectively disperse contaminated air and that the buildings pose a public health hazard to patients, staff, and medical personnel."[59]

## B. Defendants Have Presented No Evidence that They Relied on Appropriate Medical Expertise to Inform Their Use of the Camp J Plan as a Response to COVID-19

Dr. Morrison is not an expert in correctional medicine, infectious disease, or public health; nor is he impartial. Defendants produced over 100 pages from Dr. Morrison's emails, which prove that, to the extent he discussed Camp J with Department of Health officials, the officials advised against the plan. The Bureau of Health Services Financing for Medicaid in an email explained that

---

[57] The Court excluded the affidavit of Mr. Mansfield explaining that MASS Design Group relayed these concerns and more to the DOC, as well as the final draft of the Report.

[58] *See* Pls.' Ex. 27.

[59] *Id.* Defendants claim that rented air conditioning fixed the ventilation. Air conditioning alone would not fix the ventilation problems, but on top of that, Nurse Park, Paul Nash, and Duong Cao all testified that there is no air conditioning at Camp J.

"planning for more than one center (other than Angola) would be good . . . [s]preading out patients and building in some redundancy are helpful here in the event of a very serious outbreak."[60]

## V.  There Are Alternatives to the Camp J Plan

Secretary LeBlanc offered testimony that transferring people to Camp J was the only alternative to leaving COVID-19 patients in local jails and prisons that were incapable of providing medical isolation and/or medical treatment. As Plaintiffs have repeatedly informed Defendants since before transfers even began, that is simply not the case. Setting aside the patients at Camp J who should be receiving supplemental oxygen and other treatment at a hospital, there are other options for isolation and monitoring of patients with less severe symptoms. Defendants have instructed the local jails and prisons to transport their confirmed cases to Camp J only if patients cannot be isolated at the local facility, but the DOC has presented no evidence that the local facilities have received any guidance on setting up such isolation capabilities or held accountable for efforts to do so. There is little incentive for facilities to attempt isolation on their own when the Camp J option is available. EBR transferred 18 patients to Camp J until transfers stopped shortly after this TRO was requested. If EBR was able to create its own isolation capability, certainly it is possible that other similar facilities could do the same.

The MMS in New Orleans is also available. This would be particularly appropriate for the patients who are hospitalized and then discharged—they could be discharged to the MMS and in close proximity to a hospital. There are 387 beds available at the MMS as of April 30.[61] At the hearing, Secretary LeBlanc brushed off a question regarding the use of the MMS due to supposed public safety concerns, but, as he is well-aware, there are already 20 total DOC parole and probation correctional officers staffing the MMS, along with the Louisiana State Police officers. Four DOC

---

[60] Defs.' Ex. 50 at 92.
[61] Situational Awareness Report, *supra* note 52.

parole and probation officers are similarly providing security services at Camp J and could be reassigned if operations there were ceased.

### VI. Plaintiffs Have Met the Requirements of the PLRA[62]

Defendants appeared to concede at the hearing that Administrative Remedy Procedures ("ARPs") are "considered non-essential and suspended,"[63] but later represented that the ARP process itself had not been suspended, only the deadlines for Defendants to respond. Plaintiffs agree with this Court's understanding of the plain language of the plan to indicate that the process is suspended and thus unavailable, but indeterminate suspension of Defendants' deadline to respond similarly makes the process unavailable.

### CONCLUSION

For these reasons, Plaintiffs request that this Court immediately enjoin Defendants from transfers to Camp J, require a site inspection of Camp J, and require an assessment of medically appropriate isolation spaces. In the alternative, Plaintiffs request an injunction requiring Defendants to staff Camp J adequately, issue policies to ensure social distancing, ensure cleaning and PPE procedures at Camp J consistent with CDC guidance, and prohibit all cross-contamination between Camp J and the rest of LSP, including by LSP staff and patients. Should the Court decline to issue an injunction, Plaintiffs would move for accelerated discovery, including a site inspection pursuant to Fed. R. Civ. P. 34(a)(2). In either instance, Plaintiffs request that the DOC engage in active widespread testing of Class Members consistent with CDC guidance.

Respectfully submitted by:

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117

---

[62] *See* Pls.' TRO Reply, Dkt. 26-2 at 10.
[63] Defs.' Ex. 3 at 36.

Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

*Attorney for Plaintiffs*


## CERTIFICATE OF SERVICE

I, Nishi Kumar, an attorney, hereby certify that on May 4, 2020, I caused a copy of the foregoing to be filed using the Court's CM/ECF system.

I further certify that I, or another one of Plaintiffs' attorneys, will promptly electronically serve a copy of the same, along with all other pleadings and papers filed in the action to date to the General Counsel for the Louisiana Department of Corrections, the General Counsel for the Louisiana Governor, and the General Counsel for the Louisiana Department of Health, as well as the Louisiana Department of Justice Director of Litigation via email.

/s/ Nishi Kumar
Nishi Kumar, La. Bar No. 37415