## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DANIEL GUMNS, MICHAEL VIDEAU,
TREVON WILEY, IAN CAZENAVE,
REGINALD GEORGE, LIONEL
TOLBERT, OTTO BARRERA, KENTRELL
PARKER, MICHAEL ROBINSON, JULIUS
ALLEN, ERNEST ROGERS, ALFOANSO
GARNER, BRADLEY WINTERS,
KENDRICK WILSON, and JAMES
HUGHES, on behalf of themselves and all
similarly situated individuals

CIVIL ACTION NO.

20-231-SDD-RLB

VERSUS

JOHN BEL EDWARDS, in his official capacity
as Governor of the State of Louisiana;
LOUISIANA DEPARTMENT OF PUBLIC
SAFETY & CORRECTIONS; JAMES
LEBLANC, in his official capacity as Secretary
of the Department of Safety and Corrections;
JOHN MORRISON, in his official capacity as
Medical Director of the Department of Safety
and Corrections; LOUISIANA
DEPARTMENT OF HEALTH; and
STEPHEN R. RUSSO, in his official capacity
as Interim Secretary of the Louisiana
Department of Health

### RULING

This matter is before the Court on the *Emergency Motion for Temporary Restraining Order Enjoining Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary*[1] filed by Plaintiffs, Daniel Gumns, Michael Videau, Trevon

---

[1] Rec. Doc. No. 15.
Document Number: 60212

Wiley, Ian Cazenave, Reginald George, Lionel Tolbert, Otto Barrera, Kentrell Parker, Michael Robinson, Julius Allen, Ernest Roers, Alfoanso Garner, Bradley Winters, Kendrick Wilson, and James Hughes, on behalf of themselves and all similarly situated individuals (collectively, "Plaintiffs").[2]   Defendants, John Bel Edwards, in his official capacity as Governor for the State of Louisiana ("Governor Edwards"), the Louisiana Department of Public Safety & Corrections ("DOC"), Secretary James LeBlanc ("Sec. LeBlanc"), in his official capacity as Secretary of the Department of Public Safety and Corrections, Dr. John Morrison, in his official capacity as Medical Director of the Department of Public Safety and Corrections,[3] the Louisiana Department of Health ("LDH"), and Stephen R. Russo ("Russo"), in his official capacity as Interim Secretary of the Louisiana Department of Health (collectively, "Defendants")  have filed *Oppositions*[4] to Plaintiffs' motion.  The Court held an evidentiary hearing on Plaintiffs' motion on April 30, 2020, and the Parties submitted Post-Trial briefing.[5]   For the following reasons, Plaintiffs' motion shall be denied.

## I.    BACKGROUND

The subject of Plaintiffs' motion is the COVID-19 response transfer plan developed by Defendants, by which COVID-19 positive inmates housed in state and parish jails and prisons are transferred to Camp J, at Louisiana State Penitentiary at Angola ("LSP"), for

---

[2] Plaintiffs have also moved for class certification, which remains pending before the Court.  Rec. Doc. No. 25.
[3] Although Dr. Morrison's employment with DOC ceased on April 14, 2020, no defendant has been substituted for his position, and Dr. Morrison testified at the hearing on this matter.
[4] Rec. Doc. Nos. 24, 32, & 38.
[5] Rec. Doc. Nos. 47 & 48.  Governor Edwards and Russo adopted the brief filed by the DOC Defendants.
Document Number: 60212

isolation and medical monitoring.  Camp J is remotely located in a self-contained cell block at LSP that was moth-balled by the LSP in 2018.

The COVID-19[6] pandemic has caused a global crisis and has greatly affected this country's prison populations.  The parties agree[7] that COVID-19 is a viral pandemic that poses an ongoing threat to the health and safety of all residents of Louisiana and is highly infectious. The incubation period of COVID-19 is 2 to 14 days.  Symptoms of COVID-19 can include fever, cough, chest pain, headache, loss of smell, diarrhea, aches, vomiting, difficulty breathing, and can result in pneumonia. People positive for COVID-19 can present with no symptoms, and COVID-19 tests can provide false negatives.  People over the age of 65 are at higher risk of developing serious symptoms if they contract COVID-19.  People with certain pre-existing medical conditions—including chronic lung disease, asthma, heart conditions, immune deficiencies, severe obesity, diabetes, chronic kidney disease, liver disease, HIV or AIDS, prolonged use of corticosteroids, cancer, smoking, and bone marrow or organ transplant—may be at a higher risk of developing serious symptoms if they contract COVID-19. There is currently no cure or vaccine for COVID-19, and it can be deadly.

## II.  ARGUMENTS

Plaintiffs purport to represent a class defined as: All prisoners and pretrial detainees who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices.[8] Plaintiffs propose a declaratory and injunctive subclass of all incarcerated individuals who

---

[6] The Court may refer interchangeably to "COVID-19," the "coronavirus," or the "virus."
[7] All stipulated facts are set forth in Rec. Doc. No. 41.
[8] Rec. Doc. No. 1, ¶ 208.
Document Number: 60212

are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices ("Subclass I").[9] Plaintiffs propose a declaratory and injunctive subclass of all individuals being held in pre-trial detention who are, or will in the future be, subjected to the medical care policies and practices of the DOC, and subjected to the DOC's COVID-19 policies and practices ("Subclass II").[10]

Plaintiffs sued Defendants pursuant to 42 U.S.C. § 1983, alleging that Defendants have violated the Eighth Amendment rights of Subclasses I & II in their deliberate indifference to the serious risk of harm posed by COVID-19, and violated the Fourteenth Amendment rights of Subclass II to reasonably safe living conditions. Plaintiffs contend LSP is not equipped to treat COVID-19 patients and is incapable of providing adequate treatment for life-threatening symptoms because it is located over an hour from the nearest hospital. Plaintiffs also contend that Camp J is unfit for housing healthy inmates, much less sick inmates, and Defendants' transfer plan threatens the lives of LSP's medically vulnerable population by increasing the risk of transmission of the coronavirus among LSP's population.[11]

Defendants oppose Plaintiffs' motion and defend their transfer plan and the use of Camp J as an isolation dorm for COVID-19 positive inmates. Defendants offer evidence that the Camp J isolation plan was developed collaboratively among the Defendants, related state agencies, and members of law enforcement, and in consultation with CDC

---

[9] *Id.* at ¶ 209.
[10] *Id.* at ¶ 210.
[11] Plaintiffs' reliance on this Court's Text Order in *Lewis v. Cain*, 15cv318-SDD-RLB, Rec. Doc. No. 578, is misguided and inappropriate. The Court has made no findings in *Lewis v Cain* regarding the breadth or scope of medical practices at LSP that the Court may deem constitutionally deficient.
Document Number: 60212

guidelines.   Defendants submit that Camp J is suitable to house and monitor COVID positive inmates for temporary isolation purposes.   Defendants maintain that Plaintiffs' claims are not justiciable because Plaintiffs failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA").[12] Defendants further maintain that Plaintiffs have failed to meet the burden for the issuance of a TRO or preliminary injunction.

## III.    EXHAUSTION OF REMEDIES

The Parties dispute whether Plaintiffs in this matter are required to exhaust administrative remedies under the PLRA.  Plaintiffs contend the Administrative Remedy Procedures ("ARP") process was suspended by the DOC's Continuity of Operations Plan ("COOP").[13]   At the evidentiary hearing, counsel for Defendant argued that the ARP deadlines were extended, but exhaustion was still required, and the ARP process is still available to inmates.  Plaintiffs argue that, "[i]n any event, given the imminent risks of COVID-19 in Louisiana prisons, Plaintiffs cannot be expected to complete a lengthy exhaustion process."[14]   The Plaintiff's position lacks legal support. In the context of COVID-19 exigencies, the Fifth Circuit has recently made it clear that there is no emergency exception or "interest of justice" exception to the PLRA's exhaustion requirement.[15]

---

[12] 42 U.S.C. § 1997e(a).

[13] Rec. Doc. No. 26-2, p. 11 (quoting LSP COOP Attachment 8, p. 18).

[14] *Id.*

[15] *Valentine v. Collier*, 2020 WL 1934431 (5th Cir. Apr. 22, 2020);  *Marlowe v. LeBlanc*, ---- Fed. Appx. ---, 2020 WL 2043425 (5th Cir. Apr. 27, 2020). *Marlowe* involved an inmate's complaints about the prison's response to the COVID pandemic. The Fifth Circuit found that: "The district court's exhaustion analysis under the Prison Litigation Reform Act runs counter to Supreme Court precedent. The district court acknowledged that Plaintiff failed to exhaust administrative remedies. It nonetheless excused the plaintiff, reasoning that 'the interests of justice' compelled it to act on an emergency basis. *See Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008). As this court explained in *Valentine*, such an approach is out-of-step

Document Number: 60212

In the present matter, the evidence regarding exhaustion is scant.  A strong argument could be made that *Valentine* and *Marlowe* compel dismissal for failure to exhaust administrative remedies. However, the Defendants' COOP[16] categorizes ARP's as "non-essential and *suspended*." The Defendants' contention that the COOP merely suspended response times is unsupported by the plain language of the COOP.[17]  The evidence in this case establishes that the DOC was operating pursuant to COOP Level Red, under which ARP was suspended.

## IV.    STANDARD FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy, to be granted only if Plaintiffs clearly demonstrate (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the Defendants, and (4) that granting the preliminary injunction will not disserve the public interest.[18] The purpose of a temporary restraining order is to "preserve the status quo and prevent irreparable harm

---

with Supreme Court precedent, *Valentine*, at *6–7, and this court has disavowed the 'interests of justice' exception embraced in *Johnson*, *see Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) (holding that *Underwood v. Wilson*, 151 F.3d 292 (5th Cir. 1998), which *Johnson* relied on, was "tacitly overruled and is no longer good law to the extent it permits prisoner lawsuits challenging prison conditions to proceed in the absence of pre-filing administrative exhaustion"). It must be acknowledged that Superintendent LeBlanc issued an order on March 23 temporarily suspending the administrative deadlines for replying to grievances, and such order may have affected the "availability" of exhaustion. But Plaintiff makes no effort to explain the impact of that order on his refusing to file a grievance or on the way in which it would have been processed. The record, moreover, indicates that grievances are currently being processed within 48 hours. Dist. Ct. Order at 6 n.3."

[16] Exhibit D-3.

[17] Attachment 8 of the DOC's COOP provides that, during "Level Red" conditions (which is the triggering event for using Camp J as an isolation site), "[t]he following facility operations will be considered non-essential and suspended. . . Legal - ARP/Property Claims/Appeals." *Id.* Attachment 8, pp. 16-18.

[18] *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted); *Justin Industries v. Choctaw Securities, L.P.*, 920 F.2d 262 (5th Cir.1990).

Document Number: 60212

just so long as is necessary to hold a hearing, and no longer."[19] "Additionally, in accordance with the Prison Litigation Reform Act ('PLRA'), preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the federal right, and be the least intrusive means necessary to correct the harm."[20]

## V.   FEDERAL COURTS AND STATE PRISON POLICY, GENERALLY

Federal Courts eschew toward "minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions."[21]   In a case challenging a state prison transfer policy, the Supreme Court warned against federal courts making decisions regarding "the day-to-day functioning of state prisons and involve[ing] the judiciary in issues and discretionary decisions that are not the business of federal judges,"[22] noting that "[t]he federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States."[23]

As this Court held in *Lavergne v. Cain*, "[w]hen weighing any form of injunctive relief, federal courts must be mindful not to jump at the chance to take prison administration into their own hands and out of the hands of the people entrusted with such tasks by the state."[24]   Further, "[c]ourts have recognized that unwarranted intrusions by

---

[19] *RW Development, LLC v. Cuningham Group Architecture, Inc.*, 2012 WL 3258782, at *2 (S.D. Miss. Aug. 8, 2012) (citing *Granny Goose Food, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974); *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

[20] *Hood v. Vessel*, 2013 WL 12121562, at *1 (M.D. La. May 14, 2013) (citing 18 U.S.C. § 3626(a)).

[21] *Williams v. Edwards*, 547 F.2d 1206, 1211-1212 (5th Cir. 1977)(citing *Procunier v. Martinez*, 416 U.S. 396, 404-05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)).

[22] *Mecham v. Fano*, 427 U.S. 215, 228-229 (1976).

[23] *Id.* at 229 (citing *Preiser v. Rodriguez*, 411 U.S. 475, 491-492, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969)).

[24] 2016 WL 5899972 at *2 (M.D. La. Oct. 7, 2016)(citing *Williams v. Edwards*, 547 F.2d 1206, 1211-12 (5th Cir. 1977) ("The Supreme Court has articulated for the federal courts a policy of minimum intrusion into the affairs of state prison administration; state prison officials enjoy wide discretion in the operation of state penal institutions.")).

Document Number: 60212

the courts can be disruptive to the prison administrators, who are often in the best position to operate the prison in a fashion that is best for the security of prisoners and outsiders alike."[25]

The Court looks to the Fifth Circuit's recent decisions in *Valentine v. Collier*[26] and *Marlowe v. LeBlanc*,[27] which presented challenges to prison conditions in the context of the COVID-19 pandemic, to guide its analysis.

## VI.    EIGHTH AMENDMENT DELIBERATE INDIFFERENCE TO MEDICAL NEEDS

The Eighth Amendment imposes on prison authorities a duty to protect prisoners.[28] This duty is violated "only when two requirements are met. First, as an objective matter, the deprivation or harm must be sufficiently serious. Second, the official must have been deliberately indifferent."[29] To satisfy the first element, "the plaintiff must show an objectively intolerable risk of harm."[30] The second requirement is subjective and requires that the plaintiff show the defendant "(1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; (2) subjectively drew the inference that the risk existed; and (3) disregarded the risk."[31]

In the context of the request for injunctive relief, the question is whether Plaintiffs are substantially likely to succeed on their claims that the Defendants' plan to isolate COVID-19 positive inmates at Camp J violates the Plaintiffs' Eighth Amendment and

---

[25] *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (discussing the importance of preserving penal institution's administrative authority)).
[26] 2020 WL 1934431 (5th Cir. Apr. 22, 2020).
[27] 2020 WL 2043425 (5th Cir. Apr. 27, 2020).
[28] *Jason v. Tanner*, 938 F.3d 191, 195 (5th Cir. 2019).
[29] *Id.* (cleaned up).
[30] *Valentine*, 2020 WL 1934431, at *3 (quotation marks omitted).
[31] *Id.* (cleaned up).

Document Number: 60212

Fourteenth Amendment rights.[32]  For the following reasons, the Court finds that Plaintiffs have failed to meet their burden.

## VII.   FINDINGS OF FACT AND CONCLUSIONS OF LAW[33]

### A. Substantial Likelihood of Success on the Merits

1. <u>Development of the DOC COVID-19 Response and Camp J Transfer Plan</u>

Plaintiffs argue that Defendants' COVID-19 response plan is nothing more than a standard flu plan and is not adequately responsive to the specific risks presented by the virus.  The evidence does not support this argument.  The record is replete with evidence of deliberate and thoughtful efforts by the Defendants to develop a response plan for Louisiana inmates. The evidence revealed considerable time, effort, and collaboration among the Defendants to develop prophylactic measures for the prison population well before Louisiana had a single confirmed COVID-19 case.[34]  First, LSP developed a customized facility plan to address COVID-19,[35] suspended visitation, volunteering, tours, routine transfers from the local level, and postponed special events such as the Angola spring rodeo.[36]  The DOC created a COVID-19 webpage and two COVID-19 informational videos for all offenders, available in both English and Spanish.

On February 28, 2020, Sec. LeBlanc sent a memo to "All DPS&C Staff and All State Prison Offenders" regarding COVID-19, advising that DOC was "taking precautions

---

[32] *See Valentine*, 2020 WL 1934431, at *3 (prisoners' entitlement to injunctive relief depends on showing of deliberate indifference).

[33] The Court's factual findings are drawn from all memoranda and attached exhibits submitted by the Parties and the documentary and testimonial evidence presented and admitted at the TRO/Preliminary Injunction hearing.  The Court has considered all arguments and evidence submitted in connection with this motion, whether or not specifically addressed herein.

[34] Exhibit D-2, p. 12. The first reported COVID-19 case in Louisiana was March 9, 2020. Exhibit D-5.

[35] Exhibit D-4.

[36] Exhibit D-7.

Document Number: 60212

and reviewing our preparedness plans to begin now taking steps to prevent the possible spread and decrease exposure risks."[37] He related personal protection measures recommended by the CDC; informed offenders that risk screening would start and that such screening could result in visits being denied; and concluded by stating that DOC was "reviewing our emergency response plan to ensure that we are prepared should our preventive measures not be enough to keep us from having a confirmed case."[38] The record reflects that Sec. LeBlanc continued to consult with agency representatives and heads of law enforcement regarding the risk of exposure, obtaining inventory for hygiene and protection supplies, and suspending visitation and non-emergent transfers.[39]

On March 10, 2020, DOC issued Regulation No. HCP26, Health Care Policy - Infection Control[40] which reduced to writing the COVID-19 response. The regulation directed that DOC, *inter alia*, establish an incident command team, designate a pandemic coordinator, maintain adequate supplies (gloves, masks and hand sanitizers, among others), begin screening, waive healthcare copayment fee for offenders, and ensure that health care personnel are updated with the latest CDC recommendations.[41] Sec. LeBlanc directed DOC staff that "the health of our agency (staff and population) is important and our preparedness should not be taken lightly."[42]

Within days of the first reported COVID-19 case in Louisiana, DOC's Medical Director, Dr. Morrison focused on efforts to "keep the virus from entering our state-run

---

[37] Exhibit D-1.
[38] *Id.*
[39] Exhibit D-2.
[40] Exhibit D-4.
[41] *Id.*
[42] Exhibit D-50, p. 15.
Document Number: 60212

facilities."[43] The DOC identified quarantine areas,[44] and developed criteria for COVID-19 testing of inmates.[45] Dr. Morrison testified that the DOC did not wait until inmates had COVID-19 symptoms to test; rather, inmates' temperatures were checked, and any inmate with greater than 100º fever was isolated.  Dr. Morrison testified that this testing measure exceeded CDC testing guidelines for prisons.

The record also establishes that, as more data, information, and guidance became available, Defendants updated its guidance to DOC prisons and staff in accordance with evolving CDC guidelines, and the agency and DOC doctors continually conferred to update and adapt DOC's response plan to the ever-changing situation.[46]  The record evinces continuous consultations and discussions amongst the Defendants regarding CDC guidance, protective equipment, and testing.[47] The wealth of evidence undermines Plaintiffs' claim that the Defendants had only a generic pandemic plan not specifically responsive to COVID-19.

Dr. John Morrison testified at the TRO/Preliminary Injunction hearing.  The Court accepted Dr. Morrison as a medical expert in the field of surgery and found his testimony credible.  Dr. Morrison testified that, at the onset of the pandemic, he contacted Dr. Alex Billoux, Assistant Secretary of Health for the LDH, to discuss the impending spread of the virus.  Dr. Morrison testified that he regularly consulted with the LDH and the CDC, and the documentary evidence submitted by Defendants confirms this fact.[48]  Each DOC

---

[43] March 12, 2020 e-mail. *Id.* at p. 16.
[44] *Id.* at p. 23.
[45] Exhibit D-5, p. 24.
[46] Exhibits D-15, D-16, D-17, D-18, D-24, D-50, pp. 35-37, 40, & 43.
[47] *See* Exhibits 25, 26, 29, 30, & 50, pp. 62, 69, 70-73, 81-82, 84-88.
[48] *See* Exhibit D-50. This directly contradicts the attestation of Plaintiff's expert, Dr. Puisis, who attested that there was no evidence that the Department of Health was involved in the decision to use Camp J as an isolation facility.  Rec. Doc. No. 24, ¶ 16.
Document Number: 60212

location was asked to review their respective COOPs and were instructed to identify where and how that facility would isolate COVID positive inmates. Some facilities had limited isolation capacity, so the DOC determined that it needed an alternative to prevent local facilities from becoming overwhelmed. The DOC recognized in March that a plan was needed to prevent overwhelming DOC facilities with less space and resources. As the DOC was contemplating this problem, Sec. LeBlanc and Dr. Morrison asked Assistant Warden Nurse Practitioner Tracy Falgout ("Falgout") and his team to evaluate the possibility of using Camp J to isolate COVID-19 positive inmates. Ultimately, DOC developed a plan to move COVID-19 positive inmates to Camp J to serve as disease prevention for the main prison populations and to curtail the spread of the disease. DOC's isolation plan was not unlike the stay-at-home initiatives implemented throughout our country in an effort to "flatten the curve" and prevent overwhelming our hospitals. The DOC chose to isolate COVID-19 positive inmates in order to protect the general population and prevent overwhelming local prisons that lacked the capacity to isolate infected inmates.

Dr. Morrison testified that Camp J was a good solution because it: (1) is isolated from LSP main prison area; (2) would alleviate the isolation limitations of Louisiana's smaller prisons and parish jails; (3) would have a monitoring staff dedicated solely to the patients at Camp J; (4) could operate as a self-contained prison; (5) would have access to a dedicated ambulance; and (6) inmate workers at Camp J would remain housed there and not return daily to LSP general population.

Under the plan, COVID-19 positive inmates transferred to Camp J are isolated in an open bay dorm called "Bass." Once an inmate meets the CDC requirements showing

Document Number: 60212

improvement, the inmate is transferred to a step-down unit, "Gar" (and later "Shark") to complete isolation. After continued improvement meeting the CDC criteria, the inmate is returned to the transferring prison or jail.

The DOC presented evidence that it spent thousands of dollars to provide air conditioning and other upgrades like new beds for Camp J.[49]  The record establishes that beds in the Bass open bay dorm were placed six feet apart to comply with CDC social distancing guidelines, and Camp J was thoroughly cleaned prior to occupancy.

In support of the argument that Camp J is constitutionally unsuitable, Plaintiffs offered the Declaration of Dr. Michael Puisis, an internist who has worked in correctional medicine for 35 years.[50]  Most of Dr. Puisis' Declaration details his opinion that LSP provides deficient medical care generally, is overpopulated and understaffed, is comprised largely of vulnerable inmates, and is unprepared and/or unequipped to address the COVID-19 pandemic.[51]  Dr. Puisis disagrees with the Camp J transfer and isolation plan, concluding that the transport process would increase the risk of transmission and affect not just LSP but the entire parish, and LSP is unable to adequately provide medical care and monitoring of COVID-19 patients.[52]  Dr. Puisis attested that there was no evidence that the Department of Health was involved in the decision to use Camp J as an isolation facility,[53] an attestation that was overwhelmingly contradicted by the evidence. Dr. Puisis was critical of the transfer plan for failing to address

---

[49] Exhibit D-45.
[50] Exhibit P-24.  Dr. Puisis has been accepted by this Court in previous cases as an expert in correctional medicine, and Dr. Puisis has evaluated LSP in the course of other civil rights prison litigation, and he previously monitored LSP for the Department of Justice.  He was not offered or accepted as an expert in this matter at the hearing.
[51] *Id.* at pp. 1-5.
[52] *Id.* at ¶ 14.
[53] *Id.* at ¶ 16.
Document Number: 60212

hospitalization or LSP's capacity to provide appropriate medical care while maintaining isolation and quarantine,[54] and for failing to set forth adequate protocols for medical isolation of Camp J from the rest of LSP.[55]  Dr. Puisis admitted that LSP's COVID-19 screening protocols are "consistent with recommendations of the Centers for Disease Control (CDC) correctional guidelines."[56]  Despite this acknowledgment, Dr. Puisis nevertheless "question[s] the ability to effectively carry out the procedures as stated."[57] Notably, Dr. Puisis has not been to Camp J since 2018.[58]

The Court finds Dr. Puisis' conclusions general, speculative, not based on firsthand knowledge of the current conditions or activities in Camp J, and in some instances, refuted by Defendants' evidence. By Dr. Puisis' admission, the screening protocols used to identify inmates for isolation were consistent with CDC guidelines. The Court finds that Defendants' evidence established that the Camp J isolation and step-down protocols were consistent with available guidance and best practices.

Plaintiffs have failed to present evidence that Defendants developed the transfer plan with knowing disregard for a serious risk of harm substantially certain to occur.  To the contrary, the Court finds that the plan was carefully developed to limit the impending harm of the spread of coronavirus throughout all prisons and jails in the state of Louisiana, and as set forth below, the alleged harm has not materialized.

---

[54] *Id.* at ¶¶ 18-19.
[55] *Id.* at ¶ 20.
[56] *Id.* at ¶ 11.
[57] *Id.*
[58] *Id.*

Document Number: 60212

    2.  <u>The Conditions at Camp J</u>

Plaintiffs ask the Court to find the conditions and care at Camp J so abhorrent as to be constitutionally infirm.  The documentary and testimonial evidence establish the following. LSP has one entrance.  Camp J is located on LSP's 1,800-acre campus and is geographically remote from LSP's main prison camps.[59] Camp J is comprised of four buildings and a nurses' station. The Defendants offered evidence that "those parts of Camp J that will house inmates for isolation have been fully climate controlled with central air conditioning purchased/leased by DOC for these purposes."[60]

Camp J is staffed by Nurse Practitioner Cindy Park ("Park"), two to three registered nurses, and a respiratory therapist, who was added to the team in the third week of April 2020.  Park testified at the hearing, and the Court found her credible and knowledgeable.[61]  Park and her team are assigned to work only at Camp J and are provided full personal protection equipment ("PPE"). Park is in Camp J from 7:30 am until 4:30 pm, Monday through Friday, and she also makes rounds on Saturdays and Sundays. The nurses at Camp J make rounds every six hours at Bass, and the respiratory therapist works twelve-hour shifts.  The testimony regarding the level of medical monitoring provided to isolation inmates was corroborated by Plaintiff inmate witnesses Nash and Cao.

All initial intakes are housed at the Bass unit for early isolation and monitoring.

---

[59] *Id.* at ¶¶ 10-11.
[60] Tracy Falgoust Declaration, Rec. Doc. No. 24-3, ¶ 13.
[61] Plaintiffs spend some time attacking Park's character, calling her "unconcerned" and "cavalier" and suggesting that her testimony was lacking in candor because it was given in the presence of her supervisors. Rec. Doc. No. 48, pp. 13-14.  The Court observed Park and did not reach these conclusions. The Court found Park to be credible, honest, and dedicated to caring for those isolating at Camp J.
Document Number: 60212

Bass is an open dormitory with 41 beds. While there are no physical dividers between the beds at Bass, the beds are six feet apart.  As of the date of the hearing, there were approximately 40 people housed at Bass. All Bass patients are given masks that are replaced upon request, and Camp J patients are also provided with bleach and disinfectant soap.  Park testified that social distancing at Bass is "easy to do."

The Gar step-down unit has eight tiers with thirteen cells to a tier, and one patient per cell.  Shark is another step-down unit with four tiers on one side and one tier on the opposite side, and patients are housed one per cell.  The "far side" of Shark is where Camp J inmate-workers are housed. There are no call buttons in the cells, and the beds in the cells are bolted against the walls.  Park testified that Shark was opened as a second step-down unit during the third week of April because Gar was full of recovering patients. Park testified that she has not observed mold at Camp J.

Putative Class members Paul Nash ("Nash") and Duong Cao ("Cao"), who were isolated at Camp J following positive tests for COVID-19, testified before the Court.[62] Nash and Cao testified generally that Camp J is dirty, contains mold, has poor ventilation and some non-functioning toilets, and they have seen rats and spiders in the cells.  Some of this testimony was refuted by the testimony of Cindy Park and photographs submitted of Camp J.[63]

Plaintiffs also offered a report by architects who evaluated Camp J before it closed back in 2018.  These architects concluded that Camp J was unsuitable housing for

---

[62] Plaintiffs also called Patrick Courtney to testify.  Courtney testified that he was penalized by LSP for refusing to work at Camp J for fear of contracting the virus.  Sec. LeBlanc testified that the disciplinary write-up for this refusal had been dismissed, he had apologized to Courtney for the write-up, and testified that no LSP inmates would receive discipline for refusing to work at Camp J.
[63] Exhibits D-21 & D-32.
Document Number: 60212

inmates because of its "remoteness to the main prison, its poor spatial ergonomics, [and] its unsanitary conditions;"[64] however, Plaintiffs admitted that these architects have not been to Camp J since 2018.

The Court finds that Plaintiffs have failed to establish that the current conditions of Camp J present an intolerable risk of harm to the inmates temporarily housed there for limited duration isolation and monitoring.  The DOC presented evidence that Camp J resources were employed to climatize,[65] clean, and prepare Camp J to function strictly as a temporary isolation dorm.  Ironically, Camp J inmates are provided masks, bleach, and disinfectant soap - items that were largely unavailable to the general public in early April. The Court acknowledges that the conditions of Camp J may not be ideal for long-term or permanent housing; however, considering the purposes for which Camp J is being used, the conditions of Camp J are not unconstitutional.

Further, the Court draws a significant distinction between housing inmates at Camp J indefinitely and using Camp J as a temporary isolation dorm. The architect opinions relied upon by the Plaintiffs as support for their argument that Camp J is unsuitable for use as housing are irrelevant. Those opinions, rendered in 2018, were given in the context of re-purposing Camp J for use as assisted living housing for aged and infirm inmates.[66]   The Court finds it disingenuous for Plaintiffs to rely on this study as evidence of deliberate indifference under the very different circumstances presented

---

[64] Exhibit P-27, p. 8.
[65] The evidence of the nature and extent of climatization undertaken to ready Camp J is unclear. The Court took note of Nurse Practitioner Park testimony that Camp J was not air conditioned. This conflict in the evidence does not alter the Court's finding that Camp J is constitutionally adequate to be used for temporary isolation and medical monitoring.
[66] Testimony of Secretary LeBlanc and Dr. Morrison.

Document Number: 60212

herein.

### 3. Inadequate Medical Care at Camp J

Plaintiffs also complain that infected inmates at Camp J are not being provided adequate medical care/monitoring.[67]  Piggy backing on the claims made in *Lewis v Cain*,[68] Plaintiffs argue that the medical care at LSP is constitutionally infirm and thus ill-equipped to address the medical needs of COVID-19 inmates.[69]  Pointing to the administration of oxygen and IV fluids in the Bass dorm at Camp J, Plaintiff's argue that it is being used as a medical facility. Citing Assistant Warden Terry Falgout's Declaration that Camp J would not provide oxygen, IVs, or ventilators,[70] Plaintiffs argue that Camp J is being utilized for medical care that was not part of the Camp J transfer plan.

The evidence established that, as of the date of the hearing, there were three or four patients in the Bass unit at Camp J on IV fluids and three or four patients receiving oxygen.[71] It is true that Falgout attested such treatment would not be provided at Camp J.  However, Warden Falgout also attested that, "[a]s the COVID crisis presents new challenges daily, LSP's response continues to evolve, and LSP staff is prepared to adapt as necessary."[72]  The Court does not find this purported "contradiction" as meaningful as

---

[67] Strangely, Plaintiffs' counsel offers evidence of certain Plaintiffs' preferences to recover at home or be treated at the hospital.  Such preferences are simply irrelevant in a prison setting.  "It is also well established that an inmate has no constitutional right to have the treatment he prefers or the best medical treatment available."  *Baughman v. Garcia*, 254 F.Supp.3d 848 (S.D. Tex. 2017)(citing *Estelle*, 429 U.S. at 105–06, 97 S.Ct. 285; *see also Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982) ("The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare and Medicaid provide for the aged or the needy.")).

[68] *See supra* note 11, a class action suit alleging deliberate medical indifference in the care and treatment of inmates at LSP. The matter is under advisement and the Court has not made findings in *Lewis v Cain*.

[69] *See* Puisis Declaration, *supra* note 50.

[70] Rec. Doc. No. 24-3, ¶ 12.

[71] Testimony of Nurse Practitioner Park.

[72] *Id.* at ¶ 21.

Document Number: 60212

Plaintiffs insist, and it does not render Falgout's Declaration unreliable for lack of credibility.

Nurse Park likened the administration of oxygen and IV fluids equivalent to somewhat routine "home therapies." The Court agrees.   Furthermore, the fact that some patients at Camp J are receiving oxygen or IVs is not an indictment of Defendants' plan, nor does it demonstrate that Camp J is being used as a medical treatment facility rather than for the purpose of isolation and recovery.   Indeed, many members of the general population who test positive for coronavirus are sent home with oxygen or IV medications to be self-administered.

 Park's testimony established the general medical monitoring procedures taking place at Camp J.  Upon verified proof of a positive COVID-19 test, patients are isolated in the Bass unit for at least seven days from the date of the positive test.  If, at the end of seven days, patients remain symptomatic, they remain in Bass.  Once a Bass patient is asymptomatic without medication and without fever for three days, the patient moves to the Gar or Shark step-down units.   After a patient completes 14 days in the Gar or Shark unit, the patient is then re-tested for COVID-19.  If a patient has a negative test, he is tested again, and, if that second test is also negative, the patient is considered "recovered" and released back to the pre-transfer prison or back into the general population at LSP.[73]   Remarkably, symptomatic prisoners in Louisiana are provided a minimum of three tests while many symptomatic citizens have been unable to obtain even one test.

---

[73] Rec. Doc. No. 24-3, ¶ 14; Park testimony.
Document Number: 60212

Park and her nurses make rounds in Bass at least two times and day and at least once a day in Gar and Shark, all in compliance with CDC guidelines. The Camp J staff monitors inmates' fever, cough, and other symptoms, in accordance with CDC guidelines for determining when to end medical isolation.[74]

If a Camp J inmate's condition begins to worsen, the patient is transferred to Our Lady of the Lake ("OLOL") hospital in Baton Rouge, Louisiana.  Additionally, Camp J enjoys the use of a full-time dedicated ambulance. The Court finds it notable that 40 inmate patients[75] enjoy a dedicated ambulance.  Park testified that, on two occasions, inmates were transferred to Camp J with symptoms too severe for mere isolation, and Park appropriately coordinated the transport of these inmates to the hospital.

The testimony of Nash and Cao confirmed the medical monitoring procedures described by Park.  Nash testified that he was moved from Bienville Parish Prison to Camp J in April after developing coronavirus symptoms and testing positive while in Bienville.  Nash understood that he was transferred to Camp J for isolation and monitoring because Bienville lacked the capacity to quarantine or isolate him.

While isolated in the Bass unit, Nash testified that nurses rounded in Bass once in the morning and once in the evening, and that Park made rounds twice a day and monitored patients' temperature and blood pressure. Nash was moved to the Gar step-down unit on April 15.  On April 29, he tested negative for COVID-19. Nash testified that he understood that he would be tested one more time, and if the results are negative, he will be released from Camp J and returned to Bienville Parish Prison.

---

[74] Exhibit D-29.
[75] Symptomatic inmates who are being monitored in the Bass unit.
Document Number: 60212

Cao testified that, on April 14, he was transferred to the Bass unit from the LSP barracks after running a high fever and testing positive for COVID-19.  While isolated at Bass, Cao experienced chills, sweats, no appetite, and fever.  Cao admitted that Park checked on patients twice a day, and he continued to see Park after he was transferred to Gar.  Cao was transferred to Gar after he was fever free.

Plaintiffs focus on the medical monitoring of Plaintiff Otto Barrera ("Barrera").[76] Barerra, an LSP inmate housed in the Ash 2 dormitory, developed a fever and cough on April 19, 2020.[77]  On April 20, Barrera was transported by ambulance to OLOL, where he tested positive for COVID-19.[78]  OLOL evaluated Barrera and released him back to LSP that same day where he was isolated in the Bass unit at Camp J.  On April 22, Barrera was sent to the ATU unit for medical treatment.[79]  After being treated for two hours in a negative pressure room, he was returned to Camp J, against his wishes.[80] Plaintiff's offer this scenario as evidence of poor medical care and cross-contamination risks to the main LSP prison. In her testimony, Nurse Park denied that Camp J patients are being sent to the ATU for treatment. Despite this conflicting evidence, the Court finds that the evidence overwhelmingly establishes that the purpose and use of Camp J is the temporary isolation and medical monitoring of COVID-19 inmates with mild symptoms, and that inmates requiring additional medical treatment would be referred to the ATU or sent to the nearest hospital, if necessary.

---

[76] Exhibit P-49. Barrera's Declaration was admitted over Defendants' objection since it was determined that Barrera was unavailable to provide live testimony based on his being confined to a hospitalization.
[77] *Id.* at ¶¶ 5, 9.
[78] *Id.* at ¶ 11.
[79] *Id.* at ¶15.
[80] *Id.* at ¶ 16; Dr. Morrison's testimony.

Document Number: 60212

Plaintiffs offered opinion testimony from Dr. Susi Vasallo in support of their claim that the care and treatment of COVID-19 inmate-patients is constitutionally infirm. Dr. Vassallo was accepted by the Court as an expert in correctional medicine and in the care and treatment of COVID-19 patients.  Dr. Vassallo opined that the medical care being provided at Camp J falls short of the "community standard"[81] in the following ways:  the ratio of nurses to patients is insufficient; in one instance (Plaintiff Barrera), the patient's oxygen levels were not properly monitored; and patients at Camp J are being improperly cohorted, placing more vulnerable patients at increased risk, in contravention of the CDC guidance.  Dr. Vassallo also testified that, in her opinion, the Camp J patients are located too far from a hospital to receive timely emergency treatment, if required.

Dr. Vassallo was particularly critical of the treatment of Barrera while at Camp J. Dr. Vassallo testified that Camp J's staff failed to properly manage Barrera's oxygen saturation and recognize indicators that he needed hospitalization five days before he was transferred to OLOL.[82]  Dr. Vassallo explained that, based on her review of his medical records, Barrera's oxygen saturation levels had been at levels indicating a need for hospitalization for many days prior to his transport to OLOL. Dr. Vassallo described the skill and intense monitoring required to administer oxygen to COVID-19 patients, which she claims Sec. LeBlanc erroneously characterized as "basic." Dr. Vassallo testified that fever checks alone are insufficient to meet the standard of care for COVID-19 patients.

---

[81] The Court notes that the "community standard" of care is not the legal standard applicable to an Eighth Amendment claim. Rather, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency." *Gibson v. Collier,* 920 F.3d 212, 216 (5th Cir. 2019)(quoting *Kosilek v. Spencer,* 774 F.3d 63, 96 (1st Cir. 2014)(en banc)).
[82] Barrera was sent back to OLOL on April 30 after having been previously released by OLOL on April 20. Document Number: 60212

The Court was persuaded by Dr. Vassallo's testimony regarding the medical appropriateness of monitoring oxygen saturation rates of known positive COVID-19 patients. As explained by Dr. Vasallo, COVID-19 patients are subject to rapid decompensation in pulmonary function; hence, close monitoring of oxygen saturation is advisable. There is no evidence that oxygen saturation is being aggressively monitored at Camp J. While in the Court's view of the medical testimony, this is medically advisable and a reasonable protocol, the failure to monitor oxygen saturation is not deliberate indifference, particularly considering that all the medical experts roundly agreed that the COVID-19 medical protocols are ever-evolving as more is learned about the disease.

While the Court accepts Dr. Vassallo's expertise and found her opinions credible, Dr. Vassallo admitted that she had never been to Camp J to observe the conditions and monitoring taking place; thus, she lacks firsthand knowledge of the medical monitoring being performed.  Further, that Barrera was sent to OLOL initially and returned on the same day undermines the allegation that the Camp J staff failed to timely respond to Barrera's worsening condition.  The fact that Barrera was quickly sent back from OLOL likely informed the staff's delay in sending him back to OLOL later in the week.  Notably, Barrera attested that, although his nurse counseled him to remain on oxygen at all times, "it is extremely uncomfortable and sometimes I take off my mask."[83]  Thus, Barrera's admitted noncompliance may have contributed to the worsening of his condition.

Dr. Vassallo testified generally as to certain protocols at Camp J she considered to be "medically unreasonable."  As previously noted,[84] medical unreasonableness, while

---

[83] *Id.* at ¶ 18.
[84] *See supra* note 102 and discussion at page 23, *supra*.
Document Number: 60212

possibly negligent, is not evidence of deliberate indifference.  As the Fifth Circuit stated in *Gibson v. Collier*, "it can be cruel and unusual punishment to deny essential medical care to an inmate. But that does not mean prisons must provide whatever care an inmate wants. Rather, the Eighth Amendment 'proscribes only medical care so unconscionable as to fall below society's minimum standards of decency.'"[85]

Additionally, the Court is unpersuaded by the argument that the distance from LSP to the nearest hospital – approximately one hour – is deliberately indifferent to Plaintiffs' serious medical needs.  Plaintiffs cite no authority to support this argument.  Indeed, the citizens who reside in West Feliciana Parish and the employees of LSP are just as far from the hospital should they need emergency medical treatment.[86]

As to Barrera, the Court makes no specific findings whether Barrera's medical monitoring was handled in a medically reasonable manner, and that is not the question before the Court.  However, the evidence before the Court regarding his medical monitoring does not establish deliberate indifference to a serious risk of harm by the Camp J staff.  Even if Barrera's medical monitoring was negligent, the Fifth Circuit instructs that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."[87]

Most damaging to Plaintiffs' claims of inadequate medical care/monitoring is the evidence that the Camp J plan appears to be working.  Sec. LeBlanc aptly testified that,

---

[85] 920 F.3d 212, 216 (5th Cir. 2019)(quoting *Kosilek v. Spencer*, 774 F.3d 63, 96 (1st Cir. 2014)(en banc)).
[86] It is also likely that some inmates transferred to Camp J from more remote or rural parishes are actually closer to a hospital being at LSP.
[87] *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)(citations omitted).
Document Number: 60212

by comparison to the COVID-19 clusters in documented nursing homes across the country, and the documented clusters of infection and death rates being experienced within the federal Bureau of Prisons, the Camp J transfer and isolation plan is containing the spread of the virus.  That a second step-down unit – Shark – was brought online because Gar reached capacity of **recovering** patients demonstrates success, not deliberate indifference to serious medical needs.  Plaintiffs scoff at the purported "self-congratulation" of the Defendants; however, Plaintiffs have presented no evidence that inmates being sent to Camp J are not recovering.  It is Plaintiffs' heavy burden, on the current motion, to present evidence of an intolerable risk of harm, and unsupported speculation does not satisfy this burden for the extraordinary remedy of the issuance of a TRO or preliminary injunction.

    4.  <u>Cross-Contamination and Cohorting</u>

    Finally, Plaintiffs contend the DOC is deliberately indifferent to the serious risk of harm presented by the cross-contamination and improper cohorting taking place at Camp J, which increases Plaintiffs' vulnerability to contracting the virus.  Plaintiffs support this claim with evidence that some Camp J staff members return to their homes without properly sanitizing their daily PPE and live with partners who work at LSP.  Also, Camp J patients not sent to the hospital with worsening conditions are treated at the ATU in the main prison, as is the general population of LSP, thus exposing uninfected inmates to the virus.

    Nurse Park testified that she lives on LSP grounds, within two minutes from Camp J, with her husband who also works as a nurse at LSP.  She also testified that the Camp J staff wear jumpsuits, rubber boots, and PPE upon arrival. Upon leaving, they take

Document Number: 60212

decontamination showers, bag their soiled items, and wash them at home.  Inmates who are working as staff at Camp J are being housed at Camp J in a tier separate from the patients, and these inmate workers have volunteered to work at Camp J.[88] Defendants provided unrefuted testimony that LSP inmates who work at Camp J are living at Camp J and are not going back to Camp F or any other general population location at LSP.

The Court finds Plaintiffs' evidence regarding cross-contamination insufficient to rise to the level of a serious risk of harm.  That the medical staff working at Camp J return to their homes each day is not evidence of a serious risk of harm.  Indeed, this demonstrates no more risk of cross-contamination than medical care workers who serve the general public and return to their homes.  The evidence established that the medical staff at Camp J are making efforts to properly utilize PPE and provide sanitary living conditions to minimize the risk of transmission.  That the DOC staff is not perfect at eliminating any risk of cross-contamination is not evidence of deliberate indifference.

The Court is unpersuaded that the transport of worsening positive inmates at Camp J to the ATU, in lieu of the hospital, poses an intolerable or serious risk of harm.  The CDC guidelines advise to restrict transfers of incarcerated/detained persons to and from other jurisdictions and facilities **unless necessary for medical evaluation and medical isolation/quarantine**.[89]  Additionally the CDC guidance explicitly contemplates the need for "modifications based on a facility's individual structure and resources."[90]

The Court is also unpersuaded by Plaintiffs' argument regarding cohorting. Evidence was presented that some Camp J patients are choosing not to utilize PPE and

---

[88] Exhibits D-47 & D-48.
[89] Exhibit D-25, p. 14 (emphasis added).
[90] *Id.* at p. 5.
Document Number: 60212

are congregating together and playing card games rather than maintaining six feet of social distancing.  Notably, all those isolated at Camp J are already infected with the coronavirus.  While Dr. Vassallo concluded that Camp J inmates were not properly cohorting according to CDC guidelines, Dr. Morrison testified that Bass is a cohorting dorm, operating consistent with CDC guidelines.  Dr. Morrison explained that cohorting allows for the grouping of patients with similar symptoms and level of infection, and it is appropriate to cohort Bass patients in one room with negative pressure.

The CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities emphasized that: "The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."[91]  Addressing the process of cohorting in the prison setting, the CDC advises:

> Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group. Ideally, cases should be isolated individually, and close contacts should be quarantined individually. However, **some correctional facilities and detention centers do not have enough individual cells to do so and must consider cohorting as an alternative**.[92]

Express CDC guidance recognizes that cohorting may be necessary. Furthermore, the failure to strictly adhere to CDC guidelines is not *ipso facto* evidence of deliberate indifference.  In *Amos v. Taylor*, inmates at  Parchman penitentiary in Mississippi sought emergency injunctive relief requiring the Mississippi Department of Corrections' interim commissioner and superintendent to implement certain measures to prevent or mitigate

---

[91] Exhibit D-25.
[92] *Id.* at p. 3 (emphasis added).
Document Number: 60212

the spread of COVID-19.[93]  The district court denied this relief, finding that the plaintiffs failed to satisfy the requisite elements for injunctive relief.  The plaintiffs complained that, in certain instances, the prison was not in compliance with CDC guidelines or its own COVID-19 response policy.  The court found that "mere departure from recommended best practices is insufficient to show deliberate indifference." [94] It is well settled that lack of adherence to industry best practice standards is not in and of itself deliberate indifference.  "Rather, the known noncompliance must result in an excessive risk to inmate health or safety."[95]

In its analysis of the allegations of deliberate indifference, the *Amos* court found that several of the "defendants' stated policies conflicted in some ways with some of the general recommendations of the CDC Guidance."  The court noted that the undisputed evidence showed that the defendants

> made no efforts to enforce, rather than merely recommend adherence to, social distancing guidelines. The CDC Guidance also recommends that facilities provide inmates "hand drying machines or disposable paper towels for hand washing" and "tissues and no-touch trash receptacles for disposal." … None of these items are provided as a part of Parchman's response.[96]

The *Amos* court relied on the Fifth Circuit's recent decision in *Valentine* and concluded that the plaintiffs had presented insufficient evidence of deliberate indifference with respect to the prison's COVID-19 response.

> The defendants have taken numerous proactive steps to prevent the transmission of COVID-19, which they believe to be consistent with the CDC Guidance. Doc. #75-2 at ¶ 5. While there is some evidence showing incomplete implementation of the procedures, the evidence is either limited

---

[93] 2020 WL 1978382 (N.D. Miss. Apr. 24, 2020).
[94] *Id.* at *10 (citing *M.D. ex rel. Stukenberg v. Abbot*, 929 F.3d 272, 289 (5th Cir. 2019) (Higginbotham, J., concurring in part) ("Best practices are not the handmaiden of deliberate indifference.").
[95] *Id.*
[96] *Id.*

Document Number: 60212

to sporadic instances, limited to two buildings in a single unit of Parchman, or both, and therefore fails to show a policy or custom which would justify the facility-wide injunctive relief sought by the plaintiffs. *See Foster v. Tarrant Cty. Sheriff's Dep't*, No. 4:20-cv-113, 2020 WL 1906095, at *3 (N.D. Tex. Apr. 17, 2020) ("The general rule is that allegations of isolated incidents are insufficient to establish a custom or policy.") (collecting cases).

Similarly, while elements of Parchman's protocols appear to conflict with a handful of provisions in the CDC Guidance (provision of paper towels and tissues and policies enforcing social distancing), these departures are insufficient on their own to show a likelihood of success regarding deliberate indifference, particularly in light of the comprehensive and far reaching steps taken by the defendants. *Valentine*, 2020 WL 1934431, at * 4; cf. Hernandez, 110 F. Supp. 3d at 943 ("At least since the CDC released its guidelines, and since Puisis issued his report showing Defendants' policies and practices fell below the constitutional standard of care, Defendants have known about the risks of harm but have not changed their practices."). Indeed, as in *Valentine*, the evidence shows that Parchman "has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus." 2020 WL 1934431, at * 4. Accordingly, the Court concludes that the plaintiffs are unlikely to succeed on their claims.[97]

Although Plaintiffs herein attempt to distinguish this case from the facts in *Valentine*, the Court does not find the facts significantly different such that the reasoning and analysis in *Valentine* is not instructive here. In *Valentine*, the Fifth Circuit stayed pending appeal an injunction issued by a district court against a prison where the plaintiffs failed to demonstrate likely success in showing deliberate indifference.[98]  The court found that the evidence demonstrated that the prison took numerous steps to prevent transmission, including employee screenings, copay waivers, suspension of in-person visits, isolation for symptomatic inmates, masks for staff, increased cleaning in inmate areas, and increased soap access.[99]   Additionally, the plaintiffs submitted evidence

---

[97] *Id.* at *11.
[98] 2020 WL 1934431, at *4.
[99] *Id.*

Document Number: 60212

showing that at least one symptomatic inmate was not isolated; some cleaning policies were not being implemented; the prison refused to give inmates hand sanitizer, facial tissues or paper towels; information on co-pays and COVID-19 were not adequately presented to inmates; and social distancing was not being enforced.[100]  The Fifth Circuit stayed the district court's injunction, concluding that the prison was likely to succeed on the merits of its appeal because "the Plaintiffs lack evidence of the Defendants' subjective deliberate indifference" to the risk of COVID-19.[101] The Fifth Circuit reasoned:

> Though the district court cited the Defendants' general awareness of the dangers posed by COVID-19, it cited no evidence that they subjectively believe the measures they are taking are inadequate. To the contrary, the evidence shows that TDCJ has taken and continues to take measures— informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus. Although the district court might do things differently, mere "disagreement" with TDCJ's medical decisions does not establish deliberate indifference.[102]

For the same reasons articulated in *Amos* and *Valentine*, the Court finds that, while the Camp J transfer and isolation plan is not a "perfect" plan, the well-intentioned efforts to decrease the risk of harm and the spread of the coronavirus throughout Louisiana jails and prisons belies a claim of deliberate indifference.  Under the foregoing jurisprudence, occasional failures of implementation or lax enforcement of guidelines by Defendants does not constitute deliberate indifference. Plaintiffs have presented no evidence that Defendants subjectively believe their plan is inadequate, and the overall success of the plan thus far undermines Plaintiffs' claims.

---

[100] *Id.* at *4-*6.
[101] *Id.* at *4.
[102] *Id.* (citations omitted).
Document Number: 60212

### B. Harm to the Defendants & Public Policy/Safety Factors

1. <u>Harm to Defendants</u>

While Plaintiffs focus entirely on the alleged risk of harm to their purported class, Plaintiffs fail to give any real consideration to the serious potential risk of harm that an injunction would cause to Defendants.  As noted above, the DOC is not charged solely with the protection of inmates at LSP; rather, the DOC is responsible for the care and safety of all prisoners in the custody of the DOC throughout the State of Louisiana.  Dr. Morrison and Sec. LeBlanc testified that an injunction would be devastating for inmates housed at facilities that cannot safely isolate/quarantine COVID-19 positive inmates. When asked about the impact of halting the Camp J plan, Sec. LeBlanc responded that one could use his/her imagination to picture the catastrophic consequences of illness and death.  Additionally, while Plaintiffs' experts opined/testified regarding Camp J and LSP, they did not consider or reach conclusions as to the effect on the remainder of the Louisiana inmates in DOC custody if Camp J is closed. Plaintiffs presented no evidence to rebut the fact that the harm of closing Camp J outweighs any alleged speculative injuries to Plaintiffs, particularly considering the success of the Camp J plan to date.

Regarding weighing the potential harm to the state if an injunction was upheld, many of the findings by the Fifth Circuit in *Valentine* are applicable to the present matter. In *Valentine*, the court found that the injunctive relief ordered by the district court visited harm upon the State Department of Corrections. The *Valentine* court found that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration

of its prisons.'"[103] The court further found that the harm to the state Department of Corrections was "particularly acute" because the injunction "interferes with the rapidly changing and flexible system-wide approach . . . used to respond to the pandemic so far."[104] This same harm would ensue if this Court imposed Plaintiffs' notions of pandemic response on the DOC in this case.   The *Valentine* court further observed that the Department's "ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches."[105] Similarly, this Court finds that an injunction would raise serious potential risk of harm to the Defendants because it would hamstring the DOC "from responding to the COVID-19 threat without a permission slip from the district court."[106]   For the same reasoning and analysis articulated by the Fifth Circuit, the Court finds that the second factor weighs in Defendants' favor.   Plaintiffs have failed to demonstrate that the requested injunction will not cause irreparable harm to Defendants and potentially to inmates and pre-trial detainees throughout the State of Louisiana.

### 2.  Public Safety Issues with Alternative Plans

Plaintiffs acknowledge that Defendants have "instructed the local jails and prisons to transport their confirmed cases to Camp J only if patients cannot be isolated at the

---

[103] *Valentine*, 2020 WL 1934431, at *5 (citing *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651, 109 L.Ed.2d 31 (1990)).
[104] *Id.*
[105] *Id.* (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 28–29, 25 S.Ct. 358, 49 L.Ed. 643 (1905); *In re Abbott*, 954 F.3d 772, —— (5th Cir. 2020)).
[106] *Id.* The Fifth Circuit reinforced this principle in *Marlowe*, when it found that the harm from the district court's injunctive relief was "particularly acute because the district court's order interferes with the rapidly changing ... approach that [DPSC] has used to respond to the pandemic so far." 2020 WL 2043425, at *4 (quoting *Valentine*, 2020 WL 1934431, at *5).
Document Number: 60212

local facility,"[108] but complain that "the DOC has presented no evidence that the local facilities have received any guidance on setting up such isolation capabilities or held accountable for efforts to do so," and "[t]here is little incentive for facilities to attempt isolation on their own when the Camp J option is available."[109]  Clearly, Plaintiffs attempt to shift their burden of proof onto Defendants.  Plaintiffs have offered no evidence that local jails and prisons are not attempting to isolate prisoners where they can, and the claim that local jails must not be following this instructive because there is no incentive to do so is argumentative, speculative, and unsupported by evidence.  Moreover, not only is this refuted by Defendants' evidence, this is Plaintiffs' motion, and it is incumbent upon Plaintiffs to present evidence to support their claims, not Defendants.  It is improper for Plaintiffs to toss out speculative allegations then demand Defendants offer evidence to disprove them.

Also, Plaintiffs repeatedly claim that a better alternative to the Camp J transfer plan is to house COVID-19 positive inmates at the Medical Monitoring Station ("MMS") in the New Orleans, Louisiana Morial Convention Center.[110]  Plaintiffs claim Defendants have "completely ignore[d]" the availability of the MMS, "which is fully equipped to house incarcerated patients and has hundreds of empty beds."[111]  Sec. LeBlanc was asked about this purported alternative, and he testified that transferring inmates to the MMS would be a "public safety nightmare." Indeed, Plaintiffs fail to offer evidence or address

---

[108] Rec. Doc. No. 48, p. 20.
[109] *Id.*
[110] Rec. Doc. No. 15-1, p. 24, n. 168.
[111] Rec. Doc. No. 26-2, p. 2, n. 12 (citing Situational Awareness Report, *supra* note 4 ("384 beds are available.)).

genuine public safety concerns posed by the use of the MMS to house COVID-19 inmates.

Moreover, the existence of an alternative plan – even a better plan - is not evidence that the challenged plan is unconstitutional or illustrative of deliberate indifference. Whether the Plaintiffs' proffered alternative plan of using the MMS in New Orleans is feasible and better than Defendants' plan is not the inquiry.  Plaintiffs must offer evidence that the challenged plan is unconstitutional, and they have not done so.  The Court finds that the balance of the harms and the public interest weigh against the issuance of the requested TRO or preliminary injunction.

**VIII.    CONCLUSION**

Accordingly, for the reasons set forth above, Plaintiffs *Emergency Motion to Restrain Defendants from Transferring COVID-19 Carriers to Louisiana State Penitentiary*[112] is DENIED.

Signed in Baton Rouge, Louisiana on <u>May 15, 2020</u>.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[112] Rec. Doc. No. 15.
Document Number: 60212